1   Ilene F. Brookler Bar #269422
    Richard D. Greenfield
2   Marguerite R. Goodman
    GREENFIELD & GOODMAN, LLC
3   250 Hudson Street, 8th Floor
    New York, NY 10013
4   Tel: 917-495-4446

5   Lesley E. Weaver Bar #191305
    SHEPHERD, FINKELMAN, MILLER
6   & SHAH, LLP
    199 Fremont Street, 20th Fl.
7   San Francisco, CA 94105-2255
    Tel: 415-992-7282                    E-filing

8
    (Additional Counsel on Signature Page)
9

10              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11
    A. J. COPELAND, Individually and
12  Derivatively on behalf of            CV11        1058
    HEWLETT-PACKARD COMPANY

13
    Plaintiff,
14

                    v.
15                                       Civil Action No.

    RAYMOND J. LANE; GARY REINER;
16  LEO APOTHEKER; MEG WHITMAN;
    SHUMEET BANERJI; PATRICIA
17  RUSSO; DOMINIQUE SENEQUIER;
    G. KENNEDY THOMPSON; MARK V.
18  HURD; MARC L. ANDREESSEN; SARI
    M. BALDAUF; RAJIV L. GUPTA;
19  LAWRENCE T. BABBIO, JR.; JOHN H.
    HAMMERGREN; JOEL Z. HYATT;
20  JOHN JOYCE; LUCILLE SALHANY
    and ROBERT RYAN,

21
    Defendants
22              and

23  HEWLETT-PACKARD COMPANY

24  Nominal Defendant.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COMPLAINT

## NATURE OF THE ACTION AND SUMMARY OF THE CLAIMS

1.     This is a shareholder's individual and derivative action brought on behalf of Nominal Defendant Hewlett-Packard Company ("H-P" or the "Company"). No claims are asserted herein against H-P, which is a Nominal Defendant and an additional victim of the violations of the suffrage rights of Plaintiff, who is and was entitled to vote at the Company's Annual Meeting of Shareholders presently scheduled to be held March 23, 2011 and at the Company's 2010 Annual Meeting.

2.     This action charges the Defendants with using their control over H-P and its corporate suffrage process in effectuating and/or directly participating and/or aiding and abetting violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder by the Securities and Exchange Commission ("SEC") in order to perpetuate themselves in office as Directors of the Company, thereby permitting them to unjustly enrich themselves and otherwise damage the Company at its expense and the expense of its shareholders.[1]   Defendants Lane, Apotheker and the other Director Defendants named herein, together with Defendant Hurd (with respect to the 2010 Proxy Statement) are charged by this Complaint with violations of federal proxy rules and regulations by, *inter alia*, failing to disclose material facts in the Company's 2010 and 2011 Proxy Statements and/or with gross negligence in the management of the Company by, *inter alia*, engaging directly and/or through their subordinates in an unlawful and deceitful course of conduct in which the Company was mismanaged as described below.

3.     The claims arise from systemic and pervasive breaches of fiduciary duty spanning many years on the part of current and former senior officers and current and former directors of the Company in connection with, inter alia, violations of the federal Foreign Corrupt Practices Act ("FCPA") and other illegal payments by H-P employees, the payment of secret benefits and improper compensation to Defendant Hurd, the concealment of the

---

[1]   H-P's directors each receive hundreds of thousands of dollars in compensation each year including, *inter alia*, cash, stock and options.

foregoing conduct in violation of the federal securities and other laws and the reckless bidding for and ultimate acquisition by H-P for 3PAR on September 27, 2010 for $2.3 billion plus other expenses.

4.    To date, the Company has suffered substantial economic damages and damages to its reputation as a direct result of the wrongdoing alleged herein and, further, H-P's directors (other than those who have resigned before or effective March 23, 2011) are likely to be elected/re-elected to their positions in the wake of and due to the issuance and dissemination of a false and misleading proxy statement issued on or about February 1, 2011 in connection with the Company's 2011 Annual Meeting of Shareholders.

5.    The allegations against Defendants are based upon personal knowledge as to Plaintiff and his ownership of shares of H-P, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of other publicly available information, including articles in the news media and on blogs; (c) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and circumstances alleged herein; and, (d) review of the shareholder derivative Complaints in actions commenced against Defendants.

6.    Plaintiff believes that substantial additional evidentiary support will exist for his allegations after a reasonable opportunity for discovery.

## I.    JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act, SEC Rule 14a-9 promulgated thereunder, as well as common law.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Count I asserts claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; and (b) pursuant to the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of

the acts charged herein, including the issuance and dissemination of the proxy statements at issue and the mismanagement of H-P, including the wrongdoing referred to below, occurred in substantial part in this District. In addition, the Company maintains its corporate headquarters in this District.

9.     In connection with the acts alleged in this Complaint, Defendants, either directly or indirectly at the times they served as directors of H-P, used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate wire facilities, to carry out the wrongdoing described herein.

10.     In additional to Plaintiff's individual claims asserted pursuant to federal law, this action has been commenced pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District.

## II.     PARTIES

### Plaintiff

11.     Plaintiff A. J. Copeland ("Plaintiff") owns and has continuously owned common stock in H-P beneficially since 1999 and throughout all of the period of the wrongdoing alleged herein.

### Nominal Defendant

12.     Nominal Defendant H-P is a corporation organized under the laws of Delaware with its principal executive offices and corporate headquarters located in Palo Alto, California. H-P manufactures and sells a wide range of computer, software, copying and related products throughout the world. It holds itself out as the "world's largest technology company."

13.     The Company conducts its operations through multiple subsidiary companies. H-P's Board of Directors and senior management exercise strict supervision, control, and dominion over the Company's subsidiaries activities, decisions, policies, and practices and, as

such, knew and/or should have known contemporaneously of the wrongdoing alleged herein and/or directly participated in such conduct by, inter alia, recklessly causing H-P to bid for and ultimately purchase 3PAR as described below. H-P's Board and senior management (including, in particular, Defendant Hurd) set the business objectives and sales goals of all of the Company's subsidiaries and they regularly reviewed and approved their budgets and projections.

**Defendants**

14.     Defendant Raymond J. Lane has been a Director since November 2010 and, since such date, has been Chairman of the Board of the Company. Defendant Lane currently is a member of the Board's so-called "Independent Committee" appointed by the Board purportedly "to investigate, review, and evaluate the facts and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board or the Company....and to make recommendations to the Board whether H-P should commence or continue litigation concerning any of the matters raised or should adopt any new or modified corporate policies or procedures or other internal corrective measures." Defendant Lane also serves as Managing Partner of Kleiner Perkins Caufield & Byers, a private equity firm and plays a very active, "hands-on" role in connection with its investments. Defendant Lane also is a director of Quest Software, Inc. and several private companies, all of which responsibilities require his attention. As such, he has spent virtually no time to personally performing any of the investigation, review and evaluation responsibilities that he has as a member of the so-called "Independent Committee."

15.     Defendant Leo Apotheker is the Company's President and Chief Operating Officer. Defendant Apotheker is the former Chief Executive Officer of SAP, Aktiengesselschaft ("SAP"), and, according to Lawrence Ellison, Chief Executive Officer of Oracle Corporation ("Oracle"), oversaw an industrial espionage scheme that stole Oracle's software including 8 months while Defendant Apotheker was responsible for the operations of SAP. Oracle was awarded $1.3 billion by an Oakland, California jury following an 11-day trial on November 24, 2010 and SAP's admission of guilt before its commencement. The facts and

circumstances surrounding such conduct, including Defendant Apotheker's role in it, are presently being investigated by the United States Department of Justice and the FBI, according to an August 5, 2010 filing by SAP. On October 26, 2010, Defendant Lane, referring to Defendant Apotheker's role in the alleged corporate espionage, caused H-P to issue a statement that Apotheker has "limited knowledge of and role in the matter" despite the fact that he had no personal knowledge of the alleged wrongdoing and why Defendant Apotheker was in hiding to prevent process servers from serving a trial subpoena upon him.

16.     Defendant G. Kennedy Thompson was elected to the Board in 2006 and is the former Chairman and Chief Executive Officer of Wachovia Corporation ("Wachovia"). Defendant Thompson is and has been a defendant in numerous securities fraud class actions and shareholder derivative actions, many of which are still pending. During much of the Relevant Period, Defendant Thompson, as a H-P director, was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of his stewardship responsibilities to the Company and its shareholders. Indeed, he abdicated his responsibilities to the Company while overseeing the virtual collapse of Wachovia, which ultimately was rescued from collapse by being acquired by and merged into Wells Fargo & Company. By acquiescing and/or participating in the wrongdoing alleged herein, Defendant Thompson breached his fiduciary duties owed to the Company and its shareholders.

17.     Defendant Gary M. Reiner has been a member of the Company's Board for about one month. Defendant Reiner currently is a member of the Board's so-called "Independent Committee" appointed by the Board purportedly "to investigate, review, and evaluate the facts and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board or the Company....and to make recommendations to the Board whether H-P should commence or continue litigation concerning any of the matters raised or should adopt any new or modified corporate policies or procedures or other internal corrective measures." Defendant Reiner serves as Special Advisor to General Atlantic, a private equity firm. Previously, Defendant Reiner served as the Senior Vice President and Chief Information Officer at General Electric Company from 1996 until

1
2
3
4
5
6

March 2010 including the period in which this formerly great American icon became almost bankrupt in 2008 due to, *inter alia*, reckless, wholly inappropriate and high-risk acquisitions (which caused it billions of dollars in losses), an area where Defendant Reiner had significant responsibilities. In six weeks that Defendant Reiner has been on the H-P Board, he has spent virtually no time to personally performing any of the investigation, review and evaluation responsibilities that he has as a member of the so-called "Independent Committee."

7
8
9
10
11
12
13
14

18.     Defendants Joel Z. Hyatt; John Joyce; Lucille Salhany and Robert Ryan are currently directors of the Company who have tendered their resignations in the wake of the matters referred to herein are due to leave their positions at the Company's 2011 Annual Meeting of Shareholders on March 23, 2011. Each of them was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of their respective stewardship responsibilities to the Company and its shareholders. Indeed, they abdicated their responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein.

15
16
17
18
19
20
21
22

19.     Defendants Meg Whitman; Shumeet Banerji; Patricia Russo; Dominique Senequier; Marc L. Andreessen; Sari M. Baldauf; Rajiv L. Gupta; Lawrence T. Babbio and John H. Hammergren are directors of H-P who have been directors during all or part of the wrongful conduct referred to herein including the violations of the federal securities laws referred to herein. Each of them was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of their respective stewardship responsibilities to the Company and its shareholders. Indeed, they abdicated their responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein.

23
24
25
26
27

20.     Defendant Mark V. Hurd is the Company's former Chairman of the Board, President and Chief Executive Officer who was fired or voluntarily resigned his positions with the Company in connection with some or all of the conduct described herein other than H-P's acquisition of 3PAR and the issuance of the 2011 Proxy Statement, which took place following his departure.

28

21.     The individual defendants named herein are named defendants solely with

respect to the wrongdoing that occurred while they served as directors of H-P.

