Ilene F. Brookler Bar #269422
Richard D. Greenfield, *pro hac vice*
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY  10013
Tel: 917-495-4446
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

Rose F. Luzon #221544
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
rluzon@sfmslaw.com

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**A. J. COPELAND**, Individually and
Derivatively on behalf of
**HEWLETT-PACKARD COMPANY**

Plaintiff,

v.

**RAYMOND J. LANE; et al**

Defendants
         and

**HEWLETT-PACKARD COMPANY**

Nominal Defendant.

Civil Action No.
11-CV-1058 (EJD)

## SECOND AMENDED COMPLAINT

## NATURE OF THE ACTION AND SUMMARY OF THE CLAIMS

1.     This is a shareholder's individual and derivative action brought on

behalf of Nominal Defendant Hewlett-Packard Company ("HP" or the

"Company").  No claims are asserted herein against HP, which is a Nominal

Defendant and an additional victim of the violations of the suffrage rights of Plaintiff, who was entitled to vote at the Company's 2010, 2011, and 2012 Annual Meetings of Shareholders.

2.     With respect to the HP proxy statements at issue, the Individual Defendants, who were serving at various times on the Company's Board of Directors ("Board") and who solicited proxies from Plaintiff and the Company's other shareholders, collectively and individually, initiated and/or actively participated in a course of conduct that was designed to, and did:

(a)     Conceal the fact that the Company was improperly misrepresenting its internal controls in order to allow a widespread scheme of overseas bribery, kickbacks and other behavior to occur at the Company;

(b)     Deceive the investing public, including shareholders of HP, regarding the Individual Defendants' management of the Company's operations; and

(c)     Induce HP shareholders repeatedly to vote at shareholder meetings in favor of the Board's nominees for election to the Board, to ratify the appointment of Ernst &Young, LLP ("E&Y") as the Company's auditor, and to otherwise vote as requested by the Board.

3.     In addition to the HP Board's repeated violations of federal proxy disclosure laws and applicable rules, this action addresses the paradigm of corporate governance mismanagement and the virtual absence of the stewardship responsibilities on the part of the members of HP's Board of Directors, which is

and has been dysfunctional for more than a decade.  Despite re-constituting itself five times during this period, the Board has remained faction-ridden and has failed to provide any consistent direction for the Company or oversight of its management. Since naming Carly Fiorina as Chief Executive Officer ("CEO") in 1999, HP has endured proxy wars with some of the founders' children over the controversial merger of HP with Compaq, continuous in-fighting among Board members culminating in the summary ousting of Fiorina, the use of illegal monitoring tactics and pretexting of suspected Board members, felony charges leveled against the Board Chair and executives, the firing of Defendant Hurd for serious misconduct, including, *inter alia,* expense and account irregularities involving a female "independent" contractor, and the firing of Defendant Apotheker, its third CEO in a row, only months after his hiring.

4.     Mark Chandler, General Counsel for Cisco Systems, Inc., in an article published by *The Wall Street Journal* on November 28, 2011, described HP as a "company beset by the chaos of executive turnover."  Former General Electric CEO, Jack Welch, sharply criticized the Board: "The Hewlett–Packard board has committed sins over the last 10 years." "They end up blowing up the CEOs and don't have anyone else in mind to come in. Where the hell was the leadership development?"  The revolving door of CEOs has led to tens of millions of dollars in severance payouts and has resulted in HP being relegated to "poster boy" status for the failure of corporate governance and the breach of fiduciary duty by

members of the Board. According to *The New York Times* of September 21, 2011:

> "The answer, say many involved in the process, lies squarely with the troubled Hewlett-Packard board. **'It has got to be the worst board in the history of business,'** Tom Perkins, **a former H.P. director** and a Silicon Valley legend, told me.
>
> Interviews with several current and former directors and people close to them involved in the search that resulted in the hiring of Mr. Apotheker reveal a board that, while composed of many accomplished individuals, as a group was rife with animosities, suspicion, distrust, personal ambitions and jockeying for power that rendered it nearly dysfunctional.
>
> \*       \*          \*
>
> During Mr. Apotheker's brief tenure, once-proud **H.P. has become a laughingstock in Silicon Valley**." [Emphasis added.]

  5.  The public recognition of the ongoing dysfunctional management and sorry state of affairs at the Company was most recently acknowledged by Defendant Whitman, HP's CEO, as reported in *The Wall Street Jour*nal of October 30, 2012: "Ms. Whitman again warned [that] the worst is yet to come for the company. H-P's stock is now trading near a 10-year low." The same article goes on to say that she "has repeatedly blamed her predecessors [Defendants Hurd and Apotheker] for not investing in research and development as a reason for why H-P is now struggling." She is also directly quoted as admitting that: "We haven't had a new product lineup in seven years…It was very obvious that we had a product gap here."

  6.  This action charges the Individual Defendants with using their control over HP and its corporate suffrage process in effectuating and/or directly

participating and/or aiding and abetting violations of §14 (a) of the Securities

Exchange Act of 1934 and Rule 14a-9 promulgated thereunder by the Securities

and Exchange Commission ("SEC") in order, *inter alia*, to perpetuate themselves

in office as Directors of the Company, thereby permitting them to unjustly enrich

themselves and otherwise damage the Company at its expense and the expense of

its shareholders.[1] Defendants Lane, Apotheker (with respect to the 2011 Proxy

Statement) and the other Director Defendants named herein, together with

Defendant Hurd (with respect to the 2010 Proxy Statement) are charged by this

Complaint with violations of federal proxy disclosure law, rules and regulations

by, *inter alia*, failing to disclose material facts in the Company's 2010, 2011, and

2012 Proxy Statements resulting in the repeated election/re-election of directors

who were not qualified to serve and the retention of E&Y whose audits were not

carried out in conformity with Generally Accepted Auditing Standards ("GAAS")

and which breached its letters of engagement (i.e. contacts for service), and/or with

willful gross negligence in the management of the Company by, *inter alia*,

engaging directly and/or through their subordinates in an unlawful and deceitful

course of conduct in which the Company was mismanaged, causing it to be and to

continue to be damaged in amounts which cannot presently be calculated, as

described below. The foregoing deceptions in the Company's 2010-2012 Proxy

Statements breached, as well, the respective Individual Defendants' duty of candor

---

[1] HP Directors **each** receive hundreds of thousands of dollars in compensation each year
including, *inter alia,* cash, stock and options.

owed to HP as well as to its shareholders entitled to vote in connection with the Company's Annual Meetings for such years.

7.      In addition to the claims arising from the issuance and dissemination of false and misleading proxy materials, the claims alleged by Plaintiff arise from systemic and pervasive breaches of fiduciary duty and other malfeasance spanning many years on the part of current and former senior officers and current and former directors of the Company. Such breaches of duty were carried out in connection with, *inter alia*, violations of the federal Foreign Corrupt Practices Act ("FCPA"), the False Claims Act and other illegal payments by HP employees; the payment of secret benefits and improper compensation to Defendant Hurd and, as well, to Jodie Fisher, a "special friend" of Defendant Hurd; the concealment of the foregoing conduct in violation of the federal securities and other laws; and the reckless bidding for and ultimate acquisition by HP for 3Par on September 27, 2010 for $2.3 billion plus other expenses.[2]

8.      To date, the Company has suffered substantial economic damages and damages to its reputation as a direct result of the wrongdoing alleged herein. These damages were magnified when, on November 30, 2011, Standard & Poor's ("S&P") cut its rating of HP debt, lowering its rating from single "A" to "BBB"

---

[2] The Board continued such conduct when Defendant Apotheker was CEO with the reckless acquisition by HP of Autonomy Corporation in October 2011 for $11.7 billion. No specific claim is made in this Complaint with respect to the Autonomy transaction, which occurred subsequent to the commencement of this litigation. Nevertheless, as with the 3Par acquisition, the purchase of Autonomy was made without due regard to the opinions of HP's own experts and securities analysts who had determined that the price paid was grossly excessive.

plus. In this substantial downgrade, S&P went on to state as to this formerly "blue chip" company:

> "In addition, we have concerns that HP's inconsistent growth strategies and high levels of board of directors and management turnover have elevated the level of operational and execution risk in the near term."

This double-notch downgrade has made and will continue to make HP's working capital/borrowing costs much more expensive and is directly attributable to the wrongful conduct described herein.

9. Although the conduct described herein took place over a multi-year period, most recently, HP's current directors were elected/re-elected to their positions in the wake of and due to the issuance and dissemination of a false and misleading proxy statement issued on or about February 3, 2012 in connection with the Company's 2012 Annual Meeting of Shareholders.

10. The allegations against the Individual Defendants are based upon personal knowledge as to Plaintiff and his ownership of shares of HP, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of the 2010, 2011, and 2012 Proxy Statements; (c) review of other publicly available information, including articles in the news media and on blogs; (d) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and

circumstances alleged herein; and, (f) review of the shareholder derivative Complaints in actions commenced against Defendants.

11.     Plaintiff believes that substantial additional evidentiary support exists for his allegations and will surface in this litigation after a reasonable opportunity for discovery.

## I.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act, SEC Rule 14a-9 promulgated thereunder, as well as common law.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Counts I and II assert claims for violations of § 14(a) of the Exchange Act and SEC Rule 14a-9; and (b) pursuant to the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Many of the acts charged herein, including the issuance and dissemination of the proxy statements at issue and the mismanagement of HP, including the wrongdoing referred to below, occurred, in substantial part, in this District. In addition, the Company maintains its corporate headquarters in this District. Upon information and belief, none of the wrongdoing alleged herein took place in Delaware.

14.     In connection with the acts alleged in this Complaint, the Individual Defendants, either directly or indirectly at the times they served as directors of HP,

used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate wire facilities, to carry out the wrongdoing described herein.

15.   In additional to Plaintiff's individual claims asserted pursuant to federal law, this action has been commenced pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a)(2) and (3) and 1401 because some or all of the events, actions, and failures to act giving rise to the claims asserted herein occurred in this District.

## PARTIES

**Plaintiff**

16.   Plaintiff A.J. Copeland ("Plaintiff") owns and has continuously owned common stock in HP beneficially since 1999 and throughout all of the period of the wrongdoing alleged herein.

**Nominal Defendant**

17.   Nominal Defendant HP is a corporation organized under the laws of Delaware with only nominal contacts there, principally with legal counsel and a fictitious office serving as an agent for service of process. HP's principal executive offices and corporate headquarters are located in Palo Alto, California.   HP manufactures and sells a wide range of computer, software, copying and related

products throughout the world. It holds itself out as the "world's largest technology company."  HP is a Nominal Defendant only and no claims are asserted against it.

18.    The Company conducts its operations through multiple subsidiary companies. HP's Board of Directors and senior management exercise supervision, control, and dominion over the Company's subsidiaries activities, decisions, policies, and practices and, as such, knew and/or should have known contemporaneously of the wrongdoing alleged herein and/or directly participated in such conduct by, *inter alia*, recklessly causing HP to bid for and ultimately purchase 3Par and Autonomy, as described below. HP's Board and senior management (including, in particular, Defendant Hurd during his time as CEO, Defendant Apotheker during his time as CEO, and Defendant Whitman during her time as CEO) set the business objectives and sales goals of all of the Company's subsidiaries and they regularly reviewed and approved their budgets and projections.

**Individual Defendants**

19.    Defendant Raymond J. Lane has been HP's Executive Chairman since September 2011 when Defendant Whitman became the CEO, and essentially is a co-leader with her.  He previously served as HP's non-executive Chairman from November 2010 to September 2011.  HP's 2012 Proxy Statement specifically states that the Board determined that "Mr. Lane is not independent" "within the meaning of HP's director independence standards."  Although it was only after he

assumed his present position that the Company's Board "determined that Mr. Lane is not independent because of his role as executive Chairman of the Board," as set forth below, he has never been independent or disinterested in the context of Plaintiff's pre-suit demands and the existing shareholder litigation since agreeing to join the Board sometime prior to November 1, 2010.[3]

20.     Defendant Lane also serves as Managing Partner of Kleiner Perkins Caufield & Byers ("Kleiner"), a private equity firm, and he plays a very active, "hands-on" role in connection with its investments and business operations generally. Upon information and belief, despite claims as to his purported independence, he is a co-investor with professional colleagues at Kleiner, who are present or former members of the HP Board, and whose culpability he was charged with investigating.

21.     At the time Defendant Lane accepted his position as a member of HP's Board, he had multiple time-consuming business and other activities, in addition to his more than "full-time" responsibilities at Kleiner. In that regard, he was also, at that time a director of Quest Software, Inc., Chairman of the Board of Trustees of Carnegie Mellon University, Vice Chairman of Special Olympics International, and he serves on the West Virginia University's Board of Governors, all of which responsibilities required significant amounts of his available time. In

---

[3] Although Defendant Lane might well be described as "independent" under technical New York Stock Exchange rules, he was never disinterested or an objective director, competent to act independently of those officers and directors of HP identified in Plaintiff's pre-suit demands, or the then-existing shareholder suits that were pending at the time of his appointment to the Board.

addition, Defendant Lane is actively involved in a number of investments in which he is a General Partner or otherwise involved in management.

22.     Upon information and belief, in or about October, 2010, when he agreed to join the HP Board, he also agreed that he could be put on the to-be-formed "Independent Committee" to lend it an appearance of independence. In fact, at or about the same time, he was given instructions about the Board's eventual formation of the "Independent Committee" (which would not even be created or authorized by the Board until months later) and its expected rejection of Plaintiff's pre-suit demands by HP's General Counsel, Michael Holston, and at least one presently unknown member of the Board. At such time, although he agreed to serve on the Committee, he also pointed out that he would not have time to personally perform any meaningful role in the functioning of the Committee. He was assured that this would be acceptable.

23.     As indicated above, Defendant Lane was a member of the Board's so-called "Independent Committee" appointed by the Board purportedly "to investigate, review, and evaluate the facts and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board or the Company. . . and to make recommendations to the Board whether HP should commence or continue litigation concerning any of the matters raised or should adopt any new or modified corporate policies or procedures or other internal corrective measures." As he already knew when he

agreed to be a director of HP, he would (and did) spend virtually no time personally performing any of the investigation, review and evaluation responsibilities that he had as a member of the so-called "Independent Committee."

24.    Defendant Leo Apotheker is the Company's former President and Chief Executive Officer, hired by the Board, effective November 1, 2010, to oversee HP following the abrupt termination of Defendant Hurd's employment, and unceremoniously terminated on or about September 22, 2011, some 10 months after having taken office.   Defendant Apotheker's hiring was a hasty, ill-conceived choice carried out without even an interview by the Board or any serious Board consideration of his background, including his lack of experience in hardware, the business that drives HP's revenue, and his leadership problems at SAP Aktiengesselschaft ("SAP"), his most recent employer.   Eric Jackson, managing member of Ironfire Capital, stated "Apotheker is the worst CEO hire in the last decade."

25.    *The New York Times* of September 21, 2011 described the circumstances under which the Board hired Defendant Apotheker:

> "Among their revelations: **when the search committee of four directors narrowed the candidates to three finalists, no one else on the board was willing to interview them. And when the committee finally chose Mr. Apotheker and again suggested that other directors meet him, no one did.** Remarkably, when the 12-member board voted to name Mr. Apotheker as the successor to the recently ousted chief executive, Mark Hurd, most board members had never

met Mr. Apotheker.

> 'I admit it was highly unusual,' one board member who hadn't met Mr. Apotheker told me. 'But **we were just too exhausted from all the infighting.'**

> \*                    \*                    \*

> The immediate cause of dissension was the board's decision in August 2010 to demand the resignation of Mr. Hurd, who had himself assumed the top position in the midst of board leaks and a phone pretexting scandal surrounding efforts to determine the source of the leaks that had laid bare irreconcilable differences among directors. He had replaced Carly Fiorina, who was also summarily ousted by the board." [emphasis added]

26.     As Julianne Pepitone exclaimed in *CNN MoneyTech* on September 22, 2011, Defendant Apotheker's "messy firing is a mirror of his messy hiring. *The New York Times* stated on October 1, 2011, Defendant

> "Apotheker's short, turbulent reign as the chief executive of Hewlett-Packard was by nearly all accounts a disaster. The board demanded his resignation, and if there ever was a case for firing someone for cause, this would seem to be it."

Defendant Apotheker received from the Board more than $13 million in termination benefits, including a fiscal 2011 bonus of $2.4 million for his disastrous 10 months in office.

27.     Defendant Apotheker is also the former Chief Executive Officer of SAP, serving in that position from November 2008 to February 2010. According to Lawrence Ellison, CEO of Oracle Corporation ("Oracle"), Defendant Apotheker oversaw an industrial espionage scheme that stole Oracle's software; Oracle was

awarded $1.3 billion by an Oakland, California jury following an 11-day trial on November 24, 2010 and SAP's admission of guilt before its commencement.[4] The facts and circumstances surrounding such conduct, including Defendant Apotheker's role in it, are, upon information and belief, presently being investigated by the United States Department of Justice ("DOJ") and the FBI, according to an August 5, 2010 filing by SAP.

28. On October 26, 2010, Defendant Lane, before even assuming his positions with HP but consistent with his understanding that he was to protect his future colleagues on the Company's Board, referring to Defendant Apotheker's role in the alleged corporate espionage, caused HP to issue a statement that Apotheker had "limited knowledge of and role in the matter" despite the fact that Defendant Lane had no personal knowledge of the alleged wrongdoing and why Defendant Apotheker had been in hiding to prevent process servers from serving a trial subpoena upon him.