### III.     SUBSTANTIVE ALLEGATIONS

#### A.     The 2011 Proxy Statement and Annual Meeting

22.     On or about February 1, 2011, the Company issued and disseminated its Notice of Annual Meeting and Proxy Statement ("Proxy Statement") announcing and soliciting shareholder votes in connection with H-P's Annual Meeting of shareholders to be held March 23, 2011.

23.     Among the items of business for H-P shareholders at the Annual Meeting was to elect the directors named in the 2011 Proxy Statement, each of whom was put forward by the Company's Board of Directors. Indeed, the 2011 Proxy Statement proclaimed that "The Hewlett-Packard Company Board of Directors (the "Board") has made these materials available to you." Upon information and belief, each of the 17 H-P directors serving as of February 1, 2011 approved the content of the 2011 Proxy Statement and/or indirectly controlled its content all the while omitting material facts bearing upon how the shareholders of the Company would vote upon the Board's nominees for directorships. The 17 directors stated:

> "Our Board recommends that you vote your shares FOR each of the nominees for election to the Board, FOR the ratification of the appointment of HP's independent registered public accounting firm, FOR the approval of the compensation of HP's named executive officers, FOR the approval of an annual advisory vote on executive compensation, FOR the approval of the Hewlett-Packard Company 2011 Employee Stock Purchase Plan, and FOR the approval of an amendment to the Hewlett-Packard Company 2005 Pay-for-Results Plan to extend the term of the plan."

24.     Notwithstanding the conduct described herein, the 2011 Proxy Statement falsely says: "HP is committed to maintaining the highest standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining HP's integrity in the marketplace." The 2011 Proxy Statement goes on to state that:

> "Board Structure and Committee Composition     As of the date of this proxy statement, the Board has 17 directors and the following six standing

committees: (1) Audit; (2) Finance and Investment; (3) HR and Compensation; (4) Nominating and Governance; (5) Public Policy; and (6) Technology. The current committee membership, the number of meetings during the last fiscal year and the function of each of the standing committees are described below."

25.     In fact, by use of the term "standing committee," the Board members intentionally concealed the fact that the Board has had de facto "standing committees" for many years, designated by the full Board to investigate repeated acts of management and director wrongdoing. Most recently, the Board had a "Special Litigation Committee" since 2006, which was dealing with other continuing serious misconduct on the part of Board members and senior management. Upon information and belief, the existence of such "Special Litigation Committee" had never been terminated by the Board. The 2011 Proxy Statement deceptively excluded any reference to the latest de facto "standing committee," the so-called "Independent Committee." Notwithstanding the fact that the 2011 Proxy Statement discloses the existence and members of all other "standing committees," it deceptively fails to disclose who is on such committee, what its purported mission is and what, if anything it has accomplished. Thus, in the context of what has been disclosed in the 2011 Proxy Statement as to the Board's various committees, the identities of their members and their respective purposes, the omission of the same type of information with respect to the "Independent Committee" violates the sitting directors' disclosure obligations under and pursuant to §14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

26.     The so-called "Independent Committee" was, according to its counsel, Andrew J. Levander, Esq. of Dechert LLP (collectively "Levander"), appointed by the Board purportedly "to investigate, review and evaluate the facts and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board..." Unlike the pre-existing "Special Litigation Committee," it was not given the same mandate and powers and, as such, even if it had a legitimate purpose, such Committee was, at best, only advisory and cosmetic in nature.

27.     In fact, this latest iteration of a "standing committee" purportedly investigating corporate wrongdoing at the Company is a sham. It was formed for the sole purpose of creating

1   a pretext for the Company's counsel in the existing "no-demand" derivative litigation and in

2   this litigation to seek the dismissal of all such cases and to stop any claims from being pursued

3   against the members of the H-P Board and Defendant Hurd. It is likely to generate a

4   "whitewash" report prepared by Levander setting forth certain of the facts and circumstances

5   relative to the claims set forth herein, which report will be provided to the Board to assist it in

6   rejecting the pre-suit demands set forth in, *inter alia*, Plaintiff's pre-suit Demand Letters and,

7   ultimately, to be used in creating an argument for seeking the dismissal of shareholder

8   derivative litigation brought by H-P shareholders against the Defendants.

9       28.     The "Independent Committee" has taken over the purported investigation of the

10  claims set forth herein from the Board itself which was, purportedly, investigating such claims

11  directly as stated by John F. Schultz, Esq. to one of Plaintiff's counsel in an e-mail dated

12  November 3, 2010 and a letter dated November 16, 2010.[2]   In fact, the Board conducted no

13  such investigation and Mr. Schultz's representation argument was made so the members of the

14  Board and their counsel could "buy time" and come up with a strategy that would have the

15  appearance of credibility, all of which resulted in the subsequent appointment of the

16  "Independent Committee" and lead to motions to dismiss this litigation and other derivative

17  litigation.

18      29.     Following the creation of the "Independent Committee," Levander stated that:

19  "The Independent Committee has retained Dechert LLP to assist the Committee in this

20  [purported investigation, review and evaluation] process." In fact, to the extent there is or was

21  any ongoing investigation, review and evaluation, it was carried out solely by Dechert. Further,

22  Dechert, although technically "retained" by the "Independent Committee," upon information

23  and belief, was selected by a "Group of Counsel" believed to include Michael J. Holston, H-P's

24  General Counsel as well as outside counsel for the Company and its Board of Directors in

25  consultation with Dechert. None of such facts, material in the context of what was disclosed in

26

27  [2] Mr. Schultz stated that: the Board is currently investigating the allegations in [Plaintiff's] demand[s].
    Separate and distinct from whatever the Board was doing or not doing, the law firm of the "Covington
28  Report," the factual content of which has been concealed from the Company's shareholders because,
    *inter alia* it would demonstrate the lax stewardship of H-P by its Board of Directors.

the 2011 Proxy Statement with respect to the Board's "standing committees," was included therein, thereby rendering the Proxy Statement false and misleading.

30.     The 2011 Proxy Statement further fails to disclose, in the context of what was disclosed, that in order to create an appearance of independence and legitimate corporate activity, none of the directors appointed to the "Independent Committee" has devoted any meaningful amount of time and effort to the Committee's purported responsibilities. In fact, the "Independent Committee" members, neither of whom has or has had sufficient time available to carry out he stated mission of the Committee entrusted to them, have delegated virtually all of the Committee's activities (other than occasional *pro forma* meetings and conference calls) to their counsel, Levander. Indeed, not only is Levander providing legal advice to the Committee but, upon information and belief, is performing all factual "investigation" on its behalf, avoiding sworn and transcribed testimony from all material witnesses in order to cloak any such "interviews" in attorneys' notes to facilitate subsequent claims of attorney work product and or attorney-client privilege. Most of the most material witnesses are not being interviewed by Levander or the Committee nor are they being asked to produce documents relative to the issues raised in the Demand Letters.

31.     The 2011 Proxy Statement, in the context of what has been disclosed in connection with H-P's corporate governance, fails to disclose that the "Independent Committee," in order to create the illusion of objectivity and fairness, offered to provide Plaintiff's counsel (and, presumably, counsel for other H-P shareholders who have made demands upon the Board) an opportunity to communicate with Levander and/or the "Independent Committee" members upon minimal advance notice as referred to below.[3]

32.     The 2011 Proxy Statement, in the context of what has been disclosed in connection with H-P's corporate governance, fails to disclose that even if the "Independent Committee" was a legitimate exercise of the Board's business judgment and power to

---

[3] Had any such offer been made by or on behalf of members of H-P's Board shortly following Plaintiff's Demand Letters, there might have been an argument that the offer was made in good faith. Having been made, however, on short notice and at or near the end of the Board's "investigation," the offer clearly was made in bad faith.

investigate the claimed wrongdoing, the Board and the Committee were and are pre-disposed to protect their respective members, their colleagues on the Board; i.e. those who selected them as directors.

33.     The 2011 Proxy Statement, in the context of what has been disclosed in connection with H-P's corporate governance, fails to disclose that even if the "Independent Committee" was serving a legitimate function, H-P's entire Board, including the Committee members as well as Levander, knew that the Committee did not have sufficient time to "investigate" (even if it was inclined to do so) all of the material claims set forth in the Demand Letters including, in particular, the full extent and scope of H-P's violations of the FCPA in various parts of the world.

34.     The 2011 Proxy Statement falsely stated that the Board has in place a functioning "Board Risk Oversight" process. It states:

> "The Board, with the assistance of the Audit Committee and other Board committees as discussed below, reviews and oversees our enterprise risk management ("ERM") program, which is an enterprise-wide program designed to enable effective and efficient identification and management of critical enterprise risks and to facilitate the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels, and facilitate and drive appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of HP enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments, and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response and monitoring efforts to senior management and to the Audit Committee.
>
> The Audit Committee oversees management's implementation of the ERM program, including reviewing HP's enterprise risk portfolio and evaluating management's approach to addressing identified risks. While the Audit Committee has primary oversight responsibility for the risk assessment and management process, various other committees of the Board also have responsibility for oversight of risk management. .....In addition, the Finance and Investment Committee is responsible for overseeing financial risks. Further, the Nominating and Governance Committee oversees risks associated with HP's governance structure and processes. The Board is kept informed of its committees' risk oversight and related activities primarily through reports of the committee Chairmen

> to the full Board. In addition, the Audit Committee escalates issues relating to risk oversight to the full Board as appropriate to provide that the Board is appropriately informed of developments that could affect HP's risk profile or other aspects of HP's business. The Board also considers specific risk topics in connection with strategic planning and other matters."

35.     The Board misrepresented the functioning of H-P's "Board Risk Oversight" process as evidenced by the manner in which the Board authorized management to, *inter alia,* proceed to bid irrationally for 3PAR, an ego-driven acquisition and paid substantial bribes in the United States and abroad pursuant to which the Board wholly disregarded the financial and operational risks to the Company by such conduct. The lofty principles set forth as the Company's "Board Risk Oversight" process in the 2011 Proxy Statement were contradicted by the actions of the Defendants herein.

36.     The 2011 Proxy Statement misrepresented the manner in which the Company's Board members were and are evaluated and omitted non-pejorative material facts about such directors which the Company's shareholders would have wanted to know in voting upon the election/re-election of such directors such as Defendants Thompson and Apotheker. The 2011 Proxy Statement represented to H-P shareholders the process by which director nominees were considered and purportedly evaluated:

> "The Board annually reviews the appropriate skills and characteristics required of directors in the context of the current composition of the Board, our operating requirements and the long-term interests of our stockholders. The Board believes that its members should possess a variety of skills, professional experience, and backgrounds in order to effectively oversee our business. In addition, the Board believes that each director should possess certain attributes, as reflected in the Board's membership criteria described below.
>
> HP's Corporate Governance Guidelines contain the current Board membership criteria that apply to nominees recommended for a position on the Board. Under those criteria, members of the Board should have the highest professional and personal ethics and values, consistent with longstanding HP values and standards. They should have broad experience at the policy-making level in business, government, education, technology or public service. They should be committed to enhancing stockholder value and should have sufficient time to carry out their duties and to provide insight and practical wisdom based on experience. **Their service on other boards of public companies should be limited to a number that permits them, given their individual circumstances, to perform responsibly all director duties. Each director must represent the interests of all stockholders of HP.** Although the Board uses these and

COMPLAINT                                                        13

other criteria as appropriate to evaluate potential nominees, it has no stated minimum criteria for nominees.