29. Defendant G. Kennedy Thompson was elected to the Board in 2006 and is the former Chairman and CEO of the failed Wachovia Corporation ("Wachovia"). Defendant Thompson is and has been a defendant in numerous securities fraud class actions and shareholder derivative actions, many of which are still pending. In just one of such cases, $590 million was paid on his behalf to obtain a release of the liability claims against him and other defendants. Defendant

---

[4] Such award has since been reduced by the Court.

Thompson sat on the HP Board during the purported investigation of Defendant Hurd. During much of the Relevant Period, Defendant Thompson, as a director of HP, was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of his stewardship responsibilities to the Company and its shareholders. Indeed, he abdicated his responsibilities to the Company while overseeing the virtual collapse of Wachovia, which, while *in extremis*, ultimately was rescued from collapse by being acquired by and merged into Wells Fargo & Company in a "bailout" overseen by the FDIC. By acquiescing and/or participating in the wrongdoing alleged herein, Defendant Thompson breached his fiduciary duties owed to the Company and its shareholders.

30.    Defendant Gary M. Reiner has been a member of the Company's Board since January 20, 2011. Defendant Reiner currently is or was a member of the Board's so-called "Independent Committee" appointed by the Board purportedly "to investigate, review, and evaluate the facts and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board or the Company….and to make recommendations to the Board whether HP should commence or continue litigation concerning any of the matters raised or should adopt any new or modified corporate policies or procedures or other internal corrective measures."

31.    When Defendant Reiner agreed to be a director of HP, he concurrently agreed to be one of the members of the "Special Committee." Upon information

and belief, HP's General Counsel, as he had with Defendant Lane, informed Defendant Reiner that he would spend a minimum amount of time personally performing any of the investigation, review and evaluation responsibilities in serving as a member of the "Independent Committee" and that such responsibilities would be taken over by lawyers for the Committee. In fact, upon information and belief, he understood that he was being put on the to-be-formed "Independent Committee" to lend it an appearance of independence. As with Defendant Lane, Defendant Reiner was given instructions about the Board's eventual formation of the Committee and its expected rejection of Plaintiff's pre-suit demands.

32.    Defendant Reiner spent virtually no time performing personally any of the investigation, review and evaluation responsibilities that he was assigned as a member of  "Independent Committee." At the time he became a director of the Company and was a member of the Committee, Defendant Reiner served as a Special Advisor to General Atlantic, LLC, a private equity firm. Previously, Defendant Reiner served as the Senior Vice President and Chief Information Officer at General Electric Company from 1996 until March 2010 including the period in which this formerly great American icon became almost bankrupt in 2008 due to, *inter alia,* reckless, wholly inappropriate and high-risk acquisitions (which caused it billions of dollars in losses), an area where Defendant Reiner had significant responsibilities.

33.    Defendants Ryan and Salhany were members of the HP Board

appointed by their fellow directors to a so-called "Special Committee," purportedly to investigate the facts and circumstances that originated with a letter from Gloria Allred, Esq. alleging that Defendant Hurd was involved in a sexual and otherwise improper relationship with her client, Jodie Fisher, a former soft-core pornography actress.

34.   In December 2010, after Defendant Apotheker took over as CEO, Defendant Lane asked the two directors seen as Defendant Hurd's main defenders, Defendants Joel Z. Hyatt, and John Joyce to step down.  As a matter of balance, Lane also told the two directors who led the Hurd probe, Lucille Salhany and Robert Ryan, to depart as well.   All four of these directors tendered their resignations and left their positions on or about January 20, 2011. Each of them was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of their respective stewardship responsibilities to the Company and its shareholders. Indeed, they abdicated their responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein.

35.   Defendant Margaret C. ("Meg") Whitman is the Board's most recent appointee to the positions of President and CEO, effective on or about September 22, 2011. Defendant Whitman had no technology industry experience, having worked in consumer companies prior to joining HP.  At eBay, Whitman botched the Skype acquisition, handing shareholders a $2.75 billion loss.  Workers at eBay found her to be "divisive, disagreeable and detached."  Although any high level

executive recruiter could have found a more suitable CEO candidate, Defendant Lane presented his close personal friend, Defendant Whitman, as "uniquely qualified." In fact, despite her previous executive experience with eBay, she was a failed gubernatorial candidate simply looking for a job, which Defendant Lane had promised her he would help her find.

36.    Defendant Whitman joined the HP Board in January 2011, having been picked by Defendant Lane, as part of his efforts to "get her back on her feet" after she had lost her campaign for the California governorship.[5] Defendant Lane, who had personally contributed substantial amounts to her campaign and raised substantial sums from others, approached her soon thereafter about the CEO job even though Defendant Apotheker had been in the position for just a few months. After she lost her race, Defendant Lane also got her a job at Kleiner, where he was Managing Partner. Defendants Whitman and Lane have been friends since he, as Oracle president, helped a former employer through a major server crash. Defendant Lane's advocacy of her at the Company (including lobbying for her positions on the Board and later, as President and CEO) was for his and her personal benefit and a breach of his duty of loyalty to HP.

37.    During much of the Relevant Period when she served as a member of HP's Board and later as its CEO, Defendant Whitman, as a director of HP, was

---

[5] She spent more of her own money on the race than any other political candidate spent on a single election in American history, spending $144 million total of her own fortune and $178.5 million including donors' funds. Defendant Whitman lost to Jerry Brown in the November 2, 2010 election.

well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of her stewardship responsibilities to the Company and its shareholders. Indeed, she abdicated her responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein during the period in which she has been an officer and/or director of HP.

38.    Defendants Shumeet Banerji; Patricia Russo; Dominique Senequier; Marc L. Andreessen; Sari M. Baldauf; Rajiv L. Gupta; Lawrence T. Babbio and John H. Hammergren have been HP directors during all or part of the wrongful conduct referred to herein including the violations of the federal securities laws referred to herein. Each of them was well-informed about the wrongdoing alleged herein and did nothing about it in furtherance of their respective stewardship responsibilities to the Company and its shareholders. Indeed, they abdicated their responsibilities to the Company by acquiescing and/or participating in the wrongdoing alleged herein.

39.    Defendants Hammergren, Andreesen, Babbio, Baldauf and Gupta, all sat on the HP Board during the purported investigation of Defendant Hurd.  When Apotheker joined HP, he picked Senequier to join the Board.  Apotheker sat on the supervisory board of AXA Private Equity Services, where she was CEO, and they both sat on the supervisory board of Schneider Electric SA.   Institutional Shareholder Services, a corporate governance research firm, criticized Defendants Babbio, Baldauf, and Thompson for allowing Defendant Apotheker to have a

direct role in choosing five new HP Board members in 2011, four of whom had business connections with him.  Defendants Babbio, Baldauf, and Senequier did not seek re-election in 2012.

40.   Defendant Mark V. Hurd is a former Chairman of the Board, President and CEO of HP, who was fired from or voluntarily resigned his positions with the Company, effective August 6, 2010, in connection with some or all of the conduct described herein, other than HP's acquisition of 3Par and Autonomy and the issuance of the 2011 and 2012 Proxy Statements, which took place following his departure.

41.   The Individual Defendants named herein are named defendants solely with respect to the wrongdoing that occurred while they served as directors of HP.

### IV. SUBSTANTIVE ALLEGATIONS

### A.   The 2012 Proxy Statement and Annual Meeting

42.   On or about February 3, 2012, the Company issued and disseminated its Notice of Annual Meeting and Proxy Statement ("Proxy Statement") announcing and soliciting shareholder votes in connection with HP's Annual Meeting of Shareholders held on March 21, 2012.

### (1)   Election of Directors

43.   Among the items of business for HP shareholders at the Annual Meeting was to elect six new directors and to re-elect five directors named in the 2012 Proxy Statement, each of whom was put forward by the Company's Board of Directors which, as of February 3, 2012 consisted of the Individual Defendants

(other than Defendants Hurd, Apotheker, Hyatt, Salhany, and Ryan), as well as Ann Livermore and Ralph Whitworth.

44.    Upon information and belief, each of the 14 HP directors serving as of February 3, 2012, approved the content of the 2012 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote upon, *inter alia*, the Board's nominees for directorships. The 14 directors stated:

> "Our Board recommends that you vote your shares FOR each of the nominees for election to the Board, FOR the ratification of the appointment of HP's independent registered public accounting firm, FOR the approval of the compensation of HP's named executive officers, and AGAINST the stockholder proposal."

45.    The HP Board was well aware of the information required to be disclosed in the 2012 Proxy Statement since E&Y, the Company's independent accountant and auditor, prepared a detailed report for the Board in November 2011 describing these requirements.  The report specifically states that proxy statements such as those of HP must provide information about the nominees

> "intended to allow shareholders to judge the professional competence, accountability and effectiveness of directors and officers and the qualifications of nominees."

According to E&Y, such disclosure should cover the "process for identifying and evaluating potential nominees for director", the source of the nominee's recommendation, "the specific experience, qualifications, attributes or skills that

led to the conclusion that the individual should serve as a director" and "[a]ny involvement during the past 10 years in certain types of judicial and administrative proceedings, to the extent material to an evaluation of the ability or integrity of the executive officer, director or nominee (including bankruptcy, criminal, injunctive and securities-related proceedings)." E&Y explained to the Board that

> "the SEC's final rule, *Proxy Disclosure Enhancements*, expanded the list of legal proceedings under item 401(f) to include: (1) any judicial or administrative proceedings resulting from involvement in mail or wire fraud or fraud in connection with any business entity, (2) any violations of federal or state securities, commodities, banking or insurance laws and regulations, or any settlement of those (or related) actions."

46. Despite E&Y's report and the applicable disclosure requirements, the HP Board caused the 2012 Proxy Statement to be issued on its behalf to misrepresent the manner in which the Company's Board members were and are evaluated, and omitted non-pejorative material facts about the director nominees, which the Company's shareholders would have wanted to know in voting upon the re-election of such directors, including, *inter alia,* disclosing pending and previous shareholder litigation, accusing them of violating their disclosure obligations under the federal securities laws, breaching their fiduciary duties, including the duty of loyalty, and wasting corporate assets. For example, Defendants Lane and Thompson had repeatedly been sued by shareholders of Quest Software, Inc. and Wachovia Corporation, respectively.[6] The 2012 Proxy Statement also failed to

---

[6] In connection with the now-defunct Wachovia, which was on the brink of collapse due to Defendant

disclose the extent to which members of the Board during the period of the Company's violations of the Foreign Corrupt Practices Act ("FCPA",) and the False Claims Act, among other laws, were the subject of administrative or other governmental investigations for their conduct or in connection with their respective companies.

47.    The 2012 Proxy Statement represented to HP shareholders the process by which director nominees were considered and purportedly evaluated:

> "The Board annually reviews the appropriate skills and characteristics required of directors in the context of the current composition of the Board, our operating requirements and the long-term interests of our stockholders. The Board believes that its members should possess a variety of skills, professional experience, and backgrounds in order to effectively oversee our business. In addition, the Board believes that each director should possess certain attributes, as reflected in the Board's membership criteria described below.

> HP's Corporate Governance Guidelines contain the current Board membership criteria that apply to nominees recommended for a position on the Board. Under those criteria, members of the Board should have the highest professional and personal ethics and values, consistent with longstanding HP values and standards. They should have broad experience at the policy-making level in business, government, education, technology or public service. They should be committed to enhancing stockholder value and should have sufficient time to carry out their duties and to provide insight and practical wisdom based on experience. **Their service on other boards of public companies should be limited to a number that permits them, given their individual circumstances, to perform responsibly all director duties. Each director must represent the interests of all stockholders of HP.** Although the Board uses these and other criteria as appropriate to evaluate potential nominees, it has no stated minimum criteria for nominees.

> The Board believes that all the nominees named below are highly qualified and have the skills and experience required for effective service on the Board. The nominees' individual biographies below contain information about their experience, qualifications and skills that led the Board to nominate them."

---

Thompson's mismanagement of it before it was taken over by Wells Fargo in 2009, over $590 million was paid in August 2012 on his behalf to settle shareholder claims against him and his subordinates.

[Emphasis added.]

48. Notwithstanding the foregoing, in reality, upon information and belief, other than tracking each director's purchases and sales of HP stock, the Board made no serious evaluation of sitting directors, any determination of their effectiveness or the amount of time they had available to meaningfully devote to the Company's business affairs. Those selected to be directors were chosen despite having numerous other directorships (i.e. Defendants Gupta and Hammergren sit on three outside boards, Defendant Russo sits on four outside boards), professional duties and responsibilities which prevented them from fulfilling their fiduciary obligations to the Company and its shareholders, all of whom were directly and proximately damaged by the wrongdoing described herein. Because of these responsibilities, none of the non-management members of the Board could devote sufficient time, *inter alia*, to effectively oversee the manner in which the Company conducted its business, to seriously evaluate the value of acquisitions such as Autonomy and 3PAR to the Company, and to insure that its employees did not pay bribes in violation of the FCPA or engage in conduct in violation of the False Claims Act and otherwise act illegally as set forth below.

49. Specifically, as to Defendant Whitman, she sits on three outside boards – The Procter & Gamble Company, Zipcar, Inc., and Zaarly, the latter of which she joined over a month after her tenure as CEO of HP already began. According to Spencer Stuart research, less than half of CEOs serve on any outside

board.  Indeed, many boards actively limit CEO participation on outside boards to none or one as a condition of employment.  If Defendant Whitman works the average amount of hours for directors, according to the National Association of Corporate Directors, her outside board services take up over 51 hours a month. None of this information was disclosed to the shareholders so that they could have decided in an informed manner if three outside boards was too many for Defendant Whitman to perform the responsibilities she was charged with both as a director and CEO of HP, a $127 billion corporation, in need of attention.

50.    The 2012 Proxy Statement further fails to disclose the source of nomination for Banerji, Livermore, Reiner, Russo, Whitman and Whitworth, all of whom were put on the Board in 2011.  Upon information and believe, Defendant Apotheker recommended four of them (not Whitman and Whitworth) to the Board in a misguided attempt to protect his own position and in breach of his duty of loyalty to HP and in violation of the Board's own nomination policies, and Defendant Lane picked Whitman, as described above.[7]

51.    The Company's 2012 Proxy Statement also fails to disclose information regarding pending lawsuits against the nominee directors despite the fact that such information is material to a shareholder's vote for the election of directors, that E&Y had counseled the Board that such information should be

---

[7] On November 17, 2011, the Board announced that Ralph Whitworth, an activist HP shareholder, had been "given a seat" on the Board. Such step was taken to neutralize Mr. Whitworth and to prevent him and his company, Relational Investors, LLC, from taking certain positions adverse to the interests of HP's latest CEO and the Board.

disclosed, and that federal disclosure law and regulations require that it be disclosed. For example, as set forth above, Defendant Lane was named as a defendant in shareholders' derivative litigation involving his conduct as a director of Quest Software, Inc. and Defendant Thompson is or has been a principal defendant in multiple shareholders' suits in connection with his activities as CEO and as a director of the now-defunct Wachovia Corporation, and at least $590 million has been paid to settle only some of the claims against him.  The 2012 Proxy Statement also fails to mention this litigation and other then-pending shareholder litigation involving nine of the Individual Defendants elected to the Board as a result of the false and misleading 2010 and/or 2011 HP Proxy Statements. Had such material information been disclosed, the directors may well not have been elected by votes on the proxy solicitation at issue.

52.     The nominees for directorships of HP, as set forth in the 2012 Proxy Statement, were elected, and such election was an essential link between the false and misleading proxy statement and the wrongdoing such directors engaged in following the 2012 Annual Meeting.  To the extent that their serving as directors damaged the Company as described herein, such damages would not have taken place but for their election. These directors receive compensation for serving as directors, as well as additional compensation for sitting on the Board including fees for committee chairs and additional meetings.

**(2)**   **Ratification of Appointment of E&Y**

53.   The Audit Committee of the Board appointed E&Y as HP's independent registered public accounting firm for the fiscal year ending October 31, 2012, as it had in previous years. Among the various proposals put forth by the Board in the 2012 Proxy Statement, the Company's stockholders were asked by HP's Board to ratify the Audit Committee's selection of E&Y at the Annual Meeting.

54.   In putting forth E&Y's appointment for ratification by the Company's stockholders, the Board failed to disclose to HP shareholders material, non-pejorative facts bearing upon such ratification including, *inter alia*, the fact that E&Y was in breach of its contractual obligations to perform its audits of the Company's financial statements in conformity with GAAS, which E&Y was obligated to do pursuant to the terms of its engagement by HP. Indeed, as an integral component of its obligations under GAAS, it was E&Y's responsibility to evaluate HP's internal controls, which it repeatedly failed to do so over a period of at least five years.

55.   The representations in HP's 2012 Annual Report, made by E&Y and those of the Individual Defendants serving as members of HP's Board, which Annual Report was incorporated by reference in the 2012 Proxy Statement, attested to the adequacy of HP's internal controls over, *inter alia*, its financial reporting. These statements were materially false and misleading because of the

widespread deficiencies in internal controls known or which should have been known to E&Y and the members of the Audit Committee that allowed much of the unlawful conduct complained of herein to occur including, *inter alia*, the payment of bribes in many countries in violation of the FCPA, the false recording of business expenses by Defendant Hurd, and otherwise.

56.    The Exchange Act requires every issuer that has securities registered, pursuant to Section 12 of the Exchange Act, to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP.")

57.    "Internal control" is defined as  "[a] process - effected by an entity's board of directors, management, and other personnel - designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."  AU §319.06.

58.    "Reportable conditions" are "matters coming to the auditor's attention that in his judgment should be communicated to the audit committee because they represent significant deficiencies in the design or operation of internal control, which could adversely affect the organization because they represent significant

deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process and report financial data consistent with assertions of management in the financial statements."   AU §325.02.