The Board believes that all the nominees named below are highly qualified and have the skills and experience required for effective service on the Board. The nominees' individual biographies below contain information about their experience, qualifications and skills that led the Board to nominate them."
[emphasis added]

37.    Notwithstanding the foregoing, in reality, those selected to be directors were chosen despite having numerous other directorships, professional duties and responsibilities which prevented them from fulfilling their fiduciary obligations to the Company and its shareholders. Because of these responsibilities, none of the members of the Board could devote sufficient time, *inter alia*, to monitor the activities of Defendant Hurd as described herein, to effectively oversee the manner in which the Company conducted its business, to seriously evaluate the value of acquisitions such as 3PAR to the Company and to insure that its employees did not pay bribes.

38.    Notwithstanding what is stated in the 2011 Proxy Statement, upon information and belief, other than tracking each director's purchases and sales of H-P stock, the Board made no serious evaluation of sitting directors, any determination of their effectiveness or the amount of time they had available to meaningfully devote to the Company's business affairs.

39.    The Audit Committee of the Board had appointed Ernst & Young LLP ("EY") as H-P's independent registered public accounting firm for the fiscal year ending October 31, 2011. Among the various proposals put forth by the Board in the 2011 Proxy Statement, the Company's stockholders are being asked to ratify the appointment of EY at the Annual Meeting.

40.    In putting forth EY's appointment for ratification by the Company's stockholders, the Board failed to disclose the fact that EY had failed in its audits of H-P's financial statements to, *inter alia*, uncover the fact of the payment of substantial amounts of bribes in the United States and abroad which, if EY had conducted its audits in accord with generally accepted auditing standards, it would have uncovered. The Board knew but did not disclose in the 2011 Proxy Statement that EY had been negligent in performing its audits. Such

facts are material to the H-P shareholders' vote upon the ratification of the Audit Committee's appointment of EY.

41.     Similarly, nowhere in the 2011 Proxy Statement, despite the principal purpose of the Proxy Statement being the solicitation of proxies in favor of the sitting Board members and the ratification of the appointment of EY, was there even the slightest discussion with respect to the long-term failure of the Board and EY, in neutral, non-pejorative terms, to seriously address the wrongdoing referred to below and, in particular, the repeated instances of violations of law. Those facts, which could have been presented to H-P shareholders in neutral, non-pejorative terms, were and are of the utmost materiality in a shareholder's determination of the qualifications of each such nominee to serve or continue to serve as a director of the Company and of EY to serve as the Company's independent registered public accounting firm.

**B.     The 2010 Proxy Statement and Annual Meeting**

42.     On or about January 27, 2010, the Company issued and disseminated its Notice of Annual Meeting and Proxy Statement ("Proxy Statement") announcing and soliciting shareholder votes in connection with H-P's Annual Meeting of shareholders which was held on March 17, 2010.

43.     Among the items of business for H-P shareholders at the 2010 Annual Meeting was to elect the directors named in the 2010 Proxy Statement, each of whom was put forward by the Company's Board of Directors which, as of January 27, 2010 consisted of Defendants Hurd, Andreessen, Babbio, Baldauf, Gupta, Hammergren, Hyatt, Joyce, Ryan, Salhany and Thompson. Indeed, the 2010 Proxy Statement proclaimed that "The Hewlett-Packard Company Board of Directors (the "Board") has made these materials available to you." Upon information and belief, each of the then H-P directors serving as of January 27, 2010, including Defendant Hurd, approved the content of the 2010 Proxy Statement and/or indirectly controlled its content all the while omitting material facts bearing upon how the shareholders of the Company would vote upon the Board's nominees for directorships. The directors stated:

> "Our Board recommends that you vote your shares FOR each of the nominees for election to the Board, FOR ratification of the appointment of

1    HP's independent registered public accounting firm, FOR the approval of
     the Amended and Restated Hewlett-Packard Company 2004 Stock
2    Incentive Plan, and FOR the proposal to conduct an annual advisory vote
     on executive compensation."

3

4    44.    Notwithstanding the conduct described herein, the 2010 Proxy Statement falsely

5    says: "HP is committed to maintaining the highest standards of business conduct and corporate

6    governance, which we believe are essential to running our business efficiently, serving our

7    stockholders well and maintaining HP's integrity in the marketplace." The 2010 Proxy

8    Statement goes on to state that what were the qualifications for selection to H-P's Board:

9    "Director Qualifications
     HP's Corporate Governance Guidelines contain Board membership
10   criteria that apply to nominees recommended for a position on the Board.
     Under these criteria, members of the Board should have the highest
11   professional and personal ethics and values, consistent with longstanding
     HP values and standards. They should have broad experience at the
12   policy-making level in business, government, education, technology or
     public service. They should be committed to enhancing stockholder value
13   and should have sufficient time to carry out their duties and to provide
     insight and practical wisdom based on experience. Their service on
14   other boards of public companies should be limited to a number that
     permits them, given their individual circumstances, to perform
15   responsibly all director duties. Each director must represent the interests
     of all stockholders of HP." [emphasis added]

16

17   45.    Notwithstanding the foregoing, in reality, those selected to be directors were

18   chosen despite having numerous other directorships, professional duties and responsibilities

19   which prevented them from fulfilling their fiduciary obligations to the Company and its

20   shareholders. Because of these responsibilities, none of the members of the Board could devote

21   sufficient time, *inter alia*, to monitor the activities of Defendant Hurd as described herein, to

22   effectively oversee the manner in which the Company conducted its business and to insure that

23   its employees did not pay bribes.

24   46.    Upon information and belief, other than tracking each director's purchases and

25   sales of H-P stock, the Board made no serious evaluation of sitting directors, any determination

26   of their effectiveness or the amount of time they had available to devote to the Company's

27   business affairs.

28   47.    The 2010 Proxy Statement states that the Board had a so-called "HR and

Compensation Committee" about which the directors stated:

> "The HR and Compensation Committee discharges the Board's responsibilities relating to the compensation of HP's executives and directors; reviews and approves the Compensation Discussion and Analysis required by the SEC for inclusion in the annual proxy statement; provides general oversight of HP's total rewards compensation structure; reviews and provides guidance on HP's human resources programs; and retains and approves the terms of the retention of the committee's compensation consultants and other compensation experts. Other specific duties and responsibilities of the HR and Compensation Committee include ....reviewing and approving objectives relevant to executive officer compensation, evaluating performance and determining the compensation of executive officers in accordance with those objectives; approving severance arrangements and other applicable agreements for executive officers; overseeing HP's equity and incentive compensation plans; overseeing non-equity based benefit plans and approving any changes to such plans involving a material financial commitment by HP; monitoring workforce management programs; establishing compensation policies and practices for service on the Board and its committees including annually reviewing the appropriate level of director compensation and recommending to the Board any changes to that compensation; developing stock ownership guidelines for directors and executive officers and monitoring compliance with such guidelines; and annually evaluating its performance and its charter."
> [emphasis added]

48.     In fact, notwithstanding the above statements, the "HR and Compensation Committee" performed little or no substantive oversight of senior management's performance and compensation, particularly related to Defendant Hurd, who, among other characteristics, padded his expense accounts at least in partial view of the Committee members. The 2010 Proxy Statement failed to disclose that the Committee did little more than "rubber stamp" management's recommendations and, with respect to Defendant Hurd, recklessly permitted him to have an extraordinary employment contract with the Company without a "termination for cause" provision, standard in virtually all corporate employment contracts for senior executives.[4]

49.     The Board's Audit Committee had appointed Ernst & Young LLP ("EY") as H-P's independent registered public accounting firm for the fiscal year ending October 31, 2009. Among the various proposals put forth by the Board in the 2010 Proxy Statement, the

---

[4] The absence of such a provision in Defendant Hurd's employment contract enabled him to extort the Company for $12,224,693 as a so-called "cash severance benefit" at H-P's expense.

1    Company's stockholders were asked to ratify the appointment of EY at the 2010 Annual
2    Meeting.
3

4        50.    In putting forth EY's appointment for ratification by the Company's
5    stockholders, the Board failed to disclose the fact that EY had failed in its audits of H-P's
6    financial statements to, *inter alia*, uncover the fact of the payment of substantial amounts of
7    bribes in the United States and abroad which, if EY had conducted its audits in accord with
8    generally accepted auditing standards, it would have uncovered. The Board knew but did not
9    disclose in the 2010 Proxy Statement that EY had been negligent in performing its audits. Such
10   facts were material to the H-P shareholders' vote upon the ratification of the Audit
11   Committee's appointment of EY.

12       51.    Similarly, nowhere in the 2010 Proxy Statement, despite the principal purpose
13   of the Proxy Statement being the solicitation of proxies in favor of the sitting Board members
14   and the ratification of the appointment of EY, was there even the slightest discussion with
15   respect to the long-term failure of the Board and EY, in neutral, non-pejorative terms, to
16   seriously address the wrongdoing referred to below and, in particular, the repeated instances of
17   violations of law. Those facts, which could have been presented to H-P shareholders in neutral,
18   non-pejorative terms, were and are of the utmost materiality in a shareholder's determination of
19   the qualifications of each such nominee to serve or continue to serve as a director of the
20   Company and of EY to serve as the Company's independent registered public accounting firm.

21       **C.    The Hurd-Fisher Scandal**
22

23       52.    On a date prior to August 6, 2010, H-P's Board asked for and received the
24   resignation of Defendant Hurd in connection with, among other reasons, his highly publicized
25   relationship with Jodie Fisher involving claims of sexual harassment, inappropriate sexual
26   advances and, admittedly, an inappropriate relationship between the participants, including
27   Defendant Hurd's submission of unjustified expense reports related to such relationship and
28   otherwise.

53.     Although the underlying conduct of Defendant Hurd and Ms. Fisher, about which the members of the Board were aware for more than six weeks (since at least approximately June 29, 2010) prior to public disclosure, have caused the Company substantial investigative, public relations and other expenses which should be borne by the two of them. The Board's request for Defendant Hurd's resignation purportedly on these grounds appears to have been, upon information and belief, merely a pretextual story line for public consumption intended to conceal far more serious wrongdoing on the part of Defendant Hurd and his subordinates including the pervasive payment of bribes by H-P employees and representatives, all of which was known or should have been known by Defendant Hurd.

54.     Ms. Fisher has been compensated by the Company, at the direction of Defendant Hurd, for services of questionable value and/or which were never rendered and inappropriately reimbursed for expenses, all of which compensation Defendant Hurd directly or indirectly approved.

55.     Despite Defendant Hurd's enormous personal compensation, according to Michael J. Holston, H-P's General Counsel, Defendant Hurd had a "systematic pattern" of padding his own expense accounts. Such padding was carried out directly or through his assistant, Ms. Caprice Fimbres McIlvaine, in material amounts which have not been disclosed publicly but which, upon information and belief, rendered the statements made in publicly-filed documents false and misleading.