59.     "[A] reportable condition may be of such magnitude as to be considered a material weakness. A material weakness in internal control is a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing assigned functions."  AU§ 325.15.

60.     In an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C.§ 7241, entitled, "Corporate responsibility for financial reports," directs that the SEC shall promulgate regulations requiring that, in relevant part, "for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 ... the principal executive officer or officers and the principal financial officers or officers, or person performing similar functions, certify in each annual or quarterly report filed or submitted under

either such section of such Act that: (1) the signing officer has reviewed the report;

(2) based on the officer's knowledge, the report does not contain any untrue

statement of a material fact necessary in order to make the statements made, in

light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements and other financial

information included in the report, fairly present in all material respects the

financial condition and results of operations of the issuer as of, and for, the periods

presented in the report; (4) the signing officers (A) are responsible for establishing

and maintaining internal controls; (B) have designed such internal controls to

ensure that material information relating to the issuer and its consolidated

subsidiaries is made known to such officers by others within those entities,

particularly during the period in which the periodic reports are being prepared; (C)

have evaluated the effectiveness of the issuers' internal controls as of a date within

90 days prior to the report; and (D) have presented in the report their conclusions

about the effectiveness of their internal controls based on their evaluation of that

date; (5) the signing officers have disclosed to the issuer's auditors and the audit

committee of the board of directors (or persons fulfilling the equivalent function)

(A) all significant deficiencies in the design or operation of internal controls which

could adversely affect the issuer's ability to record, process summarize, and report

financial data and have identified for the issuer's auditors any material weaknesses

in internal controls; and (B) any fraud, whether or not material, that involves

management or other employees who have a significant role in the issuer's internal controls; and (6) the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

61.     Likewise, Section 906 of Sarbanes-Oxley, 18 U.S.C. §1350, entitled, "Failure of corporate officers to certify financial reports," requires, in relevant part:

> a. Certification of periodic financial reports.  Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission pursuant to 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.

> b. Content.  The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of ... 1934 (15 U.S.C. 78m(a) 78o(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations  of the issuer.

62.     Pursuant to Section 404 of Sarbanes-Oxley, on June 5, 2003, the SEC issued a final rule and amended Item 307 of Regulations S-K and S-B.  See Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, In re Management's Report on Internal Control Over Financial Report and Certification of Disclosure in Exchange, 2003 WL 21294970, at *11 (S.E.C. Release No. 8238) (June 5, 2003).  Specifically, as part of a company's corporate governance obligations,

management is required to include an internal control report of management that

contains the following in its annual report:

> a. A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

> b. A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

> c. Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective. The assessment must include disclosure of any 'material weaknesses' in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

> d. A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

63. The Public Company Accounting Oversight Board ("PCAOB")

adopted the longstanding auditing provision that a company has a control

deficiency "when the design or operation of a control does not allow management

of employees, in the normal course of performing their assigned functions, to

prevent or detect misstatements on a timely basis." Notice of filing of Proposed

Rule on Auditing Standard No. 2, An Audit of Internal Control Over Financial

Reporting Performed in Conjunction With an Audit of Financial Statements, File

No. PCAOB-2004-03 (Apr. 8, 2004). Further, the PCAOB believes that a

"deficiency in operation exists when a properly designed control does not operate

as designed, or when the person performing the control does not possess the

necessary authority or qualifications to perform the control effectively." *Id.*

64.     At all relevant times, the Individual Defendants, while they had

control over the content of HP's proxy statements, including the 2012 Proxy

Statement and the HP Annual Reports, incorporated therein by reference,

repeatedly opined that internal controls over financial reporting were adequate,

despite the fact that the Company's internal controls were routinely circumvented

in order to perpetrate the unlawful activities alleged herein in contravention of

GAAP and in violation of, *inter alia*, the FCPA. Indeed, given the widespread and

global bribery in which the Company's management was engaged, known to

Defendant Hurd, among others, it should have been obvious to E&Y, the Audit

Committee and even HP's entire Board, that the Company's internal controls were

materially deficient.

65.     As a result of at least some of the Company's bribery activities which

have come to public attention, HP was identified in a bribery indictment in

Leipzig, Germany on August 30, 2012 and revealed in the United States in *The*

*Wall Street Journal* on September 20, 2012. The criminal charges were brought

against three HP executives. The prosecutors, who have asked that HP be attached

as a defendant in the case, alleged that three HP Vice-Presidents approved creating

a fund pursuant to which the Company paid about $10 million in bribes and used a

German subsidiary and a network of shell companies' accounts to effectuate the

bribes paid in Russia.  Although the Company now claims that it is cooperating in the investigations of it, including those underway by the DOJ and SEC, for years it "stonewalled" such investigations under the direct supervision of Defendant Hurd and General Counsel Holston.[8]

66.     Despite these material weaknesses in HP's internal controls, the Company's financial statements, appearing in its 2012 Annual Report, stated that its internal controls over financial reporting were effective.  Through its CEO and CFO, HP unjustifiably executed "clean certifications" pursuant to Sections 302 and 906 of Sarbanes-Oxley.  But these certifications falsely and deceptively opined*, inter alia*, that the Company's CFO and CEO disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.

67.     Similarly, the Company's 2010-2012 Proxy Statements, soliciting shareholders' votes, contained false and/or misleading information by failing to identify the significant deficiencies and material weaknesses in the Company's internal controls historically and otherwise, all of which bore significantly on, *inter alia*, the retention of E&Y as HP's independent auditor. At all relevant times, the Company's Board controlled the content of HP's Proxy Statements.  As such, each

---

[8] In addition to the bribes paid, the Company has been forced to retain numerous lawyers in the United States and abroad in connection with this and other bribery/FCPA investigations. The Company has been attempting to negotiate a deferred prosecution agreement with the DOJ and payment of a substantial fine with the SEC.

of HP's directors, including those named herein as Defendants during the times in which they served as such, were and are responsible for their contents, including HP's 2012 Proxy Statement.

68.    The selection and ultimate ratification of E&Y as HP's auditor by the Company's shareholders causes and caused HP and all its shareholders (including Plaintiff) economic harm since, *inter alia*, E&Y is being and was paid by HP millions of dollars in fees for audits that were not conducted in accordance with GAAS, which it was and is contractually obligated to do.

**B.    Approval of Executive Compensation**

69.    Another item of business for HP shareholders at the Annual Meeting held on March 21, 2012 was to approve, on an advisory basis, the compensation of certain named executive officers ("the executive compensation proposal") as proposed by the Board.

70.    The 2012 Proxy Statement fails to provide adequate disclosure as to what information the HP Board considered in making the recommendation for shareholders to vote for the Board's executive compensation proposal.

71.    Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, HP is required to seek an advisory vote from its shareholders regarding its executive compensation practices (a/k/a "Say-on-Pay"). Although the vote is advisory, shareholders are entitled to cast an informed vote in order to provide meaningful feedback to the HP Board and the investing public

generally regarding the Company's executive compensation practices. HP shareholders were unable to do this inasmuch as they were not provided with all necessary material information relative to the subject matter of their votes.

72.    The 2012 Proxy Statement stated that "HP has a "pay-for-performance" philosophy that forms the foundation of **all** decisions regarding compensation of HP's named executive officers." [emphasis added]

73.    The Proxy Statement went on to explain:

> "HP stockholders did not approve HP's executive compensation at HP's 2011 annual meeting of stockholders. During fiscal 2011, we engaged in substantial ongoing discussions with institutional investors to gather feedback. Those discussions, which included meetings between our senior management and over 200 investment firms and institutional stockholders, included topics such as corporate governance, CEO compensation, discretionary payments, compensation disclosure, equity aware vesting periods, severance arrangements, capital allocation, board composition, talent management and succession planning, among others. These meetings occurred over the course of the entire fiscal year, varied in length and were conducted via teleconference and in person. HP participants varied and included our Chief Executive Officer, our Chief Financial Officer, our Chairman of the Board, other directors, various business unit leaders, representatives of Investor Relations, Human Resources and Legal, and other senior leaders. Subsequent to those discussions, the HR and Compensation Committee[9] adopted the following changes to HP's executive compensation program to address the concerns of stockholders:
>
> o    We will target the compensation of our executives within a competitive range of the market median, provided performance goals are met;

---

[9] The HR and Compensation Committee members were Defendant Babbio, who was the Chair until January 4, 2012, Defendant Russo, who replaced Babbio as the Chair, Defendant Hammergren, and Ralph V. Whitworth, who was appointed to the Committee on November 17, 2011.

o We have restructured our incentive compensation programs to limit the use of discretion in pay decisions and have provided more detailed disclosure about the rationale of our pay decisions;

o We have redesigned our annual incentive plan, the Hewlett-Packard Company 2005 Pay-For-Results Plan, to reinforce an even stronger and more transparent linkage between incentive compensation earned and clearly defined and quantifiable financial and non-financial metrics;

o We are disclosing more detailed information about historical performance targets, actual performance against targets, and payouts under our annual incentive plan;

o We have made significant changes to the structure and design of our CEO's compensation which have resulted in Ms. Whitman receiving a compensation package that is strongly performance-based and positioned below the peer group median.  The package includes:

> o An annual salary of $1 per year; no guaranteed payout under any incentive compensation plan;

> o An award of stock options, more than 80% of which will vest only upon the achievement of pre-determined stock price appreciation goals; and

> o Other compensation and benefits, including severance benefits, that are consistent with the compensation and benefits provided to other senior executives;

> o We are no longer providing tax gross-ups for Section 16 officers except for gross-ups on relocation benefits, which are generally available to most employees for assignments requested and initiated by HP;

> o We have adopted amendments to our Severance Plan for Executive Officers to bring the benefits provided under the plan closer in line with current market practice and to reduce the need for individual agreements and the use of discretion in determining severance plan benefits; and

> o We have increased our efforts to review and analyze the availability and readiness of future leadership talent,

and we have shifted our people strategy to focus on developing our internal talent to minimize the need to go outside for talent."

74. After summarizing the changes to the Board's executive compensation policy, the 2012 Proxy Statement sets forth the existing compensation practices that would be maintained at HP, including the following:

- "An independent compensation consultant and independent counsel who report directly to the HR and Compensation Committee and provide no other services to HP;

- Significant stock ownership guidelines that align executives' interests with those of stockholders;

- No tax gross-ups provided on income associated with the personal use of corporate aircraft or on payments made in connection with a change of control;

- No special or supplemental pension, health or death benefits for executives;

- A "clawback" policy that permits the Board to recover bonuses from senior executives whose fraud or misconduct resulted in a significant restatement of financial results;

- An annual risk assessment of HP's pay practices;

- Compensation policies and practices designed to discourage excessive risk-taking, including the assessment of performance across multiple dimensions and metrics, the use of multi-year performance periods, and the adoption of stock ownership guidelines and a "clawback" policy; and

- An annual stockholder advisory vote on executive compensation."

75. The Proxy Statement went on to say:

"We believe that the changes summarized above, together with our existing compensation practices, have addressed the concerns of many of our stockholders and have resulted in a compensation program

deserving of stockholder support.  Accordingly, we are asking for stockholder approval of the compensation of our named executive officers as disclosed in this proxy statement."

76.   The Proxy Statement further explained:

"This vote is not intended to address any specific item of compensation, but rather the overall compensation of our named executive officers and the policies and practices described in this proxy statement.

This vote is advisory and therefore not binding on HP, the HR and Compensation Committee of the Board, or the Board.  The Board and the HR and Compensation Committee value the opinions of HP stockholders and to the extent there is any significant vote against the named executive officer compensation as disclosed in this proxy statement, we will consider those stockholders' concerns, and the HR and Compensation Committee will evaluate whether any actions are necessary to address those concerns.  HP currently conducts annual advisory votes on executive compensation, and we expect to conduct the next advisory vote at HP's 2013 annual meeting of stockholders.

**Vote Required**
The affirmative vote of a majority of the shares of HP common stock present in person or represented by proxy and entitled to be voted on the proposal at the annual meeting is required for advisory approval of this proposal.

**Recommendation of the Board of Directors**
**Our Board recommends a vote FOR the approval of the compensation of HP's named executive officers, including the Compensation Discussion and Analysis, the compensation tables and narrative discussion following such compensation tables, and the other related disclosures in this proxy statement."**

77.   The 2012 Proxy Statement fails to disclose the following regarding the Board's executive compensation proposal: (1) a fair summary of the advice, counsel and analyses performed and provided to the HP Board and/or the HR and

Compensation Committee by Compensation Advisory Partners LLC ("CAP"), its independent compensation consultant, SNR Denton US LLP ("SNR"), its independent legal counsel, and Meridian Compensation Partners, LLC ("Meridian"), management's compensation consultant; (2) how the HP Board's HR and Compensation Committee selected CAP, SNR, and Meridian in connection with determining executive compensation, and the amount of fees HP paid to these entities in connection with their services; (3) the compensation data for named executive officers of peer companies, including the median, mean, and range for the peer group data set; and (4) the weight given to the factors reviewed by the directors in determining executive compensation. Such information was and is material to the shareholders' vote, including that of Plaintiff, as to the Board's proposed compensation package.

78.     Moreover, HP's 2012 Proxy Statement is misleading in terms of the compensation package actually awarded, particularly to Defendants Lane and Whitman.  Despite stating explicitly that Defendant Whitman's pay is "100% performance-based" and the executive compensation proposals are largely performance-based, the reality is otherwise.  For example, Defendant Whitman, after becoming CEO, was awarded stock options on September 27, 2011, enabling her to buy 1.9 million HP shares.  By the terms of her award, the stock price must close at 20% above the exercise price for a portion of the options to vest and 40% above for another portion to vest.  On its face, this award seems performance-

driven, but it is not.  Given that the exercise price was the lowest the stock had been since August 16, 2005, that the average closing price of the stock in the 5 years preceding the award was 77% higher, and that the stock already went up 23% by February 2012 without even announcing a new strategy, it would not be difficult to reach the 20% and 40% hurdles.  Defendant Whitman would receive, pursuant to the foregoing award, $18 million without any motivation to perform her job well.  Likewise, Defendant Lane was offered a similar deal that would result in millions of dollars for sub-par performance as Executive Chair.

79.     The HP Board is aware that since Defendant Whitman became CEO and Defendant Lane joined the Board, HP's revenues, margins and cash position continue to deteriorate, yet despite this failed performance, the Board has wastefully and unjustifiably provided them with bloated levels of compensation, in violation of HP's documented  pay-for-performance principles.  The compensation of both Defendants Whitman and Lane, who now dominate HP's Board,  should be far less than it has been, in an amount which cannot presently be determined, saving HP millions of dollars. The HP Board's failure to assess all material facts in determining the compensation of Defendants Lane and Whitman was a breach of fiduciary duty and a waste of HP's assets.  Indeed, the Board's approval of such compensation without an assessment of all material facts bearing upon it was and is an abdication of the Board's business judgment.

80.     The Board's awards of excessive and unjustified compensation to

Defendants Lane and Whitman was and is a waste of HP's assets and reflects an irrational squandering of those assets that served no legitimate corporate purpose. Indeed, but for their respective breaches of their duties of loyalty owed to HP, each of the members of the Board would have refrained from such unsound generosity. Such excessive compensation reflected a *quid pro quo* which was repaid to the other directors of the Company who received excessive compensation for services which were of no material value to the Company.

81.     The HP Board is not entitled to the protection of the business judgment rule because it failed to follow HP's own documented executive compensation philosophy, guiding principles, policies, and procedures, as they were represented to HP shareholders and, as indicated above, the Board had abandoned the necessity of actually using its business judgment in connection with the compensation packages provided to Defendants Lane and Whitman.

82.     Section 162(m) of the Internal Revenue Service Code limits the tax deduction a publicly held company may take with respect to annual compensation paid to the chief executive officer and three other most highly compensated officers.  An exemption is available for certain performance-based compensation that is paid pursuant to a plan that has received shareholder approval.

83.     The 2012 Proxy Statement states:

> "The impact of federal laws on HP's compensation programs is also considered, including the deductibility of compensation paid to the NEOs, as limited by Section 162(m) of the Internal Revenue Code

(the "Code"). Most of HP's compensation programs are designed to qualify for deductibility under Section 162(m), but to preserve flexibility in administering compensation programs, not all amounts paid under all of HP's compensation programs may qualify for deductibility."

84.     The bonus programs implemented by the Company produce tax liabilities for the Company and constitute corporate waste and breaches of fiduciary duties.

## C.     The 2011 Proxy Statement and Annual Meeting

85.     On or about February 1, 2011, the Company issued and disseminated its Proxy Statement announcing and soliciting shareholder votes in connection with HP's Annual Meeting of Shareholders held on March 23, 2011.

86.     Upon information and belief, each of the 17 HP directors serving as of February 1, 2011, which includes the Individual Defendants, other than Defendant Hurd, approved the content of the 2011 Proxy Statement and/or indirectly controlled its content, all the while omitting material facts bearing upon how the shareholders of the Company would vote. The 17 directors stated:

> "Our Board recommends that you vote your shares FOR each of the nominees for election to the Board, FOR the ratification of the appointment of HP's independent registered public accounting firm, FOR the approval of the compensation of HP's named executive officers, FOR the approval of an annual advisory vote on executive compensation, FOR the approval of the Hewlett-Packard Company 2011 Employee Stock Purchase Plan, and FOR the approval of an amendment to the Hewlett-Packard Company 2005 Pay-for-Results Plan to extend the term of the plan."

87.     Among the items of business for HP shareholders at the Annual Meeting was to elect the 13 directors standing for election pursuant to the 2011

Proxy Statement, each of whom was put forward by the Company's Board of Directors. In an effort to obtain shareholder votes for the Board's nominees for lucrative directorships and otherwise, notwithstanding the conduct described herein, the 2011 Proxy Statement, which was an essential link in obtaining these affirmative votes, falsely says: "HP is committed to maintaining the highest standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining HP's integrity in the marketplace."