56.     This misappropriation of the Company's funds by both Defendant Hurd and Ms. Fisher must be remedied, particularly in the context of H-P's "going away" gift to Defendant Hurd in cash and H-P stock, variously valued at $30-55 million, including the $12,224,693 "cash severance benefit" paid to him and the amounts paid to Ms. Fisher. To the extent such unjustified payments are the result of negligent drafting of Defendant Hurd's employment agreement by H-P in-house or outside legal counsel, the responsible lawyers should be held accountable to the Company as should those members of the Board's "HR and Compensation Committee," the members of which failed in their oversight of the terms of Defendant Hurd's employment.

57.     In the context of the Hurd-Fisher relationship, which was not disclosed by management or the Board until six weeks after the Company was Formally informed of the relationship and other related material facts, while negotiations between and among the Board, Mr. Holston and Defendant Hurd regarding his resignation and "going away" compensation, the Board intentionally concealed material facts from the investing public. The Board thereby subjected the Company to claims by those who invested in its stock during the period of approximately June 29 to August 6, 2010 and, inter alia, subjected the Company to an ongoing investigation by the SEC with respect thereto.

58.     Each member of the Board (including Defendant Hurd) as of August 6, 2010 is personally implicated in such concealment which, given the materiality of the underlying facts, was and is a violation of the federal securities laws, the directors' duty of candor and their fiduciary duties to the Company and its shareholders.

59.     The materiality of the concealed facts is reflected in the elimination of $8.7 billion in market value as a result of the 8% decline in the closing price of H-P common stock on August 9, 2010. Those who invested during the period of the Board's active concealment are undoubtedly very substantial. To the extent that H-P is sued based upon such claims, since any such claims would be based upon the Board's and Defendant Hurd's failure to disclose in a timely manner the material facts referred to above, each such director as of August 6, 2010 and Mr. Hurd should be held personally accountable to the Company and any attempted indemnification of any of such persons by the Company under such circumstances would be inappropriate and a waste of corporate assets.

### D. Bribery, Kickbacks and Illegal Rebates

60.     For many years, H-P officers and other executives subordinate to Defendant Hurd have been involved in paying bribes, directly and indirectly, purportedly as a means of obtaining business in Russia and elsewhere in the world, in violation of the FCPA and local anti-corruption laws. Such bribery included illegal conduct within the United States and in, inter alia, Germany, Austria, Serbia, the Netherlands and the Commonwealth of Independent

States. Such conduct is under investigation in the United States by the Department of Justice and the SEC as well as by governmental agencies in the above countries and, possibly, elsewhere.

61.     In that regard, German prosecutors have been investigating whether one current and two former H-P executives and others affiliated with them paid approximately $10 million in bribes in an attempt to obtain a contract to supply computers and related software in Russia, where local officials raided the Company's Moscow offices in April, 2010. The Company initially "stonewalled" the German prosecutors and now claims that it is cooperating with the investigation in this country and abroad.

62.     In light of the foregoing conduct by the culpable executives subordinate to Defendant Hurd, whose identities are presently unknown to H-P shareholders, the Company has been required to pay and will continue to pay substantial legal and other expenses. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial. The culpable executives and the responsible members of H-P's Board should be required to pay personally any fines or penalties that are sought against H-P as a result of their illegal conduct and its concealment.

63.     The Board also authorized the Company to agree to a costly settlement with the Department of Justice to resolve an investigation into H-P executives' violations of the Anti-Kickback Act of 1986 in connection with the GSA Multiple Award Schedule contract. Such settlement also resolved separate "whistleblower" allegations associated with the *Rille* Complaint filed in the United States District Court for the Eastern District of Arkansas in 2007. The wrongful acts of H-P executives (together with co-conspirators) included submitting claims inflated by paying kickbacks, illicit fees and rebates, to Accenture PLC (formerly known as Arthur Andersen Consulting), in exchange for its recommending the Company for government contracts. In connection with the litigation and settlement, H-P has sustained as much as $100 million in litigation expenses and settlements for conduct about which Defendant Hurd and other Board members have long-known or should have known. Further, the Company

1   has not sued Accenture to recover the money illegally paid to it in connection with the

2   government contracts it purportedly facilitated and, thus, the Board has wasted H-P's assets.

3   64.    In what appears to be a pattern of H-P executives paying bribes and making

4   improper gifts, presently unidentified H-P executives have conspired with Frankie Wong and

5   his company, Micro Systems Engineering, to provide gifts to employees of the Houston and

6   Dallas, Texas Independent School Districts, all of which was subject to another ongoing

7   investigation by the Department of Justice which has now been resolved by a payment from H-

8   P of approximately $16.25 million to such school districts plus as much as $25 million in

9   investigation and litigation-related expenses. The Board has failed to cause H-P to sue the

10  responsible executives, Frankie Wong, Micro Systems Engineering, or anyone else in

11  connection with these and other misuses of H-P assets to recover the Company's damages. The

12  Board has thus wasted the Company's assets.

13  **E. Antitrust Law Violations**

14

15  65.    The Company has been victimized by serious violations of the antitrust laws,

16  particularly price fixing conspiracies. Because of the anti-competitive activities of H-P's own

17  executives, the Board has refrained from taking action to recover the Company's damages from

18  those persons and entities who have caused substantial damages to it. For example, according

19  to a one-count felony charge filed in this Court, Wen-Hung "Amigo" Huang conspired with

20  others to suppress and eliminate competition by fixing the prices of TFT-LCD panels. Huang, a

21  resident of Taiwan and the former director of sales of Chi Mei Optoelectronics Corporation

22  ("Chi Mei"), participated in the conspiracy from on or about September 14, 2001 to on or about

23  December 1, 2006. Under his plea agreement, Huang, who was charged on July 28, 2010,

24  agreed to serve 9 months in jail, to pay a $25,000 criminal fine and to assist the Department of

25  Justice in its ongoing TFT-LCD investigation.

26  66.    TFT-LCD panels are used in computer monitors and notebooks, televisions,

27  mobile phones and other electronic devices manufactured by the Company. H-P appears to

28  have been directly affected and damaged by the LCD price-fixing conspiracy by Chi Mei and

other manufacturers of TFT-LCD panels. By the end of the conspiracy period, the worldwide market for TFT-LCD panels was valued at $70 billion. The Justice Department charged that Huang and through him, Chi Mei, participated in a conspiracy in which the participants met and agreed to charge prices of TFT-LCD panels at predetermined levels.

67.     The participants in that conspiracy also issued price quotations in accordance with the agreements reached and exchanged information on the sales of TFT-LCD panels for the purpose of monitoring adherence to the agreed-upon prices.

68.     In light of the fact that at least 18 executives and eight companies have been charged criminally in connection with price fixing in the LCD industry, there is no valid reason for H-P not to sue those companies and their executives that have harmed the Company. By not causing H-P to pursue such treble damage claims, the Board has wasted the Company's assets.

## F.  The Bidding Frenzy for 3PAR

69.     In The Wall Street Journal, of August 28, 2010, columnist Rolfe Winkler states:

> "3PAR might as well have listed itself on eBay, given the frenetic pace of bidding by Dell and Hewlett-Packard. The question for shareholders is whether the two suitors' cavalier approach to valuation means their cash risks being wasted, or whether they are making a sensibly paying up [sic] to protect their markets."

Joseph Menn and Helen Thomas, in the Financial Times of August 28, 2010, referred to: "…a bidding frenzy prompted by strategic ambitions that pushed the [$30/share] price well beyond ordinary valuations."

70.     It has been reported that, on August 1, 2010, the Company dropped out of the bidding for 3PAR. No reasons were provided to H-P's shareholders but, upon information and belief, the Board and the Company's advisors determined that the price demanded…then…was unjustified.

71.     Notwithstanding the prudence in the earlier withdrawal from the bidding for 3PAR, the Board authorized management to engage in a "bidding frenzy" for it. Thus, even if the possible acquisition of 3PAR might have been a rational exercise of the Board's business judgment before August 1, what took place thereafter well exceeded any rational exercise of

1  business judgment and amounted to utter irresponsibility on the Board's part.

2       72.    On September 27, 2010, H-P completed its acquisition of 3PAR for $2.3 billion,

3  most of which was subsequently recorded as intangible "goodwill" ($1.6 billion) and other

4  intangible assets of $569 million.

5       73.    Bloomberg reporter, Katie Hoffmann, quotes analyst Aaron Rakers, who had

6  noted the Board's desire "to show [H-P] can clinch the deal after the departure of its chief

7  executive officer." This ego-driven acquisition of more than $2.3 billion in mostly intangible

8  assets plus a $72 million "break-up" fee simply made no sense, as the Board's more considered

9  decision of approximately August 1 would reflect.

10      74.    The Board has thus acted recklessly and breached its fiduciary duties to H-P and

11  its shareholders all the while wasting the Company's assets.

12                        IV.    **DERIVATIVE ALLEGATIONS**

13      **A.    General Derivative Allegations**

14

15      75.    Plaintiff brings this action derivatively in the right and for the benefit of H-P to

16  redress the breaches of fiduciary duty and other wrongful conduct by the Defendants as alleged

17  herein.

18      76.    Plaintiff owns and has continuously owned common stock in H-P beneficially

19  since 1999 and throughout the wrongdoing alleged herein.

20      77.    This action is not a collusive one to confer jurisdiction that the court would

21  otherwise lack.

22      78.    Plaintiff will adequately and fairly represent the interests of H-P and its

23  shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in

24  prosecuting this type of action.

25      **B.    Plaintiff Has Made Pre-Suit Demands Pursuant To Rule 23.1**

26

27      79.    At the time this action was initiated, the Board was comprised of 17 directors.

28  The Director Defendants currently serving on the Board are, purportedly, considering

COMPLAINT                                             24

1  Plaintiff's Demand Letters as described below.

2      80.    On August 23 and 28, 2010, Plaintiff made pre-suit demands on the Current

3  Board as required by Fed. R. Civ. P. 23.1. Copies of the letters from one of Plaintiff's counsel

4  setting forth such demands (the "Demand Letters") are attached hereto as Exhibits "A" and

5  "B." Both before and after the Demand Letters, counsel for other H-P shareholders made pre-

6  suit demands upon the Board referring to some of the same conduct as referred to in the

7  Demand Letters. Cumulatively, all of these letters are referred to as the "Various Demand

8  Letters."

9      81.    In making the demands set forth in the August 23 and 28, 2010 Demand Letters,

10  Plaintiff was in no way conceding the disinterestedness or independence of any of the H-P

11  directors (nor does he now concede such with respect to the directors selected after such dates).

12  Rather, the pre-suit demands were made to give the Board the first opportunity to assert the

13  claims set forth in the Demand Letters. In Plaintiff's August 23, 2010 Demand Letter, it is

14  stated:

15          "The demands made herein and the fact that they have been made should
           not be taken to mean that any of you is independent, disinterested or can
16          properly and objectively deal with such demands, which you cannot. This
           letter is being sent solely for the purpose of giving H-P the opportunity to
17          commence the demanded litigation itself in the first instance and to do so
           promptly. Each of you is personally implicated in the alleged wrongdoing
18          by, inter alia, your personal culpability in connection with the wrongdoing
           alleged above and/or its cover-up. The demands set forth in this letter have
19          been made because, if they had not been, your counsel and/or counsel for
           the Company would seek to have dismissed any shareholder's derivative
20          litigation that might be commenced in connection with the claims referred
           to herein had no pre-suit demand been made."