88.   The 2011 Proxy Statement misrepresented the process by which director nominees were considered and purportedly evaluated:

> "The Board annually reviews the appropriate skills and characteristics required of directors in the context of the current composition of the Board, our operating requirements and the long-term interests of our stockholders. The Board believes that its members should possess a variety of skills, professional experience, and backgrounds in order to effectively oversee our business. In addition, the Board believes that each director should possess certain attributes, as reflected in the Board's membership criteria described below.

> HP's Corporate Governance Guidelines contain the current Board membership criteria that apply to nominees recommended for a position on the Board. Under those criteria, members of the Board should have the highest professional and personal ethics and values, consistent with longstanding HP values and standards. They should have broad experience at the policy-making level in business, government, education, technology or public service. They should be committed to enhancing stockholder value and should have sufficient time to carry out their duties and to provide insight and practical wisdom based on experience. **Their service on other boards of public companies should be limited to a number that permits them, given their individual circumstances, to perform responsibly all director duties. Each director must represent the interests of all stockholders of HP.** Although the Board uses these and other criteria as appropriate to evaluate potential nominees, it has no stated minimum criteria for nominees.

> The Board believes that all the nominees named below are highly qualified and have the skills and experience required for effective service on the Board. The nominees' individual biographies below contain information about their experience, qualifications and skills that led the Board to nominate them." [Emphasis added.]

89.     Notwithstanding the foregoing, the HP Board did not follow the stated policy guidelines in removing four board members, namely, Hyatt, Joyce, Ryan, and Salhany, and adding five more, namely, Banerji, Reiner, Russo, Senequier, and Whitman.  The 2011 Proxy Statement explained: "Two of the seven directors who joined the Board since the last annual meeting of stockholders, Mr. Apotheker and Mr. Lane, were identified by a professional search firm.  The other five directors, Mr. Banerji, Mr. Reiner, Ms. Russo, Ms. Senequier, and Ms. Whitman, were identified by an *ad hoc* committee of directors consisting of the Chief Executive Officer and three non-employee directors, which was formed in November 2010 to assist in the identification of new director candidates and to facilitate the process of evaluating those candidates as potential directors."

**90.**     The 2011 Proxy Statement omits the fact that after Defendant Apotheker became CEO of the Company, Defendant Thompson declared at a Board meeting that every director should tender his or her resignation in order that Defendant Lane, who had only just joined the Board, could pick the directors to keep.  General Counsel Holston jumped in and warned that applicable securities laws required letters of resignation to be publicly disclosed.  Defendant Thompson then asked who would quit, and most directors raised their arms.  In response,

Defendant Lane established a committee, consisting of himself, Defendants Apotheker, Babbio, McKesson, and Hammergren, to determine who to retain on the Board. In December 2010, Defendant Lane asked Defendants Hyatt, Joyce, Ryan, and Salhany to step down in order to rid the Board of those intimately involved in the Hurd investigation. In January 2011, HP announced the five new directors including Defendant Senequier, an ally of Defendant Apotheker, and Defendant Whitman, a friend of Defendant Lane.

**91.** The 2011 Proxy Statement further omitted non-pejorative material facts about the nominee directors which the Company's shareholders would have wanted to know in voting upon the election/re-election of such directors, including pending lawsuits against the director nominees, as described above.

92. The 2011 Proxy Statement goes on to state that:

> "Board Structure and Committee Composition    As of the date of this proxy statement, the Board has 17 directors and the following six standing committees: (1) Audit; (2) Finance and Investment; (3) HR and Compensation; (4) Nominating and Governance; (5) Public Policy; and (6) Technology. The current committee membership, the number of meetings during the last fiscal year and the function of each of the standing committees are described below."

In fact, by use of the term "standing committee," the Board members intentionally concealed the fact that the Board has had *de facto* "standing committees" for many years, designated by the full Board to investigate or appear to investigate repeated acts of mismanagement and director wrongdoing.

93. The 2011 Proxy Statement deceptively excluded any reference to the "Special Litigation Committee" (or the various iterations of it), which had been in

existence since 2006 and has been dealing with long-continuing and serious misconduct on the part of Board members and senior management, as well as the latest *de facto* "standing committee," the so-called "Independent Committee" and its predecessor, the Ryan-Salhany "Special Committee." Notwithstanding the fact that the 2011 Proxy Statement purports to disclose the existence of all other "standing committees," the identities of their members, and their respective purposes, such information was omitted intentionally by the Board with respect to the "Independent Committee," the Ryan-Salhany "Special Committee" and the "Special Litigation Committee", in violation of the sitting directors' disclosure obligations under and pursuant to §14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

94. Each of such committees, however named from time-to-time, was charged with, *inter alia*, in one form or another, addressing serious misconduct on the part of Board members and senior management. The fact that the HP Board felt it necessary over a multi-year period to have in place standing committees of the Board to address material wrongdoing by the senior officers and the Board, was and is of the utmost materiality in shareholders' ability to understand the long-term failings of the Board and, ultimately, how to vote upon the Board's recommendations including their own nominees for election and the ratification of E&Y as HP's auditor.

95. The 2011 Proxy Statement falsely stated that the Board has in place a

functioning "Board Risk Oversight" process. It states:

> "The Board, with the assistance of the Audit Committee and other Board committees as discussed below, reviews and oversees our enterprise risk management ("ERM") program, which is an enterprise-wide program designed to enable effective and efficient identification and management of critical enterprise risks and to facilitate the incorporation of risk considerations into decision making. The ERM program was established to clearly define risk management roles and responsibilities, bring together senior management to discuss risk, promote visibility and constructive dialogue around risk at the senior management and Board levels, and facilitate and drive appropriate risk response strategies. Under the ERM program, management develops a holistic portfolio of HP enterprise risks by facilitating business and function risk assessments, performing targeted risk assessments, and incorporating information regarding specific categories of risk gathered from various internal HP organizations. Management then develops risk response plans for risks categorized as needing management focus and response and monitors other identified risk focus areas. Management provides regular reports on the risk portfolio and risk response and monitoring efforts to senior management and to the Audit Committee.
>
> The Audit Committee oversees management's implementation of the ERM program, including reviewing HP's enterprise risk portfolio and evaluating management's approach to addressing identified risks. While the Audit Committee has primary oversight responsibility for the risk assessment and management process, various other committees of the Board also have responsibility for oversight of risk management. …..In addition, the Finance and Investment Committee is responsible for overseeing financial risks. Further, the Nominating and Governance Committee oversees risks associated with HP's governance structure and processes. The Board is kept informed of its committees' risk oversight and related activities primarily through reports of the committee Chairmen to the full Board. In addition, the Audit Committee escalates issues relating to risk oversight to the full Board as appropriate to provide that the Board is appropriately informed of developments that could affect HP's risk profile or other aspects of HP's business. The Board also considers specific risk topics in connection with strategic planning and other matters."

96.    The Board misrepresented the functioning of HP's "Board Risk Oversight" process as evidenced by the manner in which the Board authorized management to, *inter alia*, proceed to bid irrationally for 3PAR, an ego-driven acquisition, and paid substantial bribes in the United States and abroad pursuant to

which the Board wholly disregarded the financial and operational risks to the Company by such conduct. The lofty principles set forth as the Company's "Board Risk Oversight" process in the 2011 Proxy Statement were contradicted by the actions of the Individual Defendants herein. Moreover, the newly-appointed directors, such as Defendants Reiner and Whitman, had no basis in fact to make such a statement or to cause it to be made in the name of HP since they had not an adequate opportunity to learn personally whether the Board had in place a functioning "Board Risk Oversight" process. As to the remainder of the then-serving Board, they personally knew that the Board did not have an effective "Board Risk Oversight" process and, in fact, that its oversight was in a sorry state of disarray.

**97.**    Nowhere in the 2011 Proxy Statement, despite the principal purpose of the Proxy Statement being the solicitation of proxies in favor of, *inter alia*, the sitting Board members, was there even the slightest discussion or presentation of facts with respect to the long-term failure of the Board to seriously address the wrongdoing referred to herein and, in particular, the repeated instances of violations of law. Those facts, which could have been presented to HP shareholders in neutral, non-pejorative terms, were and are of the utmost materiality in a shareholder's determination of the qualifications of each such nominee to serve or continue to serve as a director of the Company. The nominees for directorships of HP, as set forth in the 2011 Proxy Statement, were elected, and

such election was an essential link between the false and misleading proxy statement and the wrongdoing such directors engaged in following the 2011 Annual Meeting. To the extent that their serving as directors damaged the Company as described herein, such damages would not have taken place but for their election. These directors received more than $14 million in compensation for serving as directors from March 2011 through February 2012.  Additionally, HP paid nearly $1 million to the HP directors for their service during this time period, including fees for committee chairs and additional meetings.

98.    Among the various proposals put forth by the Board in the 2011 Proxy Statement, the Company's stockholders were asked to ratify at the Annual Meeting the Audit Committee's appointment of E&Y as HP's independent registered public accounting firm for the fiscal year ending October 31, 2011.

99.    In putting forth E&Y's appointment for ratification by the Company's stockholders, the Board failed to disclose the fact that, as set forth above, E&Y had failed in its audits of HP's financial statements to, *inter alia*, uncover the fact of the payment of substantial amounts of bribes in the United States and abroad which, if E&Y had conducted its audits in accord with GAAS, it would have uncovered. The Board knew but did not disclose in the 2011 Proxy Statement that E&Y had been negligent in performing its audits and had breached the terms of its agreements with HP (through the Audit Committee of the Board) that such audits be conducted consistent with GAA*S*. Such facts were and are material to the HP shareholders'

vote upon the ratification of the Audit Committee's appointment of E&Y.

100.   Similarly, nowhere in the 2011 Proxy Statement, despite the principal purpose of the Proxy Statement being the solicitation of proxies in favor of the sitting Board members and the ratification of the appointment of E&Y, was there even the slightest discussion or presentation of facts with respect to the long-term failure of the Board and E&Y, in neutral, non-pejorative terms, to seriously address the wrongdoing referred to herein and, in particular, the repeated instances of violations of law. Those facts, which could have been presented to HP shareholders in neutral, non-pejorative terms, were and are of the utmost materiality in a shareholder's determination of the qualifications of each such nominee to serve or continue to serve as a director of the Company and of E&Y to serve as the Company's independent registered public accounting firm. The selection and ultimate ratification of E&Y as HP's auditor by the shareholders caused HP and all its shareholders (including Plaintiff) economic harm since, *inter alia*, E&Y was paid by HP $44.4 million dollars in fees for its 2011 audit that was not conducted in accordance with GAAS, which it was contractually obligated to do.

101.   The SEC issued a legal bulletin in October 2009 declaring that, "one of the board's key functions is to provide for succession planning so that the company is not adversely affected due to a vacancy in leadership."   The 2011 Proxy Statement contains a description of the Board's purported criteria for

assessing the qualification of potential CEO successors including "strategic vision and leadership, operational excellence, financial management, executive officer leadership development, ability to motivate employees, and an ability to develop an effective working relationship with the Board."

102.   Notwithstanding what is stated in the 2011 Proxy Statement, upon information and belief, the HP Board has had no succession plan in place, nor any serious process in place to evaluate potential candidates consistent with the foregoing criteria.  Defendant Hurd had told the Board that no internal candidates, including Todd Bradley, Ann Livermore, Tom Hogan, or David Donatelli, were ready to be CEO.  After Defendant Hurd's departure, the Board heeded Defendant Hurd's evaluations, and ruled out the internal candidates, resorting to an interim CEO for two months.  The Board then rushed recklessly into hiring a new CEO, Defendant Apotheker, 55 days after Hurd's dismissal.   Indeed, Defendant Apotheker was selected without having been interviewed by the full HP Board, and without an adequate investigation into his background, including, *inter alia,* his role in SAP's intellectual property theft of Oracle, and his lack of consumer-facing technology experience.

103.   The selection of Defendant Apotheker as CEO by the Board was reckless.  On Defendant Apotheker's watch, HP stock fell 47%, or a loss of over $40 billion in the Company's market value.  Defendant Apotheker's strategy to fix the deteriorating HP by spinning off its PC division and buying a large data

analytics company failed miserably. A five-member committee, including Defendants Babbio, Russo, and Lane, studied the options for the PC division, but did not do enough due diligence to evaluate the impact of Defendant Apotheker's plan. They met just twice and did not even consult Todd Bradley, the head of that division. On August 18, 2011, the Board approved the acquisition of Autonomy and the plan to explore a PC spinoff. It also announced the end of the Company's plan to develop a tablet-sized product. The announcements caused HP shares to plunge 20% just in one day. A month later, Defendant Apotheker was fired by the Board that had been so reckless in hiring him. Defendant Apotheker's incompetence and tumultuous tenure was generously rewarded by the Board with a severance payout of over $13.2 million.

104. Immediately after Defendant Apotheker departed, the Board, at the urging of her friend, Defendant Lane, abruptly hired Defendant Whitman as President and CEO, without having conducted any search. Defendant Whitman lacks the experience necessary to run a large, complex computer hardware, software and technological services company such as HP, and her rushed selection by the Board has been widely ridiculed in the business media. Under her leadership, HP's financial outlook continues to deteriorate and its stock has traded near a 10-year low, as noted in a critical article which appeared in *The Wall Street Journal* of October 30, 2012.

105. The Board's failure to implement a CEO succession plan and its

failure to evaluate candidates pursuant to the criteria proclaimed falsely in the 2011 and 2012 Proxy Statements, and its members' conscious indifference to this material issue facing the Company, constitutes a breach of each Board member's fiduciary duty to the Company, and has led to enormous corporate waste in the form of millions of dollars in severance payments rewarding HP's repeatedly failed CEOs.

**D.** **The 2010 Proxy Statement and Annual Meeting**

106.   On or about January 27, 2010, the Company issued and disseminated its 2010 Proxy Statement announcing and soliciting shareholder votes in connection with HP's Annual Meeting of Shareholders which was held on March 17, 2010.   The 2010 Proxy Statement proclaimed that "The Hewlett-Packard Company Board of Directors has made these materials available to you."

107.   Among the items of business for HP shareholders at the 2010 Annual Meeting was to elect the directors named in the 2010 Proxy Statement, each of whom was put forward by the Company's Board of Directors which, as of January 27, 2010 consisted of Defendants Hurd, Andreessen, Babbio, Baldauf, Gupta, Hammergren, Hyatt, Joyce, Ryan, Salhany and Thompson. Upon information and belief, each of the then HP directors serving as of January 27, 2010, including Defendant Hurd, approved the content of the 2010 Proxy Statement and/or indirectly controlled its content all the while omitting material facts bearing upon how the shareholders of the Company would vote upon the Board's nominees for

directorships.  The directors stated:

> "Our Board recommends that you vote your shares FOR each of the nominees for election to the Board, FOR ratification of the appointment of HP's independent registered public accounting firm, FOR the approval of the Amended and Restated Hewlett-Packard Company 2004 Stock Incentive Plan, and FOR the proposal to conduct an annual advisory vote on executive compensation."

108.   In an effort to obtain shareholder votes for the Board's nominees for lucrative directorships and otherwise, notwithstanding the conduct described herein, the 2010 Proxy Statement, which was an essential link in obtaining these affirmative votes, falsely says: "HP is committed to maintaining the highest standards of business conduct and corporate governance, which we believe are essential to running our business efficiently, serving our stockholders well and maintaining HP's integrity in the marketplace."

109.   The 2010 Proxy Statement goes on to state that what were the qualifications for selection to HP's Board:

> "Director Qualifications
>
> HP's Corporate Governance Guidelines contain Board membership criteria that apply to nominees recommended for a position on the Board. Under these criteria, members of the Board should have the highest professional and personal ethics and values, consistent with longstanding HP values and standards. They should have broad experience at the policy-making level in business, government, education, technology or public service. They should be committed to enhancing stockholder value and **should have sufficient time to carry out their duties and to provide insight and practical wisdom based on experience. Their service on other boards of public companies should be limited to a number that permits them, given their individual circumstances, to perform responsibly all director duties**. Each director must represent the interests of all stockholders of HP." [Emphasis added.]

110.   Notwithstanding the foregoing, upon information and belief, other

than tracking each director's purchases and sales of HP stock, the Board made no serious evaluation of sitting directors, any determination of their effectiveness or the amount of time they had available to devote to the Company's business affair. In reality, those selected to be directors were chosen despite having numerous other directorships, professional duties and responsibilities which prevented them from fulfilling their fiduciary obligations to the Company and its shareholders, all of whom were directly and proximately damaged by the wrongdoing described herein. Because of these responsibilities, none of the members of the Board could devote sufficient time, *inter alia*, to monitor the activities of Defendant Hurd and his subordinates as described herein, to effectively oversee the manner in which the Company conducted its business and to insure that its employees did not pay bribes.

**111.** The 2010 Proxy Statement further omitted from disclosure non-pejorative material facts about the nominee directors which the Company's shareholders would have wanted to know in voting upon the election/re-election of such directors, including pending lawsuits against the director nominees, as described above.