21

22      82.    Subsequent to making the demands in the Demand Letters, Plaintiff's counsel

23  was informed first on November 3, 2010 and then again on November 9, 2010 by H-P's Deputy

24  General Counsel, John F. Schultz, Esq., that, purportedly,  "the Board is currently investigating

25  the allegations in [Plaintiff's] demand[s]." Such representation was made notwithstanding the

26  fact that members of the Board and the Group of Counsel were concurrently interviewing

27  individuals not then on the H-P Board who might comprise a committee, frequently referred to

28  as "whitewash committees," to take over the purported "investigation" that Mr. Schultz had

1    maintained falsely was already underway.

2       83.   At some point, even if the H-P Board was, in fact, "investigating" Plaintiff's

3   demands, and Plaintiff contends that such representation was false, the Board and the Group of

4   Counsel abandoned such a strategy and came up with a new way of attempting to protect the

5   members of the Board from litigation.

6       84.   In that regard, on a date presently unknown, after numerous potential directors

7   were provided with factual and legal information relating to the subject matter of the Demand

8   Letters and interviewed with respect to, *inter alia*, whether they would be sympathetic to the

9   conduct of the pre-existing Board members, additional members of the H-P Board were

10   selected by those already on the Board and their legal counsel. Thereafter, the Board appointed

11   a so-called "Independent Committee" of directors with Andrew J. Levander, Esq. and his firm,

12   Dechert LLP (collectively "Levander"), serving as its counsel.

13       85.   Each of the current members of the Board including the members of the so-

14   called "Independent Committee," despite attending meetings of the Board and committees

15   thereof to which they were appointed, devoted insufficient amounts of time to the Company's

16   business, let alone pursuing the very valuable claims referred to in the Various Demand Letters.

17   All members of the Board, including the members of the "Independent Committee," have

18   devoted no appreciable amount of time to investigating or evaluating such claims and, instead,

19   have abdicated their fiduciary responsibilities in favor of Levander and the other legal counsel

20   who have been working together to deal with the Various Demand Letters and the pending

21   derivative litigation.

22       86.   None of such directors or "Independent Committee" members had any

23   expectation that he or she would have the time or inclination to conduct any such investigation,

24   let alone do so independently or without bias against the shareholders who had made the

25   demands or their lawyers. Indeed, despite the importance of the pre-suit demands, the

26   "Independent Committee" members knew from the outset that they would delegate their own

27   fact-gathering and analysis responsibilities to their legal counsel, Levander, thus creating a

28   fundamental conflict for such counsel.

1    87.    Consistent with such conflict of interest and, upon information and belief, in

2    order to protect against a serious and useful record being made, Levander, counsel to the

3    "Independent Committee," developed a plan to merely conduct "interviews" of select

4    individuals not under oath and without a recording or transcript of the "interview" being

5    conducted, just lawyer notes. Such plan was developed so as to cloak all or as much of the fact-

6    based "investigation" in a claim of attorney work product as well as all communications

7    between counsel and members of the "Independent Committee" and/or witnesses as privileged.

8    Further, consistent with the orchestrated nature of the purported "investigation," many

9    "interviews" have not and/or will never be taken, particularly of those officers and directors

10   personally responsible for the wrongdoing alleged herein.

11   88.    On February 10, 2011, Levander surfaced *vis-à-vis* Plaintiff and sent a letter to

12   his counsel and, as set forth above, claimed that the Board had "appointed the Independent

13   Committee …to investigate, review and evaluate the facts…"

14   89.    In such letter, despite the short notice and consistent with the sham nature of the

15   "Independent Committee's" functioning, Levander invited Plaintiff's counsel to meet with "one

16   or more members of the Independent Committee" at one of two two-hour slots of time on

17   February 21 and 22, 2011.

18   90.    On February 11, 2011, Plaintiff's counsel responded to Levander by e-mail as

19   follows:

20
21   "In response to your letter of yesterday, before any meeting between me
     and the members of the so-called "Independent Committee"
     ("Committee") can or should take place, I would appreciate if you would
22   provide me with the following information and documents:

23   1. The identities of each of the members of the Committee.

24   2. Each Board resolution forming the Committee and/or
     appointing its members.

25
     3. A copy of each demand upon H-P's Board of Directors referring to any of the
26   issues/claims in the letters I sent to it on behalf of my firm's clients.

27   4. A copy of any consolidated derivative complaint(s) and class action complaints
     raising any such issues and/or claims.

28
     Inasmuch as I will be traveling, if the documents can be sent
                              COMPLAINT                          27

1    electronically, that would be appreciated.

2    After I review these documents and the information provided, I will get
     back to you in connection with the meeting you propose. In that regard,
3    your letter did not indicate where the Committee members will be
     available for a meeting."
4

5    91.    On February 15, 2011, Levander responded by e-mail:

6    "if you would like to provide the Independent Committee with any
     additional information beyond that contained in your letters, some
7    combination of lawyers at my firm and one or more of Ray Lane and Gary
     Reiner, the independent Committee Members who recently joined the HP
8    Board, are available to talk with you at 3:00pm on February 21."

9
     92.    Plaintiff's counsel then informed Levander: "Let's talk further after you provide
10
     me with the documents and information requested" which Levander did not provide.
11
     93.    Plaintiff's counsel then said to Levander:
12
     "You make representations regarding a so-called "Independent
13   Committee" and what it was, according to you, "appointed" to do.

14   Until I have the documents and information requested in my e-mail of
     February 11, it makes little sense to have a substantive dialogue with you
15   or your partners, let alone meet with any members of the "Independent
     Committee."......
16
     While there are certainly circumstances under which a committee of a
17   board of directors can legitimately evaluate a pre-suit demand upon it to
     commence litigation, in this case I see no reason for you to provide me
18   with less than two weeks' notice of a meeting with "one or more members
     of the Committee" unless it is an attempt to sandbag me. I hope that was
19   not your intent.

20   In any event, I trust that you will promptly provide me with the requested
     documents and information by return e-mail."
21

22   94.    When the information and documents were still not forthcoming from Levander,

23   including the Various Demand Letters, Plaintiff's counsel once again e-mailed him on February

24   16, 2011:
     "There is nothing confidential about pre-suit demand letters sent to H-P's
25   Board and, quite frankly, I have never had someone in your position so
     argue. Indeed, such demand letters are routinely turned over upon request.
26   Indeed, your unwillingness to do so suggests that there are other questions
     that must be addressed to you and your colleagues before there is an
27   substantive dialogue with either the members of the so-called
     "Independent Committee" or of the Board of Directors as a whole. In
28   addition to the documents that I previously requested from you, the
     following questions need to be answered:

                                COMPLAINT                                          28

1. Were you or a representative of your firm present at any portion of the Board meeting at which the "Independent Committee" was "appointed?"?

2. What criteria were used by the Board to determine which of its members would be appointed to the "Independent Committee?"

3. Who participated in the determination of such criteria?

4. Were there any factors or facts that the Board considered that might serve to disqualify any individual H-P Director from serving on the "Independent Committee?"

5. What process did the Board utilize to select the members of the "Independent Committee?"

6. Did anyone investigate each of the proposed members of the "Independent Committee" to determine whether there were any facts or circumstances which would disqualify such members from serving on the "Independent Committee?" If so, who performed such investigation and when?

7. Will there be (or have there been) interviews of present and/or former employees of H-P or independent contractors conducted under oath and/or with transcripts of the interviews?

8. Will there be (or have there been) any such interviews taken of each member of the H-P Board and those former members who were serving during the period of the wrongdoing alleged in the various "Demand Letters" sent on behalf of my clients and other H-P shareholders?

9. Will there be (or have there been) attempts made to interview former employees of H-P and/or its subsidiaries whose conduct is implicated in the alleged wrongdoing?

10. Will (or has) your firm and/or the members of the "Independent Committee" attempt to calculate the extent of the economic and non-economic damages alleged by the shareholders who have sent the Board "Demand Letters" and as alleged in the derivative Complaints that have been filed?

11. Will your firm or the "Independent Committee" be taking (or taken) any action as to any of remedial measures related to the conduct referred to in the "Demand Letters?"

12. Which persons played a role in the selection of you and/or your firm to represent the "Independent Committee?"

13. When did you first learn that you and/or your firm learn that you and/or your firm were being considered to represent the "Independent Committee," the entire Board of Directors or any of the H-P Directors in connection with any of the "Demand Letters?" From whom did you learn this fact?

14. What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the "Independent Committee?" By whom and when?

15. Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed?

16. When did the "Independent Committee" or your firm in its place commence any

efforts "to to investigate, review and evaluate the facts and circumstances asserts in various derivative lawsuits...and in certain demand letters?"

17. Why did it take so long for you to send your letter to me of February 10, 2011 and why did you provide less than two weeks' notice of a possible meeting with "one or more members of the Committee?"

I look forward to receiving your responses very shortly."

95.     As of the date of this Complaint, Levander has not provided the requested information to Plaintiff's counsel other than in the above e-mail of February 15, 2011 wherein it was indicated that Defendants Lane and Reiner are members of the "Independent Committee." By not providing the fundamental information requested of counsel for the "Independent Committee," such counsel demonstrates that the entire process by which the members of the "Independent Committee" were chosen is fatally flawed and cannot survive even the most basic questions addressed to its legitimacy. Indeed, the "Independent Committee" members were chosen by the Board or counsel to the Board based not on characteristics of independence, freedom from bias and available time but, rather, based upon creating an appearance of disinterestedness. However, even that creation is a chimera with no reality.

96.     The formation of the "Independent Committee," the methodology pursuant to which its members and counsel appear to have been chosen and its purported "investigation" of the wrongdoing alleged herein were not valid exercises of the Board's business judgment. Indeed, no serious steps were taken by any members of the Board to determine the disinterestedness and lack of conflicts of interest of the directors who constitute the "Independent Committee," let alone their availability to perform the most basic responsibilities attributed to its members.

97.     In addition to the pre-disposition of Levander and the members of the "Independent Committee" toward rejection of the Demand Letters and the other H-P shareholders' pre-suit demands, as indicated above, neither of the Committee's members has any expectation that he will personally devote any significant and meaningful amount of time to the investigation that the "Independent Committee" is purportedly conducting.

98.     98.     Indeed, each of its members is already burdened by multiple responsibilities to H-P as well as through their commercial and other activities.