112. The 2010 Proxy Statement states that the Board had a so-called "HR and Compensation Committee" about which the directors stated:

> "The HR and Compensation Committee discharges the Board's responsibilities relating to the compensation of HP's executives and directors; reviews and approves the Compensation Discussion and Analysis required by the SEC for inclusion in the annual proxy statement; provides general oversight of HP's

total rewards compensation structure; reviews and provides guidance on HP's human resources programs; and retains and approves the terms of the retention of the committee's compensation consultants and other compensation experts. Other specific duties and responsibilities of the HR and Compensation Committee include ….reviewing and approving objectives relevant to executive officer compensation, evaluating performance and determining the compensation of executive officers in accordance with those objectives; approving severance arrangements and other applicable agreements for executive officers; overseeing HP's equity and incentive compensation plans; overseeing non-equity based benefit plans and approving any changes to such plans involving a material financial commitment by HP; monitoring workforce management programs; establishing compensation policies and practices for service on the Board and its committees including annually reviewing the appropriate level of director compensation and recommending to the Board any changes to that compensation; developing stock ownership guidelines for directors and executive officers and monitoring compliance with such guidelines; and annually evaluating its performance and its charter."
[Emphasis added.]

113.    In fact, notwithstanding the above statements, the "HR and Compensation Committee" performed little or no substantive oversight of senior management's performance and compensation, particularly related to Defendant Hurd, who, among other characteristics, padded his expense accounts at least in partial view of the Committee members. The 2010 Proxy Statement failed to disclose that the Committee did little more than "rubber stamp" management's recommendations and, with respect to Defendant Hurd, recklessly permitted him to have an extraordinary employment contract with the Company without a "termination for cause" provision, standard in virtually all corporate employment contracts for senior executives. The absence of such a provision in Defendant Hurd's employment contract enabled him to extort the Company for $12,224,693 as a so-called "cash severance benefit" at HP's expense. Despite Defendant Hurd's

very generous compensation and benefits disclosed in the 2010 Proxy Statement, the 2010 Proxy Statement concealed material amounts paid by HP for his direct and indirect benefit that rendered the statements made therein false and misleading.

114.   In particular, as described more fully below, Defendant Hurd had the Company pay substantial amounts to Jodie Fisher for her purported services which were, directly and indirectly, for his personal benefit and charged HP material amounts for travel and related expenses, which benefitted him personally. Such facts, had they been disclosed in the 2010 Proxy Statement, were material to Defendant Hurd's re-election to the Board. Indeed, had the payments and the circumstances under which they were made been disclosed, Defendant Hurd would not have been elected as a director of HP.

115.   The Board's Audit Committee had appointed E&Y as H-P's independent registered public accounting firm for the fiscal year ending October 31, 2009. Among the various proposals put forth by the Board in the 2010 Proxy Statement, the Company's stockholders were asked to ratify the appointment of E&Y at the 2010 Annual Meeting.

116.   In putting forth E&Y's appointment for ratification by the Company's stockholders, the Board failed to disclose the fact that E&Y had failed in its audits of HP's financial statements to, *inter alia*, uncover the fact of the payment of substantial amounts of bribes in the United States and abroad which, if EY had conducted its audits in accord with GAAS, it would have uncovered. The Board

knew but did not disclose in the 2010 Proxy Statement that E&Y had been negligent in performing its audits and had breached the terms of its agreements with HP (through the Audit Committee of the Board) that such audits be conducted consistent with GAAS. Such facts were and are material to the HP shareholders' vote upon the ratification of the Audit Committee's appointment of EY.

117.   The selection and ultimate ratification of E&Y as HP's auditor by the shareholders caused HP and all its shareholders (including Plaintiff) economic harm since, *inter alia*, E&Y was paid by HP $45.7 million dollars in fees for its 2010 audit that was not conducted in accordance with GAAS, which it was contractually obligated to do.

118.   Similarly, the nominees for directorships of HP, as set forth in the 2010 Proxy Statement, were elected, and such election was an essential link between the false and misleading proxy statement and the wrongdoing such directors engaged in following the 2010 Annual Meeting. To the extent that their serving as directors damaged the Company as described herein, such damages would not have taken place but for their election.

### E.   The Hurd-Fisher Scandal

119.   On a date prior to August 6, 2010, H-P's Board asked for and received the resignation of Defendant Hurd in connection with, among other reasons, his highly publicized relationship with Jodie Fisher involving claims of sexual harassment, inappropriate sexual advances and, admittedly, an inappropriate

relationship between the participants, including Defendant Hurd's submission of unjustified expense reports related to such relationship and otherwise.

120. Although the underlying conduct of Defendant Hurd and Ms. Fisher, about which the members of the Board were aware for more than six weeks (since at least approximately June 29, 2010) prior to public disclosure, have caused the Company substantial investigative, public relations and other expenses which should be borne by the two of them, the Board's request for Defendant Hurd's resignation purportedly on these grounds appears to have been, upon information and belief, merely a pretextual story line for public consumption intended to conceal far more serious wrongdoing on the part of Defendant Hurd and his subordinates including the pervasive payment of bribes by HP employees and representatives and related cover-up of such conduct and "stonewalling" of the SEC, DOJ and other investigative bodies, all of which was known or should have been known by Defendant Hurd as well as the members of the Board's Audit Committee.

121. Ms. Fisher had been compensated by the Company, at the direction of Defendant Hurd, for services of questionable value and/or which were never rendered and inappropriately reimbursed for expenses, all of which compensation Defendant Hurd directly or indirectly approved.

122. Despite Defendant Hurd's enormous personal compensation, according to H-P's now-terminated General Counsel, Holston, Defendant Hurd had

a "systematic pattern" of padding his own expense accounts. Such padding was carried out directly or through his assistant and HP Vice President, Caprice Fimbres McIlvaine, in material amounts which have not been disclosed publicly but which, upon information and belief, rendered the statements made in publicly-filed documents (including, *inter alia*, the 2010 Proxy Statement) false and misleading. If E&Y had conducted its audits of HP's financial statements and its evaluations of the Company's internal controls consistent with GAAS and its obligations under its engagement letters with HP's Audit Committee, such a "systematic pattern" should have been obvious to E&Y and publicly revealed.

123. The misappropriation of the Company's funds by both Defendant Hurd and Ms. Fisher must be remedied, particularly in the context of HP's "going away" gift to Defendant Hurd in cash and HP stock, variously valued at $30-55 million (at the time of his termination), including the $12,224,693 "cash severance benefit" paid to him and the amounts paid to Ms. Fisher or other benefits she received at the expense of HP, all of which were for the ultimate personal benefit of Defendant Hurd.[17] To the extent such unjustified payments are the result of negligent drafting of Defendant Hurd's employment agreement by HP in-house or outside legal counsel, the responsible lawyers should be held accountable to the Company as should those members of the Board's "HR and Compensation Committee," the members of which failed in their oversight of the terms of

---

[17] Although there was ample justification for dismissing Defendant Hurd for "cause," the Board did not do so to buy his silence and to protect themselves from further embarrassment.

Defendant Hurd's employment.[18]

124.   In addition to the negligent drafting of Mr. Hurd's employment contract, the HP Board recklessly agreed to a "separation agreement" that failed to contain a "non-compete" provision.   As a result, Defendant Hurd immediately joined Oracle, a leading competitor of HP, as its new Co-President, as of September 6, 2010.   The HP Board recklessly approved the filing of a belated lawsuit against Defendant Hurd, claiming the former CEO would take unfair competitive advantage of his intimate knowledge of HP's products, marketing, and service strategy.[19]   Reflecting the Board's own frustration with the improvident negotiation of Defendant Hurd's original compensation package and the more recently negotiated "separation agreement," such lawsuit, was vindictive and threatened any future cooperation between H-P and Oracle.   As reported by *The New York Times* on September 10, 2010:

> "**The Hewlett-Packard board is back to doing what it does best: shooting itself in the foot.**   By filing an embarrassing lawsuit against the company's former chief executive Mark V. Hurd, this week – a suit that unwittingly highlights the mistakes it made in the way it let Mr. Hurd go – **the H.P. board can now lay claim, officially, to the title of the Most Inept Board in America**."   [emphasis added]

---

[18] To the extent that the Board has failed wrongfully to take legal action to protect HP's legitimate and material claims, or entered into agreements tolling applicable statutes of limitations with those culpable officers who have caused the Company harm, it will have wasted HP's assets.

[19] Separate and apart from the "separation agreement," Defendant Hurd had and retains fiduciary duties to HP and its shareholders not to, *inter alia,* mis-use the Company's proprietary information, trade secrets or otherwise cause it harm. Upon information and belief, Defendant Hurd was and may still be breaching such duties in his role as Co-President of Oracle.

The reckless decision-making by the HP Board surrounding Defendant Hurd's termination caused the Company to suffer substantial economic damages and damages to its reputation. In the process, the Board wasted HP's corporate assets.

125.   In the context of the Hurd-Fisher relationship, which was not disclosed publicly by management or the Board until six weeks after the Company was formally informed of the relationship and other related material facts, while there were negotiations between and among the Board, General Counsel Holston and Defendant Hurd regarding his resignation and "going away" compensation, the Board intentionally concealed material facts from the investing public. The Board thereby subjected the Company to claims by those who invested in its stock during the period of approximately June 29 to August 6, 2010 and, *inter alia*, subjected the Company to an ongoing investigation by the SEC with respect thereto.

126.   Each member of the Board (including Defendant Hurd) as of August 6, 2010 is personally implicated in such concealment which, given the materiality of the underlying facts, was and is a violation of the federal securities laws, the directors' duty of candor and their fiduciary duties to the Company and its shareholders.

127.   The materiality of the concealed facts is reflected in the elimination of $8.7 billion in market value as a result of the 8% decline in the closing price of HP common stock on August 9, 2010. Those who invested during the period of the

Board's active concealment are undoubtedly very substantial. To the extent that HP has been sued based upon such claims, since any such claims would be based upon the Board's and Defendant Hurd's failure to disclose in a timely manner the material facts referred to above, each such director as of August 6, 2010 and Defendant Hurd should be held personally accountable to the Company and any attempted indemnification of any of such persons by the Company under such circumstances would be inappropriate and a waste of corporate assets.[20]

## F.   Bribery, Kickbacks and Illegal Rebates

128.   For many years, H-P officers and other executives subordinate to Defendant Hurd have been involved in paying bribes, directly and indirectly, purportedly as a means of obtaining business in Russia and elsewhere in the world, in violation of the FCPA and local anti-corruption laws. Such bribery included illegal conduct within the United States and in, *inter alia*, Germany, Austria, Serbia, the Netherlands and the Commonwealth of Independent States (i.e. Russia and certain other countries of the former USSR). Such conduct is under investigation in the United States by the DOJ and the SEC, as well as by governmental agencies in the above countries and, possibly, elsewhere.

129.   Among the various ongoing investigations that have apparently

---

[20] To the extent that HP is a defendant in such a case or as a result of any of the conduct referred to in this Complaint, Plaintiff will refrain from initiating any non-documentary discovery where it might reasonably interfere with the good faith defense of such claims against the Company. Upon the completion of any such litigation, Plaintiff will pursue all discovery means available to him. Notwithstanding the foregoing, there has been no public disclosure by HP of any such securities litigation. If in fact, there has been no such litigation, these allegations are moot inasmuch as the statute of limitations applicable to any such claims has now run.

concluded, the German public prosecutor's office has been investigating whether Kent Willet, head of HP's German equipment sales unit, and two former HP executives, Paeivi Tiippanna and Hilmar Lorenz, the former head of sales of HP in Russia, and at least seven others affiliated with them, paid more than $10 million in bribes in an attempt to obtain a contract to supply computer equipment and related software. Local officials raided the Company's offices in Germany, Austria and Switzerland in December 2009 and HP's Moscow offices in April, 2010. As indicated above, any such bribery, if proven, would constitute violations of the FCPA as well as the laws of the host countries.  On August 30, 2012, the HP executives were indicted criminally in Germany and the Company is now subject to being named in the bribery case as well, exposing it to fines and other penalties.

130.   At all material times, Defendant Hurd and the members of HP's Audit Committee knew or should have known of these and other material violations of the FCPA on the part of HP executives and the investigations of such conduct in its wake. As reported in *The Russia Monitor* on May 4, 2010, high-level executives at a subsidiary of HP made payments, through agents, to the Russian Prosecutor General's office in order to obtain the contract to supply computers to that office. There was a complicated financing scheme used to route payments to offshore accounts beneficially owned or controlled by unnamed Russian officials, funneling the suspected bribes through a network of shell companies and accounts in places including Britain, Austria, Switzerland, the British Virgin Islands, Belize, New

Zealand, Latvia, Lithuania, and the US states of Delaware and Wyoming. The bribes were paid through three German agents, who submitted fake invoices for non-existent sales and then paid the money as bribes to unnamed Russian governmental officials.

131. On April 15, 2010, *The Wall Street Journal* reported that three middlemen were alleged to have paid invoices, using funds provided by HP for equipment never purchased, to shell companies with bank accounts in Latvia, Lithuania, Austria, Switzerland and Belize. In return, the suspected middlemen allegedly received commissions totaling US$700,000, according to court documents.

132.   At least one witness has said that the above transaction was internally approved by HP through its then existing contract approval process. In the April 15, 2010 *Wall Street Journal* article, Mr. Dieter Brunner, a bookkeeper who is a material witness in the probe, said in an interview that he was surprised when, as an employee of HP, he first saw an invoice from an agent in 2004. He is quoted as saying: "It didn't make sense," because there was no apparent reason for HP to pay such big sums to accounts controlled by small-businesses. Mr. Brunner then proceeded to say he processed the transactions anyway because he was the most junior employee handling the file. He said: "**I assumed the deal was OK, because senior officials also signed off on the paperwork".**

133.   The Company's management and legal counsel, controlled by

Defendant Hurd, "stonewalled" the German prosecutors and concealed even the investigations by United States regulatory authorities (the SEC and DOJ) long after the foregoing illegal conduct had been revealed to Defendant Hurd, to legal counsel under his control and to the Audit Committee.[21] Moreover, despite the arrest of the three HP executives in December 2009, neither Defendant Hurd nor any senior HP executive made any effort to disclose the arrests or investigations to the SEC or DOJ until April 2010, according to the May 5, 2010 issue of FCPA Blog. As indicated in *The Wall Street Journal* of September 20, 2012, HP now claims that it is cooperating with the investigation in this country and abroad. By reason of the   "stonewalling" by Defendant Hurd and his subordinates in connection with the foregoing and other briberies, whatever fines and penalties the Company will be required to pay are likely to be increased.[22] Moreover, when such briberies and other wrongful conduct was disclosed to Defendant Hurd and the Board, they had an affirmative duty to make prompt disclosure thereof to the DOJ, the SEC and other agencies, including the German prosecutor's office. As with the "stonewalling" such concealment of material facts from the Company's filings with the SEC has undoubtedly made it more difficult and expensive for HP to

---

[21] While the Russian briberies occurred prior to Defendant Hurd's tenure as CEO, once he became aware of them in his capacity as CEO of HP, he had, at minimum, the duty to make timely disclosure of all material facts related thereto to at least the SEC and DLJ. Instead, he continued the "stonewalling" of the ongoing investigations which he was aware were underway.

[22] Plaintiff believes and therefore alleges that beyond the specifgically-identified Russian bribery referenced herein, HP pays bribes to obtain business in other parts of the world. Plaintiff reserves the right to ask the Court to provide leave to amend this Complaint to make reference to such other violations of the FCPA when they are disclosed publicly.

favorably resolve its ongoing negotiations.

134. In light of the foregoing conduct by the culpable executives subordinate to Defendant Hurd, and the passivity of the Audit Committee of HP's Board, the Company has been required to pay and will continue to pay substantial legal and other expenses. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial. The culpable executives and the responsible members of HP's Board should be required to pay personally any fines or penalties that are sought against HP as a result of their illegal conduct and its concealment.

**135.** If E&Y had conducted its audits of HP's financial statements and its evaluations of the Company's internal controls consistent with GAAS and its obligations under its engagement letters, such substantial bribery should have been obvious to E&Y and publicly revealed, particularly to the SEC and DOJ, which are likely to fine HP at least tens of millions of dollars or more as the result of such conduct.

136. The Board also authorized the Company to agree to a $55 million settlement with the Department of Justice in August 2010 to resolve an investigation into HP executives' violations of the Anti-Kickback Act of 1986 in connection with the General Services Administration ("GSA") Multiple Award Schedule contract. Such settlement also resolved separate "whistleblower"

allegations associated with the *United States ex rel. Rille v. Accenture LLP* Complaint filed in the United States District Court for the Eastern District of Arkansas in 2004 and joined by the DOJ in 2007. The wrongful acts of HP executives who were subordinates to Defendant Hurd (together with co-conspirators) included submitting claims inflated by kickbacks, illicit fees and rebates, to Accenture PLC (formerly known as Arthur Andersen Consulting), in exchange for its recommending the Company for government contracts, as well as providing incomplete information to the GSA during contract negotiations and overcharging the government by failing to provide "most favored customer" pricing.

137. The Board and/or its Audit Committee were long aware of the kickback scheme and GSA pricing issues and did little if anything material to correct the problem. HP executives continued to take the position that the Company's payments to systems integrators were legitimate and consistent with commercially reasonable industry standards when, in fact, as Defendant Hurd and his subordinates knew, that was not the case.

138. In connection with the litigation and settlement, HP has sustained as much as $100 million in litigation expenses and settlements for the wrongful conduct about which Defendant Hurd and other Board members have long-known or should have known. Further, the Company has not sued Accenture to recover the money illegally paid to it in connection with the government contracts it

purportedly facilitated and, thus, the Board has wasted HP's assets.

139. If E&Y had conducted its audits of HP's financial statements and its evaluations of the Company's internal controls consistent with GAAS and its obligations under its engagement letters, such widespread kickbacks and similar illicit conduct should have been obvious to E&Y and publicly revealed, thereby likely reducing the $55 million payment to the DOJ and the litigation expenses incurred by the Company.