99.     Although Plaintiff made pre-suit demands upon the members of the Board, although the Board has not yet formally rejected them, it has *de facto* done so with its appointment of the "Independent Committee" and its pre-disposed members who, after they have wasted many millions of dollars of H-P's (and its shareholders') money, will formally reject Plaintiff's and other pre-suit demands.[5]

100.    None of H-P's directors is disinterested and/or independent with respect to the wrongdoing alleged in the Demand Letters or herein. In the case of Defendants Lane, Apotheker, Banerji, Reiner, Russo, Senequier and Whitman, each of whom joined the Board subsequent to August 6, 2010, each of them has nevertheless acquiesced in the wrongful conduct of Defendant Hurd and the other members of the Board since that time as described herein and, as well, participated in its cover-up, having been informed of much of the wrongdoing prior to their joining the H-P Board. Further, each of these directors, together with the pre-existing members of the Board who were personally responsible for some or all of the wrongdoing alleged herein, caused to be issued the deceptive 2011 Proxy Statement which intentionally concealed such wrongdoing in connection with the corporate suffrage process.

101.    The "Independent Committee" will not recommend to the full H-P Board that any of them or their subordinates be sued by the Company because a majority of the members of the Board are personally implicated in and/or acquiesced in the wrongful conduct set forth in the Demand Letters and herein. Further, many of the members of the Board, having been named as defendants either in connection with previous H-P shareholder litigation and/or in other shareholder cases (*e.g.* Defendant Thompson has been named as a defendant in numerous pending and settled shareholder cases over a period of many years), have a pre-disposition

---

[5] In the remote possibility that the Board will not object to the prosecution of the H-P shareholders' claims against Defendant Hurd, it will do so to make him the sole scapegoat for all of the alleged wrongdoing and t deflect attention away from the other defendants named herein. Additionally, due to the fact that Defendant Hurd has joined a competitor, Oracle Corporation, about which Defendant Apotheker and other Board members have substantial animosity, any such action would be hardly objective or done solely in the interests of the Company and its shareholders.

1    against shareholder demands and shareholder litigation generally. As such, even if they could

2    otherwise be disinterested and independent, which they are not, they are as a Board disabled

3    from objectively addressing the demand set forth in the Demand Letters.

4    **Defendants' Roles in and Responsibilities to H-P and Its Shareholders**

5        102.    The directors of the Company owe it and its shareholders a fiduciary duty to act

6    loyally and in good faith, to oversee its business and affairs and to assure that effective policies,

7    procedures and systems are in place to prevent, and to detect and promptly terminate, unlawful

8    business practices such as those described above.   A director breaches the duty of loyalty and

9    good faith by knowingly permitting management to pursue unlawful business practices and

10    strategies such as described herein.  As a fiduciary, each director must in good faith bring to

11    bear all of his or her knowledge, skill, experience and expertise in the fulfillment of the duties

12    of attention and fidelity to the lawful best interests of the Company.

13        103.    H-P proclaims that it is: "committed to maintaining the highest standards of

14    business conduct and corporate governance, which [the directors] believe are essential to

15    running our business efficiently, serving our stockholders well and maintaining HP's integrity

16    in the marketplace."

17        104.    Even beyond these lofty, but inapplicable proclamation of business principles,

18    the Board has stated in its "Standards of Business Conduct," ("Standards" or "SBC") which its

19    members (including, in particular, Defendant Hurd) and senior management subordinate to

20    Defendant Hurd, have breached [6]:

21
22          "Since Bill Hewlett and Dave Packard started our company many years
            ago, HP has been known not just for the products and services we offer
            but also for the values we share....We gain trust by treating others with
23          integrity, respect, and fairness....Because HP is committed to getting
            things done the right way, violations of our SBC or HP policies or rules
24          may result in disciplinary action, up to and including termination of
            employment."
25
        105.    Notwithstanding such Standards and the termination of the employment of
26

27    ---
      [6] According to the Standards, "All employees and members of the Board of Directors are required to act
      consistently with our SBC.: The current version of the Standards have reflected H-P policy formally
28    and/or informally for many years and, upon information and belief, at all times relevant to the claims set
      forth herein.

Defendant Hurd when the Hurd-Fisher Scandal forced the Board to deal affirmatively with Defendant Hurd's history of breaches of such standards, the Board disregarded the widespread payment of bribes in the United States and abroad by his subordinates including failing to seek his termination and those of his culpable subordinates and those involved in covering up such conduct.

106.    With respect to governmental investigation such as those conducted by the SEC, Department of Justice and others, the Standards state, *inter alia*,:

> **"WE COOPERATE WITH INVESTIGATIONS"**
> * Cooperate with all internal investigations and audits.
> * Work with HP Legal to respond to litigation or requests from government and other external agencies.
> * Tell the whole truth when responding to an investigation and audit."

107.    Notwithstanding such Standards, under the supervision of Defendant Hurd and certain of H-P's lawyers, the Company "stonewalled" United States and foreign investigators of the various briberies referred to above. In dereliction of their duties as directors, none of the culpable persons were disciplined by H-P's Board for their breach of the Standards nor were the outside counsel who facilitated such conduct replaced.

108.    The Standards also proclaim that "We are open, honest and ethical in all of our dealings" and state, in particular:
> **"WE DO NOT BRIBE"**
> * Do not offer or provide bribes or kickbacks to win business or to influence a business decision—anywhere on anything.
>
> * Use agents and distributors only after they have passed our due diligence process to ensure that our commissions or fee arrangements will not be used as bribes on our behalf."

109.    Notwithstanding such Standards, under the supervision of Defendant Hurd, his subordinates orchestrated briberies such as the so-called "Russia GPO Deal", in which more than $10 million in bribes were paid, the various other briberies referred to above and in instances not presently disclosed to the public or to H-P's shareholders, all of which conduct (going back to 2000) has been known or should have been known by H-P's Board if its Audit Committee had been functioning as represented falsely in H-P's 2010 and 2011 Proxy

Statements and/or EY's audits had been conducted in accordance with generally accepted auditing standards. In dereliction of their duties as directors, none of the culpable persons were disciplined by H-P's Board for their breach of the Standards nor were those who facilitated such conduct sued by the Company for the damages caused the Company when such facilitators were not *in pari delecto*.

110. In connection with the Company's unambiguous Standards regarding bribery, the Board has stated in a Q&A in the Appendix to the Standards:

> "Q: Different countries have different cultures and laws. Does our SBC apply worldwide?"

> "A: Yes. Our SBC establishes principles for business conduct applicable throughout HP, regardless of the location or the particular HP organization or business. Where differences exist on any particular question as a result of local customs. Cultures, or laws, employees must apply either the SBC or local requirements--whichever sets the highest standard of behavior with respect to that question."

111. Notwithstanding such "principles of business conduct" which were in effect throughout the period of the briberies referred to herein and others not yet disclosed publicly or to H-P shareholders, under the supervision of Defendant Hurd, his subordinates orchestrated briberies contrary to such principles.

112. With respect to the use of H-P's corporate assets, the Standards state, *inter alia*:

> "WE USE ASSETS WISELY"
> * Keep personal use of H-P assets to a minimum.
> * Do not allow other people, including friends and family, to use HP resources.
> * Uphold your responsibility to protect HP financial assets."

113. Notwithstanding such Standards, until the Board was forced to deal with the Hurd-Fisher Scandal in June 2010 when Gloria Allred, Esquire, Ms. Fisher's counsel, made it impossible to look the other way, the Board long-tolerated Defendant Hurd's "business trips" (accompanied by Ms. Fisher) charged to the Company and took no action to prevent his own padding of his expense accounts or the expenses charged by Ms. Fisher to H-P. In dereliction of their duties as directors, other than Defendant Hurd who was belatedly terminated, none of the culpable persons were disciplined by H-P's Board for their breach of the Standards.

1        114.    Notwithstanding such Standards, until the Board recklessly wasted H-P's assets
2   by authorizing the bidding frenzy that resulted in the acquisition of 3PAR, effectively
3   abandoning rational business judgment and the advice received previously by the Board that
4   the price paid ultimately (more than $2.3 billion) was grossly excessive for a company with few
5   tangible assets. In dereliction of their duties as directors, none of the culpable persons,
6   including the members of the Board who approved such acquisition, were disciplined by H-P's
7   Board for their massive and not-yet-realized waste of H-P's assets and their breach of the
8   Standards.

9        115.    Pursuant to H-P practice over many years since the founding of the Company,
10  all of its directors were well supported by accurate and timely information and were provided
11  with sufficient time and resources to fully attend to all of their crucial oversight responsibilities.
12  At all times relevant, H-P's directors had unrestricted full and free access to officers and
13  employees of the Company.

14       116.    Through their service on key Board committees, the non-employee members of
15  the Board had supervisory responsibility for crucial front-line oversight in the areas of internal
16  controls, legal and regulatory compliance, corporate citizenship, risk management, corporate
17  governance and Board effectiveness. Service on these key committees as well as service as a
18  H-P Director necessarily exposed these directors to knowledge of the individual instances, and
19  overall pattern, of unlawful business practices reflected in this Complaint, as well as to
20  knowledge of the Board's consistent ineffectiveness in assuring management's prevention of
21  such unlawful business practices.

22       117.    The Board's Audit Committee was responsible at all relevant times for being the
23  Board's front line in the oversight of enforcement of the Standards and the Company's more
24  generalized governance policies including the monitoring of all compliance programs
25  (including its stated anti-bribery Standards) and reports from the Company's internal audit
26  function concerning management improprieties such as the briberies and the misuse of
27  corporate assets by Defendant Hurd as referred to above. The Audit Committee was required
28  to report regularly to the full Board concerning its meetings and discussions and to review with

the full Board all significant issues and concerns arising at its meetings. Therefore, the members of the Audit Committee received regular reports both of supposed compliance program activities and of unlawful and unethical business practices such as the briberies referred to herein, with respect to the Company and all of its operating subsidiaries, and reported these matters and the "stonewalling" of governmental investigations of such conduct to the full Board.

118. Each of the Defendants, including each of the present members of the Board, knew that as directors of H-P, it was their fiduciary duty and responsibility to oversee management to assure that it acted effectively to prevent unlawful and unethical business practices, and to promptly cause the termination of any existing unlawful and unethical business practices such as those described above. They also knew that it was a violation of their fiduciary duty of loyalty and good faith to permit the continuation of any such unlawful and unethical business practices, once they became aware of them. They were aware at all relevant times of the unlawful and unethical business practices alleged herein, yet permitted them to be continued, year after year, thus committing knowing breaches of their fiduciary duty of loyalty and good faith. Even as to the newly appointed members of the Board who have joined it relatively recently, upon in formation and belief, they were fully informed of such wrongdoing before they joined the Board. Since joining the Board, they have done nothing to seek recovery of the Company's damages as a result of such illegal or otherwise improper conduct.

119. At all relevant times during each of their tenures on the Board, as a result of their service on the Board and on the committees described for fully in the 2010 and 2011 Proxy Statements, their knowledge and expertise as alleged therein, the receipt by the Board and those committees of regular, complete and accurate reports, the sustained and systematic nature of the wrongdoing over multiple years, and as reflected in the Company's recent disclosures, each of the Board's members was aware of the unlawful business practices described herein, which conduct was not the result of a rogue employee or division, but instead, notwithstanding the Standards, reflected a Company-wide business philosophy, employed with

1  consistent methods over extended multi-year periods of time, to maximize sales through the

2  payment of bribes in violation of the FCPA and other similar laws. Thus, the Board, as a *de*

3  *facto* matter of policy, manifested over and over again in the various bribery schemes alleged

4  herein, consistently elevated revenues and profits over compliance with laws and regulations

5  designed to protect the Company. Upon information and belief, this strategy was well known to

6  H-P's senior management, including Defendant Hurd, and its Board, and was knowingly

7  pursued despite their knowledge of its illegality and the inevitable harm to H-P. The

8  Company's management, accompanied by Board passivity, knowingly made a calculated bet

9  that any legal consequences from the bribery schemes described herein would be insignificant

10  when compared to the increased sales, profits, and cash flows that were expected to result from

11  their unlawful strategy and practices. By knowingly or negligently permitting this strategy to

12  continue, the Board adopted it as Company policy, and committed a sustained and systematic

13  failure of compliance oversight in breach of its members' fiduciary duty of loyalty and good

14  faith.