140. In what appears to be a pattern of HP executives paying bribes and making improper gifts, presently unidentified HP executives conspired with Frankie Wong and his companies, Micro Systems Engineering ("MSE") and Analytical Computer Services ("ACS"), to provide gifts to employees of the Houston and Dallas, Texas Independent School Districts, in an attempt to rig the competition for the school contracts under the FCC's E-Rate program, a federally funded program designed to provide schools access to telecommunication services. Certain relator-plaintiffs filed a *qui tam* False Claims Act complaint against HP and MSE in the United States District Court for the Northern District of Texas regarding the E-Rate sales in Dallas, and others filed against HP and ACS in the United States District Court for the Southern District of Texas regarding E-Rate sales in Houston. The DOJ intervened in both cases. An investigation was conducted by the FCC and the DOJ, which now has been resolved by a payment from HP of approximately $16.25 million to such school districts, the payment of

the relators' attorneys' fees and costs, plus as much as $25 million in investigation and litigation-related expenses. The Board has, without any justification or rational reason, failed to cause HP to sue the responsible executives, Frankie Wong, Micro Systems Engineering, Analytical Computer Services, or anyone else in connection with these and other misuses of HP assets to recover the Company's damages. Upon information and belief, the Board, by not even considering such claims, has not even exercised its business judgment with respect to the pursuit of such claims. The Board has thus wasted the Company's assets.

## G.   The Bidding Frenzy for 3PAR

141.   In *The Wall Street Journal*, of August 28, 2010, columnist Rolfe Winkler states:

> "3PAR might as well have listed itself on eBay, given the frenetic pace of bidding by Dell and Hewlett-Packard. The question for shareholders is whether the two suitors' cavalier approach to valuation means their cash risks being wasted, or whether they are making a sensibly paying up [sic] to protect their markets."

Joseph Menn and Helen Thomas, in the *Financial Times* of August 28, 2010, referred to: "…a bidding frenzy prompted by strategic ambitions that pushed the [$30/share] price well beyond ordinary valuations."  Shawn Wu, an analyst at Kaufman Bros. was quoted as saying that the battle for 3Par has "gotten to a point where it seems to be getting emotional…When it gets emotional, it doesn't necessarily lead to the best business decision."

142.   It has been reported that, on August 1, 2010, the Company dropped out of the bidding for 3Par. No reasons were provided to HP's shareholders but,

upon information and belief, the Board and the Company's advisors determined that the price demanded then was unjustified.

143.   Notwithstanding the prudence in the earlier withdrawal from the bidding for 3Par, the HP Board's Finance Committee, chaired by Defendant Hammergren, and consisting of Defendants Hyatt, Babbio, and Thompson, authorized management to engage in a "bidding frenzy" for it. This decision was made under HP's interim management following Defendant Hurd's departure.  As explained by Dealbook in *The New York Times* on August 24, 2010, "3 Par has been on the block for some time.  So, it's surprising suddenly to see an unsolicited offer just a week after Dell, HP's archrival, agreed to a friendly deal at the end of a competitive auction."  Thus, even if the possible acquisition of 3Par might have been a rational exercise of the Board's business judgment before August 1, what took place thereafter well exceeded any rational exercise of business judgment and amounted to utter irresponsibility on the Board's part. This was particularly so in light of the fact that through much of the earlier negotiations and deliberations regarding 3Par, Defendant Hurd and the Board's attention was on the Hurd-Fisher scandal and its repercussions. Upon the termination of Defendant Hurd, moreover, the Company was without a CEO. In the wake of the public eruption of the scandal on August 6, 2010, HP's Board was particularly mindful of the need to generate publicity for the Company by an event that would generate positive "buzz."

144.   In its dealings with HP in connection with the possible acquisition by

it, 3Par was advised by investment bankers and others who had and have intimate knowledge of HP's available resources and dysfunctional Board, all of which appears to have been useful in 3Par's ability to extract such a high price from HP.

145.  On September 27, 2010, HP completed its acquisition of 3Par for $2.3 billion, most of which was subsequently recorded as intangible "goodwill" ($1.6 billion) and other intangible assets of $569 million.  HP's offer was about ten times 3Par's total revenue over the previous four quarters and was the highest premium offered in a competitive bidding situation of American deals of at least $50 million tracked by Bloomberg since 2001.

146.  Bloomberg reporter, Katie Hoffmann, quotes analyst Aaron Rakers, who had pointed out the Board's desire **"to show [HP] can clinch the deal after the departure of its chief executive officer."**  [emphasis added]This ego-driven acquisition of more than $2.3 billion in mostly intangible assets plus a $72 million "break-up" fee simply made no sense, as the Board's more considered decision of approximately August 1 would reflect.

147.  The 3Par deal is part of a decade long history of reckless deals made by the HP Board.  Beginning in 1999, HP spun off its measurement device unit, which included technologies that were the genesis of HP and the core to its success, to Agilent Technologies.  HP's Board tried to re-make the Company with the controversial $25 billion acquisition of Compaq in 2001, increasing HP's presence in the PC business at a time when the industry was becoming low growth

and low margin.   The acquisition of Palm for $1.2 billion in 2010 proved unsuccessful as HP announced just one year later that it would discontinue its TouchPad tablet, a smartphone operating system it acquired when it bought Palm.

148.   In a news release on August 18, 2011, HP announced the commencement of a transformation of the Company, unveiling the details of a plan to effectuate a strategy launched by Defendant Apotheker in March as a show of his own "arrival" on the scene as a "player."   As such, he announced an offer by HP to buy Autonomy Corporation, a British software company, in order to accelerate the Company's ability to offer "cloud-based" solutions.   In October 2011, HP completed its purchase of Autonomy for $11.7 billion, despite the departure of Defendant Apotheker, who initiated the deal, and despite the Company's abandonment of his strategy.   The Autonomy deal has been widely regarded by securities analysts and the business news media as greatly overpriced. This high price tag is especially worrisome to shareholders since Defendant Whitman is expected to continue to make acquisitions in order to become "a full-fledged one-stop I.T. shop."

149.   Also in the August 18, 2011 news release, HP announced that the Board was considering "strategic alternatives" for its mainstay personal computer business, including a possible spin-off or sale of the unit. The August 18, 2011 announcements sent HP's stock plummeting.   Within a month, Defendant Apotheker was dismissed after less than a year on the job.   Barely a month into

Defendant Whitman's tenure as CEO, HP announced on October 27, 2011 that it would retain the Company's personal computer business, thereby closing off the strategic path offered by her predecessor.

150.   Consistent with the Board's costly acquisitiveness over a multi-year period, in acquiring 3Par, the Board acted recklessly and breached its fiduciary duties to HP and its shareholders, all the while wasting the Company's assets.

## V.   DERIVATIVE ALLEGATIONS

### A.   General Derivative Allegations

151.   Plaintiff brings this action derivatively in the right and for the benefit of HP to redress the breaches of fiduciary duty and other wrongful conduct by the Defendants as alleged herein and to seek relief which addresses the long-term failures of corporate governance by the Board.

152.   Plaintiff owns and has continuously owned common stock in HP beneficially since 1999 and throughout the wrongdoing alleged herein.

153.   This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

154.   Plaintiff will adequately and fairly represent the interests of HP and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

### B.   Plaintiff has Made Pre-Suit Demands Pursuant to Rule 23.1

155.   On August 23 and 28, 2010, Plaintiff made pre-suit demands on the

Board as required by Fed. R. Civ. P. 23.1. Copies of the letters from one of Plaintiff's counsel setting forth such demands (the "Demand Letters") are attached hereto as Exhibits "A" and "B." Upon information and belief, both before and after the Demand Letters, counsel for other HP shareholders made pre-suit demands upon the Board referring to some of the same conduct as referred to in the Demand Letters. Cumulatively, all of these letters are referred to as the "Various Demand Letters."

156.   In making the demands set forth in the August 23 and 28, 2010 Demand Letters, Plaintiff was in no way conceding the dis-interestedness or independence of any of the H-P directors (nor does he now concede such with respect to the directors selected after such dates) or even asking the Board to undertake an investigation.  Indeed, since the members of the Board were aware, at all times, of the material wrongdoing alleged herein, no investigation of wrongdoing was necessary.  Rather, the pre-suit demands were made to give the Board the first opportunity to assert the claims directly, in the first instance, that Plaintiff now asserts derivatively.

157.   In Plaintiff's August 23, 2010 Demand Letter, it is stated:

> "**The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot.** This letter is being sent solely for the purpose of giving H-P the opportunity to commence the demanded litigation itself in the first instance and to do so promptly. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your

personal culpability in connection with the wrongdoing alleged above and/or its cover-up. The demands set forth in this letter have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made." [emphasis added]

158.   While it can be argued that, notwithstanding the foregoing disclaimer in the August 23, 2010 Demand Letter, the making of a demand is a concession by a shareholder that the Board is not incompetent to address the demand, in no event could such argument extend to every act of the Board in response to the shareholder's demands *in futuro*. Indeed, as set forth herein, the post-demands activities of the Board and "Independent Committee" have demonstrated conclusively that the process utilized to deal with Plaintiff's pre-suit demands foreclosed anything but a rejection of them. In essence, "the deck was stacked."

## C.  Post-Demand Conduct

159.   By the time of Plaintiff's Demands, the Board already had appointed the Ryan-Salhany "Special Committee" which was, purportedly, acting independently of the Board.  The law firm of Covington & Burling carried out a protective "investigation" of the Hurd-Fisher relationship and the Board's reaction to it, on behalf of the Ryan-Salhany "Special Committee", and concluded that Defendant Hurd was not guilty of any sexual harassment of Ms. Fisher, but had submitted false expense reports in what appeared to be an effort to hide the relationship.  This Board's protective "investigation," generated a document

generally referred to as the "Covington Report," the factual content of which has been concealed from the SEC and the Company's shareholders because, *inter alia*, it would demonstrate the failed stewardship of HP by its Board of Directors. Indeed, upon information and belief, HP's counsel has expended substantial sums of the Company's money in opposing HP shareholders' attempts to gain access to the "Covington Report" from being disclosed.

160.   Subsequent to the receipt of the Various Demand Letters and the commencement of certain "demand futile" shareholder litigation, the members of the HP Board started to recognize that it was not simply Defendant Hurd's conduct that was at issue, but their utter failure as stewards of the Company and fiduciaries for HP shareholders.  In order to protect their positions as Directors, including the very substantial fees and other benefits that flowed from serving as Directors, they sought the advice of a "Group of Counsel" believed to include HP's now-terminated General Counsel Holston, John F. Schultz, Esq., HP's Deputy General Counsel, and outside lawyers, including Covington & Burling, to come up with a strategy that would have the appearance of credibility, but really was an attempt to protect the members of the Board from being sued personally by the Company's shareholders and to protect them personally in the then-existing shareholder suits.

161.   Pursuant to the advice of the Group of Counsel, the HP Directors embarked upon a cover-up of their wrongdoing and concealed it from shareholders.  This led, in turn to the directors' quest for new directors, who

would, *inter alia,* appear independent and dis-interested in the wrongdoing alleged in the Various Demand Letters and in the then-pending shareholder suits.  Indeed, upon information and belief, when candidates were interviewed for additional directorships, including, in particular, Defendants Lane and Reiner, they were informed of the wrongdoing alleged in the Various Demand Letters and pending shareholder litigation, asked if they were willing to serve on a special committee to give the appearance of investigating such wrongdoing, and told they would not have to devote any significant amount of time to the special committee since the work would be done by hand-picked counsel for the committee.  As indicated above, Defendants Lane and Reiner accepted the assignment and seats on the Board under such circumstances.  In doing so, they and the other HP directors breached their respective duties of loyalty to HP and its shareholders, particularly since such activities were undertaken by the then-sitting directors solely to protect their positions and substantial benefits, and for the new directors to obtain such benefits going forward.

162.  Plaintiff's counsel was informed by H-P Deputy General Counsel, Schultz, first in an email dated November 4, 2010 and then again by letter dated November 16, 2010 that, purportedly, "the Board is currently investigating the allegations in [Plaintiff's] demand[s]."  In fact, such representations as to an ongoing investigation were utterly false. As discussed above, the Board was conducting no such investigation, but was concurrently interviewing individuals

not then on the HP Board who might comprise a new "special committee," frequently referred to as "whitewash committees," to take over the purported "investigation" that Mr. Schultz had maintained falsely was already underway by the Board. These efforts resulted in the subsequent appointment of the "Independent Committee" and motions to dismiss this litigation and other derivative litigation.[23]

163.   On a date presently unknown, after numerous potential directors were provided with factual and legal information relating to the subject matter of the Demand Letters and interviewed to determine, *inter alia*, whether they would be sympathetic to the conduct of the pre-existing Board members, additional members of the H-P Board were selected by those already on the Board and their legal counsel. Thereafter, on January 20, 2011, the Board, guided by the Group of Counsel, appointed a so-called "Independent Committee" of directors, with Levander and his firm, Dechert, LLP, retained to serve as its counsel on January 28, 2011.[24]   Upon information and belief, Dechert was selected for this role prior to even the formation of the "Independent Committee" on January 20, 2011 by HP's now-terminated General Counsel, Holston, who had maintained a long-standing relationship with Dechert over many years in Philadelphia, in the joint representation of Merck and otherwise.

---

[23] HP's counsel, indirectly controlled by HP's Board, indicated to Plaintiff's counsel that the Company was going to move to dismiss the Amended Complaint before even seeing it.

[24] Andrew J. Levander is described in *The New York Times* of November 27, 2011 as a "criminal defense lawyer."

164.   Following the creation of the "Independent Committee," criminal defense lawyer Levander stated deceptively that: "The Independent Committee has retained Dechert LLP **to assist the Committee** in this [purported investigation, review and evaluation] process." [Emphasis added.] In fact, to the extent there is or was any ongoing investigation, review and evaluation, it was carried out **solely** by Dechert and not by members of the Committee. Further, Dechert, although technically "retained" by the "Independent Committee" subsequent to its creation, upon information and belief, it was selected by the "Group of Counsel," principally HP General Counsel Holston, well before Plaintiff's Demand Letters were before the Board on January 20, 2011. Upon information and belief, Dechert provided legal services and recorded billable time in connection with its dealings with Holston, Schultz, and/or HP well before even the formation of the "Independent Committee," let alone its purported decision to retain Dechert and Levander as counsel.

165.   The *sub rosa* pre-ordained objective in selecting Levander and Dechert was to protect the interests of the Board and to create a record which could be used to seek the dismissal of pending and future litigation brought by Plaintiff or other HP shareholders.   Upon information and belief, before Levander and Dechert even performed any factual "investigation", they knew they would intentionally avoid leaving a "paper trail" with respect to any "interviews" they would take and any sworn and transcribed testimony from material witnesses, in

order to cloak them in attorneys' notes to facilitate subsequent claims of attorney work product and or attorney-client privilege.   Levander and Dechert, at or before their supposed retention by the "Independent Committee" on January 28, 2011, planned that some of the most material witnesses to the wrongdoing referred to herein were not to be interviewed by Levander, Dechert or the Committee nor would they be asked to produce documents relative to the issues raised in the Demand Letters.[25] Indeed, testimony from certain of the most material witnesses was not even sought as it would amount to potential evidence contrary to the Levander.Dechert game plan, namely a "whitewash" of all conduct and individuals implicated in Plaintiff's Demand Letters and the then-existing shareholder litigation. Further, Levander and Dechert knew at the outset that despite the fact that at least some of the more material of the witnesses who were likely to be "interviewed" had interests that were different from (and occasionally in conflict with) those of the Committee and the Board, these witnesses would not be represented by independent counsel nor would they be in a position to provide evidence free of external pressures. Upon information and belief, few if any of such persons had independent counsel.

166.   The so-called "Independent Committee" was, according to Levander, appointed by the Board purportedly "to investigate, review and evaluate the facts

---

[25] As a result of the machinations of the Group of Counsel, as set forth above, upon information and belief, Levander and Dechert were already *de facto* counsel to the "Independent Committee" before it was even established by the Board on January 20, 2011.

and circumstances asserted in various derivative lawsuits brought in federal and state courts and in certain demand letters directed to the Board…" Unlike the pre-existing "Special Litigation Committee," it was not given the same mandate and powers and, as such, even if it had a legitimate purpose, such Committee was, at best, only advisory and cosmetic in nature, as was the Ryan-Salhany "Special Committee."[26]

167.   In fact, the "Independent Committee," this latest iteration of a "standing committee" purportedly investigating corporate wrongdoing at the Company, was and is a sham. The members of the so-called "Independent Committee," as well as the members of HP's Board, were pre-disposed to protect their colleagues on the Board, and Defendant Lane, in particular, was not independent, objective or dis-interested for the reasons set forth above. [27]

168.   The "Independent Committee" was formed, not by the HP Board, but by legal counsel, for the sole purpose of creating a pretext for HP's counsel in the existing "demand futile" derivative litigation, and in this litigation (or potential litigation at the time of the Committee's formation), to seek the dismissal of all

---

[26] Moreover, Levander and Dechert were selected by the Board precisely because Levander personally was well-experienced in generating reports referred to generically as "whitewash reports" in connection with corporate wrongdoing. Indeed, in a recent example of carrying out such a role, despite the most egregious misconduct in the case of the senior officers and Board of the now-failed Lehman Brothers Holdings, Inc., Levander never recommended that legal action be commenced against that company's officers and directors.

[27] Because of the power afforded him by the Board, which power he readily exercised from the outset, even though Defendant Apothaker had already been hired as CEO, Defendant Lane was acting as *de facto* CEO. Thus, for the same reasons the Board now regards him as not independent now, he was certainly not independent from the time he joined the Board.

such cases and to stop any claims from being pursued against the members of the HP Board and Defendant Hurd. It was likely to and did generate a "whitewash report" prepared by Levander and Dechert, which report was provided to the Board to use it as a justification to reject the pre-suit demands set forth in Plaintiff's pre-suit Demand Letters and, ultimately, used in creating an argument for seeking the dismissal of shareholder derivative litigation brought by HP shareholders against the Individual Defendants.