15      120.    Each of H-P's directors has acquiesced in at least some of the wrongful conduct

16  described herein, thereby breaching his or her fiduciary duty of loyalty and good faith. Such

17  conduct is not the product of a valid exercise of business judgment, and constitutes a non-

18  exculpable breach of fiduciary duty for which each director faces a substantial threat of

19  personal liability.

20      121.    Therefore, the members of the Board are not disinterested for the purposes of

21  pre-suit demands with respect to the claims set forth in the Demand Letters and this Complaint.

22                          **V.    DAMAGES SUFFERED BY H-P**

23

24      122.    As a result of the Defendants' breaches of their fiduciary duties as described

25  herein, H-P has suffered and will continue to suffer substantial harm to an extent not yet fully

26  capable of determination.

27      123.    In addition, Defendants' breaches of their fiduciary duties to the Company have

28  also exposed the Company to substantial injury to its reputation and corporate goodwill, as well

as to potential criminal and civil liability.

## COUNT I
### (For Violations of Section 14(a) of the Exchange Act)

124.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted by Plaintiff individually and derivatively on behalf of H-P against the Defendants who were members of the Company's Board of Directors when the 2010 and 2011 Proxy Statements were issued and disseminated to the Company's shareholders.

125.     This claim is asserted against those members of the Company's Board of Directors for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 as controlling persons of H-P in connection with the Company's 2010 and 2011 Proxy Statements disseminated on behalf of the Board of Directors in connection with the Company's 2010 and 2011 Annual Meetings of Shareholders. These Proxy Statements solicited the votes of Plaintiff and the other H-P shareholders in connection with, *inter alia*, the election/re-election of the members of the Board and the retention of EY as H-P's auditor.

126.     The Proxy Statements issued and disseminated to H-P's shareholders purported to describe the activities of the Company's Board and the committees thereof in the preceding year, setting forth, *inter alia*, the number of meetings held and what certain of such committees purportedly accomplished. The Board, through the 2010 and 2011 Proxy Statements, went on to recommend that H-P shareholders vote in favor of the Board's proposals and, in particular, to vote in favor of the election of each of them as members of the Board.

127.     The 2010 and 2011Proxy Statements contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above. In particular, these Proxy Statements failed to disclose the extent to which the Company's entire Board of Directors were responsible for the wrongdoing that caused the Company to be exposed to, *inter alia*, massive amounts in fines, restitution and other damages including amounts paid to or on behalf of Defendant Hurd and the eventual losses it will sustain as a result of its acquisition of 3PAR for more than $2.3

1    billion. Each of the foregoing material facts should have been disclosed to H-P shareholders in

2    the Proxy Statements so that they, in voting upon the Board's proposals, including the retention

3    of EY as H-P's auditor despite the material failure of its audits, would do so with the benefit of

4    being informed of any facts material and relevant to the proposals as well as the election of the

5    Board's nominees.

6        128.   As a result of the use by the Company's Board of Directors of the 2010 and

7    2011 Proxy Statements to solicit the votes of H-P shareholders, which Proxy Statements failed

8    to disclose the material facts set forth herein, the Board's proposals and nominees were

9    approved in 2010 and are likely to be approved at the Annual Meeting to be held on March 23,

10   2011. By utilizing such Proxy Statements, the suffrage rights of Plaintiff and each other

11   shareholder of the Company have been violated, which conduct is in violation of Section 14 (a)

12   of the Exchange Act and SEC Rule 14a-9 and, by having the other Director-supported

13   nominees re-elected, H-P has been and continues to be damaged.

14
                                           **COUNT II**
15                  **(Breach of Fiduciary Duty and Waste of Corporate Assets)**

16       129.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully

17   set forth herein.

18       130.   The Defendants all owed and/or owe fiduciary duties to H-P and its

19   shareholders. By reason of their fiduciary relationships, the Defendants specifically owed and

20   owe H-P the highest obligation of good faith and loyalty in the administration of the affairs of

21   the Company, including the oversight of H-P's compliance with federal laws such as the FCPA

22   and similar local laws. Moreover, the Board had specific fiduciary duties as defined by the

23   Company's key corporate governance documents and principles that, had they been discharged

24   in accordance with the Board's obligations, would have necessarily prevented the misconduct

25   and consequent harm to the Company alleged herein.

26       131.   The Defendants consciously violated their corporate responsibilities in at least

27   the following ways:

28               (a)Affirmatively and repeatedly declining to stop and prevent H-P's illegal
                 payment of bribes after receiving reports of such illegal activity and red flags
                                        COMPLAINT                                    39

1    indicating such widespread illegality, and/or consciously disregarding such reports and activity;

2

3    (b)failing to pursue claims against those who have victimized the Company in their anti-competitive behavior in violation of applicable antitrust laws; (c) permitted Defendant Hurd to act as he did in connection with the Hurd-Fisher

4    Scandal and otherwise as described herein; and (d) wasting enormous amounts of the Company's assets by authorizing management to engage in reckless

5    bidding for and the ultimate acquisition of 3PAR for more than \$2.3 billion.

6    132.   As a direct and proximate result of the Defendants' conscious failure to perform

7    their fiduciary obligations and wastage of H-P's assets, the Company has sustained and will

8    sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

9    133.   As a result of the misconduct alleged herein, the Director Defendants are liable

10   to the Company.

11                                   **PRAYER FOR RELIEF**

12   WHEREFORE, Plaintiff prays for judgment as follows:

13   A.     Declaring the 2010 and 2011 H-P Proxy Statements null and void and ordering a

14   new Annual Meeting of Shareholders or special meeting of shareholders under the supervision

15   of a Trustee or Special Master after the preparation and distribution of a replacement Proxy

16   Statement prepared in compliance with all federal disclosure laws and rules;

17

18   B.     Declaring that the current and former directors of the Company named as

19   defendants herein have breached their fiduciary duties as alleged herein causing substantial

20   damages to H-P;

21   C.     Requiring the Defendants to pay to the Company the amounts by which it has

22   been damaged or will be damaged by reason of the conduct complained of herein;

23   D.     Ordering the Company to take all necessary actions to reform and improve its

24   corporate governance, compliance and internal control procedures for the purpose not only of

25   preventing a recurrence of the failures detailed above, but to optimize such procedures in light

26

27   of relevant and current best practices.

28   E.     Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and

COMPLAINT                                    40

1 | other reasonable costs and expenses; and

2 |     F.     Granting such other and further relief as this Court may deem just and proper.

3

4 | ## DEMAND FOR JURY TRIAL

5 | Plaintiff demands a trial by jury on all issues so triable.

6

7 | Dated: March 7, 2011            Respectfully submitted,

8

9 | Lesley E. Weaver Bar #191305

10 | SHEPHERD, FINKELMAN, MILLLER
& SHAH, LLP

11 | 199 Fremont Street, 20th Fl.
San Francisco, CA 94105-2255

12 | Tel: 415-992-7282
lweaver@sfmslaw.com

13 | Ilene F. Brookler Bar #269422

14 | Richard D. Greenfield
Marguerite R. Goodman

15 | GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor

16 | New York, NY 10013
Tel: 917-495-4446

17 | ibrookler@gmail.com
whitehatrdg@earthlink.net

18 | twowhitehats@earthlink.net

19 | Scott R. Shepherd
SHEPHERD, FINKELMAN, MILLER

20 | & SHAH, LLP
35 E. State Street

21 | Media, PA 19063
Tel: 610-891-9880

22 | sshepherd@sfmslaw.com

23 | Patrick A. Klingman
SHEPHERD, FINKELMAN, MILLER

24 | & SHAH, LLP
65 Main Street

25 | Chester, CT 06412
Tel.: 880-526-1100

26 | pklingman@sfmslaw.com

27 | **Counsel for Plaintiff**

28

# Exhibit A

**GREENFIELD & GOODMAN LLC**
**ATTORNEYS AT LAW**
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
**email: whitehatrdg@earthlink.net**

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

August 23, 2010

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8710-6420-9075

Dear Members of the Board:

I am writing to you on behalf of my clients, Andrew J. Copeland and Martha J.
Copeland, who presently own, and who have owned continuously since 1999,
shares of the common stock of Hewlett-Packard Company ("H-P" or the
"Company"). A copy of the relevant page and portion of my clients' brokerage
statement showing their current ownership of H-P shares is enclosed with this
letter.

On behalf of my clients, I demand that the Company sue the Company's former
CEO, Mark V. Hurd; the Company's legal counsel who were responsible for the
drafting of Mr. Hurd's employment contract with H-P; Jodie Fisher; the
Company's officers and other executives involved in the direct and indirect
payment of bribes and otherwise violating the Foreign Corrupt Practices Act; and
other wrongful conduct as set forth below and each of you for acquiescing in
and/or covering up such conduct and causing and/or sitting idly by while the
Company concealed its likely exposure in the wake of such conduct. All of such
conduct has caused and will continue to cause the Company and its shareholders
massive economic damages and further damage to its reputation in amounts which
cannot be presently calculated. Similarly, your actions and those of Mr. Hurd

1

caused internal morale problems that will not quickly fade away. According to Ms. Eleanor Bloxham, President of the Corporate Governance Alliance: "It's a really serious issue for the company in terms of morale and culture." The Company's founders, Messrs. Bill Hewlett and David Packard, whose reputations for integrity were beyond reproach and are remembered for their high ethical standards that permeated H-P's culture, must be turning over in their graves as a result of the conduct described below.

## The Hurd-Fisher Scandal:

As you are all well aware, you recently asked for and received the resignation of Mr. Hurd in connection with, among other reasons, his highly publicized relationship with Ms. Fisher involving sexual harassment, inappropriate sexual advances and, admittedly, an inappropriate relationship between the participants, including his submission of unjustified expense reports related to such relationship and otherwise. Although the underlying conduct of Mr. Hurd and Ms. Fisher, about which you were aware for more than six weeks prior to public disclosure, have caused the Company substantial investigative, public relations and other expenses which should be borne by the two of them, the request for his resignation purportedly on these grounds appears to have been merely a pretextural story line for public consumption intended to conceal far more serious wrongdoing on the part of Mr. Hurd and his subordinates.

Ms. Fisher has apparently been compensated by the Company for services of questionable value and/or which were never rendered and inappropriately reimbursed for expenses, all of which compensation Mr. Hurd directly or indirectly approved. Further, despite his enormous personal compensation, according to Michael Holston, Esq., H-P's General Counsel, Mr. Hurd had a "systematic pattern" of padding his own expense accounts. Such padding was carried out directly or through his assistant, Ms. Caprice Fimbres McIlvaine.