169. Neither director appointed to the "Independent Committee" had sufficient time available to carry out the stated mission of the "Independent Committee" entrusted to each of them.   HP's entire Board, including the Committee members, as well as Levander and Dechert, also knew that the Committee did not have sufficient time to "investigate" (even if it was inclined to do so) all of the material claims set forth in the Demand Letters including, in particular, the full extent and scope of HP's violations of the FCPA in various parts of the world. Nor did the "Independent Committee" members, Defendants Lane and Reiner, have any expectation that they would have the time or inclination to conduct any such investigation, let alone do so independently or without bias against the shareholders who had made the demands or their lawyers. Indeed, despite the importance of the pre-suit demands, the "Independent Committee" members knew from the outset that they would delegate their own fact-gathering and analysis responsibilities to their legal counsel, Levander and Dechert, thus

creating a fundamental conflict for such counsel.

170.   On February 10, 2011, Levander surfaced *vis-à-vis* Plaintiff and sent a letter to his counsel and, as set forth above, claimed that the Board had "appointed the Independent Committee …to investigate, review and evaluate the facts…"

171.   In such letter, in order to create the illusion of objectivity and fairness, Levander invited Plaintiff's counsel to meet with "one or more members of the Independent Committee" at one of two two-hour slots of time on February 21 and 22, 2011. Had any such offer been made by or on behalf of members of HP's Board shortly following Plaintiff's Demand Letters, there might have been an argument that the offer was made in good faith. Having been made, however, on short notice and at or near the end of the purported "investigation" by the "Independent Committee," the offer was clearly made by Levander in bad faith.

172.   On February 11, 2011, Plaintiff's counsel responded to Levander by e-mail as follows:

> "In response to your letter of yesterday, before any meeting between me and the members of the so-called "Independent Committee" ("Committee") can or should take place, I would appreciate if you would provide me with the following information and documents:
>
> 1. The identities of each of the members of the Committee.
>
> 2. Each Board resolution forming the Committee and/or appointing its members.
>
> 3. A copy of each demand upon H-P's Board of Directors referring to any of the issues/claims in the letters I sent to it on behalf of my firm's clients.
>
> 4. A copy of any consolidated derivative complaint(s) and class action complaints raising any such issues and/or claims.

Inasmuch as I will be traveling, if the documents can be sent electronically, that would be appreciated.

After I review these documents and the information provided, I will get back to you in connection with the meeting you propose. In that regard, your letter did not indicate where the Committee members will be available for a meeting."

173. On February 15, 2011, Levander responded by e-mail:

"if you would like to provide the Independent Committee with any additional information beyond that contained in your letters, some combination of lawyers at my firm and one or more of Ray Lane and Gary Reiner, the independent Committee Members who recently joined the HP Board, are available to talk with you at 3:00pm on February 21."

174. Plaintiff's counsel then informed Levander: "Let's talk further after you provide me with the documents and information requested" which Levander did not provide.

175. Plaintiff's counsel then said to Levander:

"You make representations regarding a so-called "Independent Committee" and what it was, according to you, "appointed" to do.

Until I have the documents and information requested in my e-mail of February 11, it makes little sense to have a substantive dialogue with you or your partners, let alone meet with any members of the "Independent Committee.".....

While there are certainly circumstances under which a committee of a board of directors can legitimately evaluate a pre-suit demand upon it to commence litigation, in this case **I see no reason for you to provide me with less than two weeks' notice of a meeting with "one or more members of the Committee" unless it is an attempt to sandbag me.** I hope that was not your intent.

In any event, I trust that you will promptly provide me with the requested documents and information by return e-mail."
[emphasis added]

176. When the information and documents were still not forthcoming from Levander, including the Various Demand Letters, Plaintiff's counsel once again e-mailed him on February 16, 2011:

"There is nothing confidential about pre-suit demand letters sent to H-P's Board and, quite frankly, I have never had someone in your position so argue. Indeed, such demand letters are routinely turned over upon request. Indeed, your unwillingness to do so suggests that there are other questions that must be addressed to you and your colleagues before there is an substantive dialogue with either the members of the so-called "Independent Committee" or of the Board of Directors as a whole. In addition to the documents that I previously requested from you, the following questions need to be answered:

1. Were you or a representative of your firm present at any portion of the Board meeting at which the "Independent Committee" was "appointed?"?

2. What criteria were used by the Board to determine which of its members would be appointed to the "Independent Committee?"

3. Who participated in the determination of such criteria?

4. Were there any factors or facts that the Board considered that might serve to disqualify any individual H-P Director from serving on the "Independent Committee?"

5. What process did the Board utilize to select the members of the "Independent Committee?"

6. Did anyone investigate each of the proposed members of the "Independent Committee" to determine whether there were any facts or circumstances which would disqualify such members from serving on the "Independent Committee?" If so, who performed such investigation and when?

7. Will there be (or have there been) interviews of present and/or former employees of H-P or independent contractors conducted under oath and/or with transcripts of the interviews?

8. Will there be (or have there been) any such interviews taken of each member of the H-P Board and those former members who were serving during the period of the wrongdoing alleged in the various "Demand Letters" sent on behalf of my clients and other H-P shareholders?

9. Will there be (or have there been) attempts made to interview former employees of H-P and/or its subsidiaries whose conduct is implicated in the alleged wrongdoing?

10. Will (or has) your firm and/or the members of the "Independent Committee" attempt to calculate the extent of the economic and non-economic damages alleged by the shareholders who have sent the Board "Demand Letters" and as alleged in the derivative Complaints that have been filed?

11. Will your firm or the "Independent Committee" be taking (or taken) any action as to any of remedial measures related to the

conduct referred to in the "Demand Letters?"

12. Which persons played a role in the selection of you and/or your firm to represent the "Independent Committee?"

13. When did you first learn that you and/or your firm learn that you and/or your firm were being considered to represent the "Independent Committee," the entire Board of Directors or any of the H-P Directors in connection with any of the "Demand Letters?" From whom did you learn this fact?

14. What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the "Independent Committee?" By whom and when?

15. Assuming your firm performed a conflict check before being considered for the assignment ultimately accepted by you, when was such conflict check performed?

16. When did the "Independent Committee" or your firm in its place commence any efforts "to to investigate, review and evaluate the facts and circumstances asserts in various derivative lawsuits...and in certain demand letters?"

17. Why did it take so long for you to send your letter to me of February 10, 2011 and why did you provide less than two weeks' notice of a possible meeting with "one or more members of the Committee?"

I look forward to receiving your responses very shortly."

177. As of the date of this Complaint, Levander still has not provided the requested information to Plaintiff's counsel other than in the above e-mail of February 15, 2011, wherein it was indicated that Defendants Lane and Reiner were then members of the "Independent Committee." By not providing the fundamental information requested of counsel for the "Independent Committee," such counsel demonstrates that the entire process by which the members of the "Independent Committee" were chosen is fatally flawed and cannot survive even the most basic inquiry addressed to its legitimacy. Indeed, the "Independent Committee" members were chosen by the Board or counsel to the Board based not on characteristics of

independence, freedom from bias and available time but, rather, based upon creating an **appearance** of dis-interestedness. However, even that creation is a chimera with no reality.

178.   The formation of the "Independent Committee," the methodology pursuant to which its members and counsel appear to have been chosen and its purported "investigation" of the wrongdoing alleged herein were not valid exercises of the Board's business judgment. Indeed, no serious steps were taken by any members of the Board to determine the dis-interestedness and lack of conflicts of interest of the directors who constitute the "Independent Committee," let alone their availability to perform the most basic responsibilities attributed to its members.   In addition to the pre-disposition of Levander and the members of the "Independent Committee" toward rejection of the Demand Letters and the other shareholders' pre-suit demands, as indicated above, neither of the Committee's members had any expectation that he would personally devote any significant and meaningful amount of time to the investigation that the "Independent Committee" purportedly conducted.   Indeed, each of its members was already burdened by multiple responsibilities to HP at a critical time as well as through their commercial and other activities.

179.   Although Plaintiff made pre-suit demands upon the members of the Board, even before the Board had formally rejected such demands, it had *de facto* done so with its appointment of the "Independent Committee" and its pre-disposed

members who, after they have wasted substantial amounts of HP's (and its shareholders') money in purported investigation of the claims made in the Various Demand Letters, its members did what they were expected to do; namely, formally rejected Plaintiff's and other pre-suit demands.   Such rejection was "rubber-stamped by the Board as a whole.

180.   None of HP's directors is dis-interested and/or independent with respect to the wrongdoing alleged in the Demand Letters or herein. In the case of Defendants Lane, Apotheker, Banerji, Reiner, Russo, Senequier and Whitman, each of whom joined the Board subsequent to August 6, 2010, each of them has nevertheless acquiesced in the wrongful conduct of Defendant Hurd and the other members of the Board since that time as described herein and, as well, participated in its cover-up, having been informed of much of the wrongdoing prior to their joining the HP Board.[28] Further, each of these directors, together with the pre-existing members of the Board who were personally responsible for some or all of the wrongdoing alleged herein, caused to be issued the deceptive 2011 and 2012 Proxy Statements which intentionally concealed such wrongdoing in connection with the corporate suffrage process.

181.   The "Independent Committee" which was not expected to recommend and, indeed, did not recommend to the full HP Board that any of them or their

---

[28] It would have been surprising if they had not, before agreeing to take a seat of the Board, been informed in detail as to, *inter alia*, the FCPA conduct of HP executives, Defendant Hurd's wrongful conduct going well-beyond the Jodie Fisher relationship and the other wrongdoing alleged in the then-pending shareholder derivative litigation and the Various Demand Letters.

subordinates be sued by the Company because a majority of the members of the Board are personally implicated in and/or acquiesced in the wrongful conduct set forth in the Demand Letters and herein. Further, many of the members of the Board, having been named as defendants either in connection with previous HP shareholder litigation and/or in other shareholder cases (e.g. Defendant Thompson has been named as a defendant in numerous pending and settled shareholder cases over a period of many years), have a pre-disposition against shareholder demands and shareholder litigation generally. As such, even if they could otherwise be dis-interested and independent, which they are not, they are as a Board disabled from objectively addressing the demand set forth in the Demand Letters.

### D. Defendants' Roles and Responsibilities

182. The directors of the Company owe it and its shareholders a fiduciary duty to act loyally and in good faith, to oversee its business and affairs and to assure that effective policies, procedures and systems are in place to prevent, and to detect and promptly terminate, unlawful business practices such as those described above. A director breaches the duty of loyalty and good faith by knowingly permitting management to pursue unlawful business practices and strategies such as described herein. As a fiduciary, each director must in good faith bring to bear all of his or her knowledge, skill, experience and expertise in the fulfillment of the duties of attention and fidelity to the lawful best interests of the Company.

183.  HP proclaims that it is "committed to maintaining the highest standards of business conduct and corporate governance, which [the directors] believe are essential to running our business efficiently, serving our stockholders well and maintaining HP's integrity in the marketplace."

184.  Even beyond these lofty, but inapplicable proclamation of business principles, the Board has stated in its "Standards of Business Conduct," ("Standards" or "SBC") which its members (including, in particular, Defendant Hurd) and senior management subordinate to Defendant Hurd, have breached[29]:

> "Since Bill Hewlett and Dave Packard started our company many years ago, HP has been known not just for the products and services we offer but also for the values we share….We gain trust by treating others with integrity, respect, and fairness….Because HP is committed to getting things done the right way, violations of our SBC or HP policies or rules may result in disciplinary action, up to and including termination of employment."

185.  Notwithstanding such Standards and the termination of the employment of Defendant Hurd when the Hurd-Fisher Scandal forced the Board to deal affirmatively with Defendant Hurd's history of breaches of such standards, the Board disregarded the widespread payment of bribes in the United States and abroad by his subordinates including failing to seek his termination and those of his culpable subordinates and those involved in covering up such conduct.

186.  With respect to governmental investigations such as those conducted

---

[29] According to the Standards, "All employees and members of the Board of Directors are required to act consistently with our SBC." The current version of the Standards have reflected H-P policy formally and/or informally for many years and, upon information and belief, at all times relevant to the claims set forth herein.

by the SEC, DOJ and others, the Standards state, *inter alia*:

> "**WE COOPERATE WITH INVESTIGATIONS**"
> - Cooperate with all internal investigations and audits.
> - Work with HP Legal to respond to litigation or requests from government and other external agencies.
> - Tell the whole truth when responding to an investigation and audit.

187.  Notwithstanding such Standards, under the supervision of Defendant Hurd and certain of HP's lawyers, the Company "stonewalled" United States and foreign investigators of the various briberies referred to above and other which have not yet been disclosed publicly.  In dereliction of their duties as directors, none of the culpable persons were disciplined by HP's Board for their breach of the Standards nor were the outside counsel who facilitated such conduct replaced.

188.  The Standards also proclaim that "We are open, honest and ethical in all of our dealings" and state, in particular:

> "**WE DO NOT BRIBE**
> - Do not offer or provide bribes or kickbacks to win business or to influence a business decision—anywhere on anything.
> - Use agents and distributors only after they have passed our due diligence process to ensure that our commissions or fee arrangements will not be used as bribes on our behalf."

189.  Notwithstanding such Standards, under the supervision of Defendant Hurd and/or his predecessors, HP executives orchestrated briberies such as the so-called "Russia GPO Deal", in which more than $10 million in bribes were paid, the various other briberies referred to above and in instances not presently disclosed to the public or to HP's shareholders, all of which conduct (going back to 2000) has

been known or should have been known by HP's Board if its Audit Committee had been functioning, as represented falsely in HP's 2010, 2011, and 2012 Proxy Statements and/or E&Y's audits had been conducted in accordance with GAAS. In dereliction of their duties as directors, none of the culpable persons were disciplined by HP's Board for their breach of the Standards nor were those who facilitated such conduct sued by the Company for the damages caused the Company when such facilitators were not *in pari delecto*. To the extent that the Individual Defendants allowed applicable statutes of limitation to run which precluded the Company from pursuing legal claims against culpable persons, and such inaction was the result of the failure of the Board to even consider such claims, each of them in office has wasted HP's assets and breach his or her fiduciary duties to it. Similarly, to the extent that the Board gave no consideration to obtaining tolling agreements from the culpable executives, its members have similarly wasted HP's assets and breached their fiduciary duties.

190.   In connection with the Company's unambiguous Standards regarding bribery, the Board has stated in a Q&A in the Appendix to the Standards:

> "**Q:** Different countries have different cultures and laws. Does our SBC apply worldwide?
>
> **A:** Yes. Our SBC establishes principles for business conduct applicable throughout HP, regardless of the location or the particular HP organization or business. Where differences exist on any particular question as a result of local customs. Cultures, or laws, employees must apply either the SBC or local requirements--whichever sets the highest standard of behavior with respect to that question."

191.   Notwithstanding such "principles of business conduct" which were in effect throughout the period of the briberies referred to herein and others not yet disclosed publicly or to HP shareholders, under the supervision of Defendant Hurd and/or his predecessors, HP executives orchestrated briberies contrary to such principles.

192.   With respect to the use of HP's corporate assets, the Standards state, *inter alia*:

> "**WE USE ASSETS WISELY**
> - Keep personal use of H-P assets to a minimum.
> - Do not allow other people, including friends and family, to use HP resources.
> - Uphold your responsibility to protect HP financial assets."

193.   Notwithstanding such Standards, until the Board was forced to deal with the Hurd-Fisher Scandal in June 2010 when Gloria Allred, Esquire, Ms. Fisher's counsel, made it impossible to look the other way, the Board long-tolerated Defendant Hurd's "business trips" (accompanied by Ms. Fisher) charged to the Company and took no action to prevent his own padding of his expense accounts or the expenses charged by Ms. Fisher to HP. In dereliction of their duties as directors, other than Defendant Hurd who was belatedly terminated, none of the culpable persons were disciplined by HP's Board for their breach of the Standards.

194.   Notwithstanding such Standards, until the Board recklessly wasted HP's assets by authorizing the bidding frenzy that resulted in the acquisition of

3PAR, effectively abandoning rational business judgment and the advice received previously by the Board that the price paid ultimately (more than $2.3 billion) was grossly excessive for a company with few tangible assets. In dereliction of their duties as directors, none of the culpable persons, including the members of the Board who approved such acquisition, were disciplined by HP's Board for their massive and not-yet-realized waste of HP's assets and their breach of the Standards.

195.   Pursuant to HP practice over many years since the founding of the Company, all of its directors were well supported by accurate and timely information and were provided with sufficient time and resources to fully attend to all of their crucial oversight responsibilities.  At all times relevant, HP's directors had unrestricted full and free access to officers and employees of the Company.

196.   Through their service on key Board committees, the non-employee members of the Board had supervisory responsibility for crucial front-line oversight in the areas of internal controls, legal and regulatory compliance, corporate citizenship, risk management, corporate governance and Board effectiveness.  Service on these key committees as well as service as a HP Director necessarily exposed these directors to knowledge of the individual instances, and overall pattern, of unlawful business practices reflected in this Complaint, as well as to knowledge of the Board's consistent ineffectiveness in assuring management's prevention of such unlawful business practices.