This misappropriation of the Company's funds by both Mr. Hurd and Ms. Fisher must be remedied, particularly in the context of H-P's "going away" gift to Mr. Hurd in cash and H-P stock, variously valued at $30-50 million. At minimum, these amounts should be offset against that "gift."According to credible media accounts, such severance payment is the result of a poorly drafted employment contract, drafted in substantial part by the Company's lawyers.

It appears that they negligently failed to provide therein a commonly used "escape clause" which would have relieved H-P from such payments upon the occurrence

2

of the conduct which resulted in Mr. Hurd's resignation, conduct that is traditionally referred to as "cause." To the extent such unjustified payments are the result of negligent drafting of Mr. Hurd's employment agreement by H-P legal counsel, the responsible lawyers should be held accountable to the Company.

In the context of the facts referred to herein, negotiations between the Board and Mr. Hurd regarding his resignation, the likely outcome of those negotiations and the retention of a public relations firm, APCO Worldwide, you intentionally concealed material facts from the investing public. You thereby subjected the Company to claims by those who invested in its stock during the period of approximately June 29 to August 6, 2010. Each of you is personally implicated in such concealment which, given the materiality of the underlying facts, was and is a violation of the federal securities laws, your duty of candor and your fiduciary duties to the Company and its shareholders more generally.

The materiality of the concealed facts is reflected in the elimination of $8.7 billion in market value as a result of the 8% decline in the closing price of H-P common stock on August 9, 2010. The shares have fallen further since August 9. While some of such deterioration will, most likely, be erased, the claims of those who invested during the period of your active concealment are undoubtedly very substantial. To the extent that H-P is sued based upon such claims, since they would be based upon your and Mr. Hurd's failure to disclose in a timely manner the material facts referred to above, each of you and Mr. Hurd should be held personally accountable to the Company. Any attempted indemnification of you or him by the Company under such circumstances would be inappropriate and a waste of corporate assets.

### Bribery, Kickbacks and Illegal Rebates:

Far more serious than the Hurd-Fisher scandal, as you well know, is the fact that H-P officers and other executives have been involved in paying bribes, directly and indirectly, purportedly as a means of obtaining business in Russia and elsewhere in the world, in violation of the Foreign Corrupt Practices Act ("FCPA") and local anti-corruption laws. For example, German prosecutors have been investigating whether one current and two former H-P executives and others affiliated with them paid approximately $10 million in bribes in an attempt to obtain a contract to supply computers and related software in Russia, where local officials raided the Company's Moscow offices in April. The Company initially "stonewalled" the German prosecutors and now claims that it is cooperating with the investigation in

3

this country and abroad. In light of the foregoing conduct by the culpable executives, whose identities are presently unknown to H-P shareholders, the Company has been required to pay and will continue to pay substantial legal and other expenses. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial. The culpable executives should be required to pay personally any fines or penalties that are sought against H-P. In addition, they must be sued by the Company for all of the expenses incurred by it to date as a result of their illegal conduct.

As you know, having approved it previously, the Company agreed in principle to a settlement with the Department of Justice to resolve an investigation into H-P executives' violations of the Anti-Kickback Act of 1986 in connection with the GSA Multiple Award Schedule contract. The proposed settlement would also resolve separate "whistleblower" allegations associated with the *Rille* Complaint filed in the United States District Court for the Eastern District of Arkansas in 2007. The wrongful acts of H-P executives (together with co-conspirators) included submitting claims inflated by paying kickbacks, illicit fees and rebates, to Accenture PLC (formerly known as Arthur Andersen Consulting), in exchange for its recommending the Company for government contracts. In connection with the proposed settlement, H-P expects a negative impact of approximately $46.6 million after tax on its third quarter fiscal year 2010 earnings per share. The Company, through its legal counsel and spokesmen, has denied engaging in any illegal conduct in connection with these matters. However, you have long-known or should have known that executives of the Company are personally responsible for the activities which resulted in the government's suit. Presumably with your blessing, the Company negotiated this settlement to avoid having the culpable executives pay the expenses thereof including the costs associated with H-P's legal expenses. By so doing, each of you is wasting the Company's assets and, on behalf of my clients, I demand that the Company sue each of you to recover its damages. I further demand that H-P sue Accenture to recover the money illegally paid to it in connection with the government contracts it purportedly facilitated.

Additionally, in what appears to be a pattern of H-P executives paying bribes and making improper gifts, executives have conspired with Frankie Wong and his company, Micro Systems Engineering, to provide gifts to employees of the Houston and Dallas, Texas Independent School Districts, all of which is subject to another ongoing investigation by the Department of Justice. I hereby demand that the Company sue each of the responsible executives in connection with these and

4

other misuses of H-P assets to recover the Company's damages.

The SEC is investigating H-P executives' practices in connection with the payment of bribes and gifts and, more broadly, in the context of the Company's disclosure practices. These violations of the FCPA, which, upon information and belief, is widespread within the Company, could not have occurred without the knowledge of Mr. Hurd and senior management of H-P. Thus, I demand that H-P sue all such executives to recover the damages it has sustained and will sustain as a consequence of such wrongful conduct.

## Antitrust Law Violations:

It appears that the Company has been victimized by serious violations of the antitrust laws, particularly price fixing conspiracies. Because of the anti-competitive activities of H-P's own executives, you have refrained from taking action to recover the Company's damages from those persons and entities who have caused substantial damages to it. For example, according to a one-count felony charge filed in the United States District Court in San Francisco, Wen-Hung "Amigo" Huang conspired with others to suppress and eliminate competition by fixing the prices of TFT-LCD panels. Huang, a resident of Taiwan and the former director of sales of Chi Mei Optoelectronics Corporation ("Chi Mei"), participated in the conspiracy from on or about September 14, 2001 to on or about December 1, 2006. Under his plea agreement which is subject to court approval, Huang, who was charged on July 28, 2010, has agreed to serve 9 months in jail, to pay a $25,000 criminal fine and to assist the Department of Justice in its ongoing TFT-LCD investigation.

TFT-LCD panels are used in computer monitors and notebooks, televisions, mobile phones and other electronic devices manufactured by the Company. H-P appears to have been directly affected and damaged by the LCD price-fixing conspiracy by Chi Mei and other manufacturers of TFT-LCD panels. By the end of the conspiracy period, the worldwide market for TFT-LCD panels was valued at $70 billion. The Justice Department charged that Huang and through him, Chi Mei, participated in a conspiracy in which the participants met and agreed to charge prices of TFT-LCD panels at predetermined levels. The participants in that

5

conspiracy also issued price quotations in accordance with the agreements reached and exchanged information on the sales of TFT-LCD panels for the purpose of monitoring adherence to the agreed-upon prices. In light of the fact that, as of this date, 18 executives and eight companies have been charged criminally in connection with price fixing in the LCD industry, there is no valid reason for H-P not to sue those companies and their executives that have harmed the Company. Accordingly, I hereby demand that H-P sue the companies and individuals that have engaged in the foregoing and other price-fixing activities that have damaged the Company.

Upon information and belief, until recently, Mr. Hurd and other senior executives of the Company concealed the underlying details relating to the conduct of H-P management in paying bribes, making kickbacks and paying illegal rebates as described above and otherwise. Such conduct is likely to have further repercussions as the Department of Justice and the SEC investigate H-P further, the ultimate consequences of which are not presently known. I hereby demand that the Company sue Mr. Hurd and each of the other knowledgeable and responsible members of H-P management for their wrongdoing and the damages caused and being caused to the Company as a result thereof.

## The Demands Made:

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot. This letter is being sent solely for the purpose of giving H-P the opportunity to commence the demanded litigation itself in the first instance and to do so promptly. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your personal culpability in connection with the wrongdoing alleged above and/or its cover-up. The demands set forth in this letter have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

/s/

Richard D. Greenfield

Enclosure

CC:

RDG:gw

# Exhibit B

**GREENFIELD & GOODMAN LLC**
**ATTORNEYS AT LAW**
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
email: <u>whitehatrdg@earthlink.net</u>

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

August 28, 2010

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8710-6420-9086

Dear Members of the Board:

I am writing to you on behalf of my clients, Andrew J. Copeland and Martha J. Copeland, upon whose behalf I sent you the attached letter of August 23, 2010. This letter is intended to supplement and add to the demands set forth in the August 23 letter, which is incorporated herein by reference.

## The Bidding Frenzy for 3PAR:

In today's <u>Wall Street Journal</u>, columnist Rolfe Winkler states:

> "3PAR might as well have listed itself on eBay, given the frenetic pace of bidding by Dell and Hewlett-Packard
>
> The question for shareholders is whether the two suitors' cavalier approach to valuation means their cash risks being wasted, or whether they are making a sensibly paying up [sic] to protect their markets."

Joseph Menn and Helen Thomas, in today's <u>Financial Times</u> referred to:

1

> "...a bidding frenzy prompted by strategic ambitions that pushed the
> [$30/share] price well beyond ordinary valuations."

It has been reported that, on August 1, 2010, the Company dropped out of the
bidding for 3PAR. No reasons were provided to H-P's shareholders but,
presumably, you and the Company's advisors determined that the price
demanded...then...was unjustified. Now, you are engaged in a "bidding frenzy"
that, even if the possible acquisition of 3PAR might have been a rational exercise
of your business judgment before August 1, what is now taking place well exceeds
such business judgment and amounts to utter irresponsibility on your part.

Whether or not the acquisition of 3PAR goes forward, you are wasting and will
have wasted the Company's assets in pursuit of 3PAR. Bloomberg reporter, Katie
Hoffmann, quotes analyst Aaron Rakers, who has noted your desire "to show
[H-P] can clinch the deal after the departure of its chief executive officer." An ego-
driven acquisition of $2 billion or more plus a $72 million "break-up" fee simply
makes no sense, as your more considered decision of approximately August 1
would reflect.

Accordingly, whether or not H-P acquires 3PAR, I hereby demand on behalf of my
clients that the Company commence litigation against each of you for its damages
and the waste of H-P corporate assets in connection with your renewed attempts to
acquire 3PAR, all of which amounts to breaches of the fiduciary duties you owe
the Company and its shareholders.

## The Demands Made:

The demands made herein and the fact that they have been made should not be
taken to mean that any of you is independent, dis-interested or can properly and
objectively deal with such demands, which you cannot. Indeed, each of you has
personally acquiesced in the 3PAR bidding frenzy that is taking place. This letter is
being sent solely for the purpose of giving H-P the opportunity to commence the
demanded litigation itself in the first instance and to do so promptly. Each of you is
personally implicated in the alleged wrongdoing by, *inter alia*, your personal
culpability in connection with the wrongdoing alleged above. The demands set
forth in this letter have been made because, if they had not been, your counsel
and/or counsel for the Company would seek to have dismissed any shareholder's
derivative litigation that might be commenced in connection with the claims
referred to herein had no pre-suit demand been made.

2

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,


Richard D. Greenfield

Enclosure
CC: Ms. Martha J. Copeland
Mr. Andrew J. Copeland

RDG:gw

3