197.  The Board's Audit Committee was responsible at all relevant times for being the Board's front line in the oversight of enforcement of the Standards and the Company's more generalized governance policies including the monitoring of all compliance programs (including its stated anti-bribery Standards) and reports from the Company's internal audit function concerning management improprieties such as the briberies and the misuse of corporate assets by Defendant Hurd as referred to above.   The Audit Committee was required to report regularly to the full Board concerning its meetings and discussions and to review with the full Board all significant issues and concerns arising at its meetings.  Therefore, the members of the Audit Committee received regular reports both of supposed compliance program activities and of unlawful and unethical business practices such as the briberies referred to herein, with respect to the Company and all of its operating subsidiaries, and reported these matters and the "stonewalling" of governmental investigations of such conduct to the full Board.

198.  Each of the Individual Defendants, including each of the present members of the Board, knew that as directors of HP, it was their fiduciary duty and responsibility to oversee management to assure that it acted effectively to prevent unlawful and unethical business practices, and to promptly cause the termination of any existing unlawful and unethical business practices such as those described above.  They also knew that it was a violation of their fiduciary duty of loyalty and good faith to permit the continuation of any such unlawful and unethical business

practices, once they became aware of them.  They were aware at all relevant times of the unlawful and unethical business practices alleged herein, yet permitted them to be continued, year after year, thus committing knowing breaches of their fiduciary duty of loyalty and good faith. Even as to the newly appointed members of the Board who have joined it relatively recently, upon in formation and belief, they were fully informed of such wrongdoing before they joined the Board. Since joining the Board, they have done nothing to seek recovery of the Company's damages as a result of such illegal or otherwise improper conduct.

199.   At all relevant times during each of their tenures on the Board, as a result of their service on the Board and on the committees described for fully in the 2010, 2011, and 2012 Proxy Statements, their knowledge and expertise as alleged therein, the receipt by the Board and those committees of regular, complete and accurate reports, the sustained and systematic nature of the wrongdoing over multiple years, and as reflected in the Company's recent disclosures, each of the Board's members was aware of the unlawful business practices described herein, which conduct was not the result of a rogue employee or division, but instead, notwithstanding the Standards, reflected a Company-wide business philosophy, employed with consistent methods over extended multi-year periods of time, to maximize sales through the payment of bribes in violation of the FCPA and other similar laws.

200.   Thus, the Board, as a *de facto* matter of policy, manifested over and

over again in the various bribery schemes alleged herein, consistently elevated revenues and profits over compliance with laws and regulations designed to protect the Company. Upon information and belief, this strategy was well known to HP's senior management, including Defendant Hurd, and its Board, and was knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to HP. The Company's management, accompanied by Board passivity, knowingly made a calculated bet that any legal consequences from the bribery schemes described herein would be insignificant when compared to the increased sales, profits, and cash flows that were expected to result from their unlawful strategy and practices.  By knowingly or negligently permitting this strategy to continue, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of its members' fiduciary duty of loyalty and good faith.

201.   Each of HP's directors has acquiesced in at least some of the wrongful conduct described herein, thereby breaching his or her fiduciary duty of loyalty and good faith.  Such conduct is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director faces a substantial threat of personal liability. Moreover, each of the Individual Defendants ignored numerous "red flags" which demonstrated to them, *inter alia*, that HP executives had engaged in massive bribery schemes over at least

a 10-year period and the other illegal conduct described herein.[30] Their failure of oversight is demonstrated by the fact that, over a multi-year period, they took no steps to disclose HP's bribery promptly to the DOJ and SEC as they were legally required to do or to otherwise mitigate the wrongdoing by "owning up to it," thus lessening any likely penalties and fines.

202.   To the extent that any of the Individual Defendants, while serving on HP's Board, claim that they were not knowledgeable of the fact and/or truth of any of the claims of illegal conduct or wrongdoing referred to herein that were violations of, *inter alia,* the FCPA or the False Claims Act, each was informed of and acquiesced in management's "stonewalling" of the DOJ, the SEC and other agencies investigating the Company's conduct through at least 2010 if not thereafter, all of which has further damaged HP.

203.   In light of the facts known to each of HP's directors as a result of the reporting systems and procedures described above, the Board was on notice that widespread wrongdoing had been taking place throughout the Company. The Board's bad faith failure to act to investigate and/or to prevent such wrongdoing reflected a systemic flaw in HP's corporate governance during a decade of CEO and Board-level upheavals, changes of direction and confusing or non-existent

---

[30] Such "red flags" were facts known to the Company's Board and senior management regarding HP's business practices and the environments where they were carried out (e.g. doing business in countries where bribes were expected such as in Russia). Given such knowledge, it was reckless for the Board to not exercise the diligence that ordinarily prudent and careful directors would and should carry out to determine whether bribery or other similarly illegal conduct was taking place. Such abdication of responsibility under the circumstances was unconscionable.

1   long range plans.

2   204.   Therefore, in light of the Board's culpability and responsibility for the

3   wrongful acts described herein to and including the appointment of the

4   "Independent Committee," it was already "interested" and unable to deal

5   objectively with Plaintiff's Demand Letters. the members of the Board thus were

6   not disinterested for the purposes of a pre-suit demand with respect to the claims

7   set forth in the Demand Letters and this Complaint.

8   205.   By means of the manner in which the Board addressed Plaintiff's pre-

9   suit demands as described herein and the pre-ordained response to them, the Board

10   *de facto* rejected the Plaintiff's demands.

**E.     Demand Futility for Excessive Compensation Claims**

206.   Further demand on the HP Board to sue themselves or any of them for

breach of fiduciary duty in connection with the executive compensation proposals

would be a futile, wasteful and useless act, and is, thus, excused.

207.   The full Board ratified the HR and Compensation Committee's

recommendation on executive pay for 2012, and then, unanimously recommended

to HP shareholders in the 2012 Proxy Statement to approve their executive

compensation proposal, including excessive pay to Defendants Whitman and Lane

as well as other executives.

208.   The Board purportedly follows a pay-for-performance executive

compensation philosophy and considers the manner in which performance is

achieved.   However, the Board paid Defendants Whitman and Lane as well as other executives millions of dollars despite HP's dismal financial results.   This executive pay was unreasonable, without good faith, and not a proper exercise of business judgment, and it violated HP's compensation policy.   Because a majority of the Board (or the entire Board) is substantially likely to be held liable for breach of fiduciary duties in connection with its own executive compensation, those Board members are "interested" for purposes of a demand, and thus, pre-suit demand is excused.

209.   Likewise, it would be futile for Plaintiff to make a demand upon the Board in connection with the election/re-election of the 11 sitting directors and retention of E&Y, approved by shareholders at the 2012 Annual Meeting, after the full Board unanimously recommended these proposals.   Additionally, because a majority of the Board is substantially likely to be held liable for breach of fiduciary duties in connection with these proposals, and because the election pertains to the directors themselves, the Board members are "interested" for purposes of a demand, and thus, pre-suit demand is excused.

## VI.   DAMAGES SUFFERED BY H-P

210.   The Board and senior management of HP, including Defendants Hurd and Lane in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to HP and its shareholders.

211.  As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, HP has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination.

212.  In addition, the Individual Defendants' breaches of their fiduciary duties to the Company have also exposed HP to substantial injury to its reputation and corporate goodwill, as well as to potential criminal and civil liability.

213.  HP's directors utterly failed to implement validly functioning reporting, control and information systems so that each Board member was timely informed of the wrongdoing alleged herein including, *inter alia*, HP's serious violations of the FCPA and the False Claims Act and Defendant Hurd's personal transgressions. In addition, at least through the present, it is clear that the HP Board, before and after Defendant Hurd's departure, consciously or recklessly failed to monitor or oversee the Company's operations, the positions taken by its senior management, the offering prices for potential acquisition candidates and otherwise.

214.  The arguable consideration that HP received from Defendant Hurd in connection with his termination and otherwise (particularly in the context of what HP gave to him) was so materially inadequate as to constitute obvious corporate waste under applicable law.

215.  The consideration HP received from the acquisition of 3PAR for $2.3 billion was materially inadequate as to constitute corporate waste under applicable

law, particularly under the circumstances under which the bidding frenzy described herein occurred.

216. The wrongdoing of each of the Individual Defendants as described herein was an essential link in the damages caused to HP and its shareholders as a result thereof.

217. By not pursuing the known and, indeed, obvious claims HP has and had against Defendant Hurd and former members of the Board, even though they did not occupy positions on the HP Board at the time of all or part of the alleged wrongful conduct of such persons, breached the fiduciary duties each of them owed to HP and its shareholders and wasted their assets.

## COUNT I

### (For Violations of Section 14(a) of the Exchange Act)

218. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

219. This claim is asserted by Plaintiff individually against the Individual Defendants who were members of the Company's Board of Directors when the 2012 Proxy Statement was issued and disseminated to HP shareholders, for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection with such Proxy Statement issued for the 2012 Annual Meeting of Shareholders.

220. This Proxy Statement solicited the votes of Plaintiff and the other HP shareholders in connection with, *inter alia*, the election/re-election of the members

of the HP Board, the retention of E&Y as HP's auditor, and the approval of the executive compensation proposal.

221.   The Board, through the 2012 Proxy Statement, recommended that HP shareholders vote in favor of each of the Board's proposals and, in particular, in favor of the election of each of them as members of the Board, and in favor of the compensation for various executives, including Defendants Whitman and Lane.

222.   The 2012 Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, this Proxy Statement failed to disclose material information regarding the nominee directors, E&Y and the executive compensation proposal as set forth above.

223.   These deceptions proximately caused HP and each of its shareholders direct and indirect economic and other damages in an amount which cannot presently be determined.

224.   As a result of the use by the Company's Board of Directors of the 2012 Proxy Statement to solicit the votes of HP shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's director nominees, proposal to retain E&Y, and the Board's executive compensation proposal was approved.

225.   By utilizing such Proxy Statement, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in

violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### (For Violations of Section 14(a) of the Exchange Act)

226.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

227.   This claim is asserted by Plaintiff derivatively on behalf of HP against the Individual Defendants who were members of the Company's Board of Directors when the 2010, 2011 and 2012 Proxy Statements were issued and disseminated to HP shareholders.

228.   This claim is asserted against those members of the Company's Board of Directors for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 as controlling persons of HP in connection with the Company's 2010, 2011, and 2012 Proxy Statements disseminated on behalf of the Board of Directors in connection with the Company's 2010, 2011, and 2012 Annual Meetings of Shareholders.

229.   These Proxy Statements solicited the votes of Plaintiff and the other HP shareholders in connection with, *inter alia*, the election/re-election of the members of the HP Board, the retention of E&Y as HP's auditor, and the approval of the Board's executive compensation proposal.

230.   The Proxy Statements issued and disseminated to HP's shareholders purported to describe the activities of the Company's Board and the committees

thereof in the preceding year, setting forth, *inter alia*, the number of meetings held and what certain of such committees purportedly accomplished. The Board, through the 2010, 2011, and 2012 Proxy Statements, went on to recommend that HP shareholders vote in favor of the Board's proposals and, in particular, to vote in favor of the election of each of them as members of the Board, and in favor of the compensation for various executives, including Defendants Hurd, Apotheker, Whitman, and Lane.

231. The 2010, 2011, and 2012 Proxy Statements contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, and failed to disclose material facts as more fully set forth above.  In particular, these Proxy Statements failed to disclose the extent to which the Company's entire Board of Directors were responsible for the wrongdoing that caused the Company to be exposed to, *inter alia*, massive amounts in fines, restitution and other damages including amounts paid to or on behalf of Defendant Hurd and the eventual losses it will sustain as a result of its acquisition of 3PAR for more than $2.3 billion. Each of the foregoing material facts should have been disclosed to HP shareholders in the 2010, 2011, and 2012 Proxy Statements so that they, in voting upon the Board's proposals, including the retention of E&Y as HP's auditor despite the material failure of its audits, would do so with the benefit of being informed of any facts material and relevant to the proposals.

232. These deceptions proximately caused HP and each of its shareholders direct and indirect economic and other damages in an amount which cannot presently be determined.

233. As a result of the use by the Company's Board of Directors of the 2010, 2011, and 2012 Proxy Statements to solicit the votes of HP shareholders, which Proxy Statements failed to disclose the material facts set forth herein, the Board's director nominees and proposals to retain EY were approved in 2010, 2011, and 2012, and the Board's executive compensation proposal was approved in 2012.

234. In addition to having been personally damaged as described herein, Plaintiff also alleges that such violations have damaged HP by, *inter alia*, causing it to pay unjustified and excessive compensation to the Board, Defendants Lane and Whitman individually and to E&Y. Accordingly, Plaintiff seeks recovery on HP's behalf for such damages from all of the members of the Board re-elected at the Company's 2010-2012 Annual Meetings and any other damages they caused HP by the issuance of the 2010-2012 Proxy Statements.

235. By the Board's issuance and dissemination of such Proxy Statements as described herein, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9 and, by having the other Board-supported nominees re-elected, HP and its shareholders have been and continue to be

1  damaged.

## COUNT III

### (Breach of Fiduciary Duty and Waste of Corporate Assets)

236.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

237.   The Individual Defendants all owed and/or owe fiduciary duties to HP and its shareholders. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe HP the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the oversight of HP's compliance with federal laws such as the FCPA and similar local laws. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the misconduct and consequent harm to the Company alleged herein.

238.   The Individual Defendants consciously violated their corporate responsibilities in at least the following ways: (a) Affirmatively and repeatedly declining to stop and prevent HP's illegal payment of bribes after receiving reports of such illegal activity and "red flags" indicating such widespread illegality, and/or consciously disregarding such reports and activity; and/or consciously covering up the wrongdoing when they became aware of it; and/or "stonewalling" the SEC, the DOJ and others investigating

such illegal conduct; (b) failing to pursue claims against those who have

caused the Company to violate the False Claims Act; (c) permitting

Defendant Hurd to act as he did in connection with the Hurd-Fisher scandal,

paying him over $12 million for his silence upon his termination, and

otherwise as described herein; (d) wasting enormous amounts of the

Company's assets by authorizing management to engage in reckless bidding

for and the ultimate acquisition of 3PAR for more than $2.3 billion; (e)

wasting the Company's assets by authorizing excessive compensation to

Defendants Apotheker, Hurd, Whitman, Lane and other executives; and (f)

failing to implement a CEO succession plan, and recklessly hiring and firing

CEOs resulting in enormous corporate waste in the form of millions of

dollars in severance payments and otherwise.

239.  Defendant Babbio, Chairman of the HP Board's HR and

Compensation Committee, negotiated the terms of the severance agreement with

Defendant Hurd, immediately making a *de facto* gift to Defendant Hurd of more

than $12 million, thereby causing the waste of HP's corporate assets. Such gift to

Defendant Hurd could not be justified rationally yet, nevertheless, it was approved

by HP's entire Board in order to, *inter alia*, buy his silence and keep him from

disclosing what the other members knew of his relationship with Jodie Fisher and

other facts which would be embarrassing to the Board. Inasmuch as the Board was

well justified in terminating Defendant Hurd's employment for cause, the

compensation paid to him upon his departure was irrational from HP's perspective. Indeed, the Board breached its duty of loyalty to HP in paying him for his silence, which was only for the personal benefit of its members.

240.   The dissemination of materially misleading and incomplete information in connection with the 2012 shareholder vote on the Board's executive compensation proposal was a breach of the Board's fiduciary duties to HP and its shareholders.   In failing to follow HP's documented executive compensation policies and procedures, such Defendants breached their duties of loyalty and candor, and grossly over-compensated Defendants Whitman and Lane as described above.

241. As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations and wastage of HP's assets, the Company has sustained and will sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

242.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company in an amount which cannot presently be determined.

## COUNT IV
### (Unjust Enrichment)

243.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

244. Defendants Hurd and Apotheker have been unjustly enriched by reason of the excessively generous severance packages given to them by the Board.

245. Defendants Lane and Whitman, having caused the Board to grant them excessive compensation which was not performance-based, were and are presently being unjustly enriched as a result thereof.

246. Each of the Board members named as defendants herein, were unjustly compensated by HP with fees and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

247. Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should repay the Company therefor together with their earnings thereupon.

## COUNT V

### (Breach of the Duty of Candor)

248. Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

249. Each of the sitting directors of the Company at the time of the issuance and dissemination of the 2010-2012 HP Proxy Statement, by reason of the fact that such proxy statements were false and misleading as described herein, breached their respective duties of candor owed to HP, Plaintiff and the Company's other shareholders.

250.   For the reasons set forth with respect to Plaintiff's proxy fraud claims, he is entitled to injunctive relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that HP's 2012 Proxy Statement is false and misleading in violation of §14(a) of the Exchange Act and the Board's duty of candor and declaring it null and void and ordering a new Annual Meeting of Shareholders or special meeting of shareholders under the supervision of a Trustee or Special Master after the preparation and distribution of a replacement Proxy Statement prepared in compliance with all federal disclosure laws and rules;

B.     Declaring the 2010-2012 Proxy Statements false and misleading in violation of §14(a) of the Exchange Act and the respective directors' duty of candor and awarding to HP the damages caused the Company as a result thereof;

C.     Declaring that the current and former directors of the Company named as defendants herein have breached their fiduciary duties as alleged herein causing substantial damages to HP;

D.     Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

E.     Requiring the Individual Defendants to repay the Company to the extent they have been unjustly enriched by their wrongful conduct as described

herein together with their earnings upon such amounts;

     F.     Ordering the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

     G.     Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

     H.     Granting such other and further relief as this Court may deem just and proper.

Dated: November 1, 2012

/s/
Richard D. Greenfield, *pro hac vice*
Ilene F. Brookler, #269422
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY  10013
Tel: 917-495-4446
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

Rose F. Luzon #221544
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
rluzon@sfmslaw.com_____

Scott R. Shepherd
SHEPHERD, FINKELMAN,
MILLER& SHAH, LLP
35 E. State Street
Media, PA  19063
Tel: 610-891-9880
sshepherd@sfmslaw.com

**Counsel for Plaintiff**